**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KIM YOUNG, RONALD JOHNSON, and WILLIAM JONES, on behalf of themselves and a class of others similarly situated,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 06 C 552** |
| **COUNTY OF COOK, MICHAEL F. SHEAHAN, CALLIE BAIRD, SCOTT KURTOVICH, and SALVADOR GODINEZ,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Kim Young, Ronald Johnson, and William Jones, on behalf of themselves and two certified classes, have sued former Cook County Sheriff Michael Sheahan and Sheriff's employees Callie Baird, Scott Kurtovich, and Salvador Godinez (collectively the Sheriff Defendants), as well as Cook County, under 42 U.S.C. § 1983. Plaintiffs allege violations of their Fourth and Fourteenth Amendment rights during the time they were confined as pretrial detainees at the Cook County Jail (CCJ). Cook County and the Sheriff Defendants have moved separately for summary judgment, and plaintiffs have moved for partial summary judgment on the issue of liability.

**Facts**

On cross-motions for summary judgment, the Court construes facts and draws inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 469 (7th Cir. 2006).

**1.     CCJ and the defendants**

During the class period, CCJ housed, at any given time, approximately 10,000 pretrial detainees in ten residential divisions.  Women are housed in two of the divisions, and men are housed in nine of them (one division houses both women and men).  New detainees enter CCJ through the Receiving Classification and Diagnostic Center (RCDC).  The RCDC contains separate areas for men and women.  Between 250 and 350 detainees are booked into and out of CCJ daily, of which approximately 300 detainees are men and thirty to forty are women.

Most of the detainees arriving at CCJ have already had a probable cause hearing before a judge.  Though defendants contend they do not know the nature of charges pending against detainees when they arrive at the RCDC, the evidence they cite on this point does not support that contention.  Rather, the evidence shows that the RCDC staff has information identifying the specific offense(s) with which each detainee has been charged, though a charge is not expressly classified as a felony or a misdemeanor.

The Sheriff Defendants were all high-ranking officials in the Sheriff's office during times relevant to plaintiffs' claims.  Sheahan was the Cook County Sheriff from December 1990 to December 2006.  As Sheriff, Sheahan was the custodian of CCJ

under Illinois law.  *See* 55 ILCS 5/3-6017.  Sheahan had policymaking authority over CCJ, including with regard to strip search policies.

Baird was the director of the Cook County Department of Corrections (CCDC) from July 2003 until November 2004.[1]  She was succeeded by Kurtovich, who served as director from November 2004 until June 2006.  In turn, Godinez followed Kurtovich as director of CCDC and continues to hold that position currently.  Baird, Kurtovich, and Godinez all had policymaking authority over intake strip searches at CCJ during their respective tenures as directors of CCDC.  This responsibility included ensuring CCJ's policies concerning intake strip searches complied with federal and state law.

**2.      Procedures and strip searches at CCJ**

All new detainees entering CCJ are visually strip searched for the purpose of finding contraband.  The search involves a visual inspection of the detainee's naked body, including his or her body cavities.  Most detainees arriving at the RCDC enter CCJ's general population, regardless of the type of charge they are facing.

Defendants have submitted over 2000 pages of contraband reports, spanning several years, that they contend show a pervasive problem of detainees attempting to bring contraband into CCJ.  Contraband, as defined in a jail setting, includes paper money, loose change, and cigarettes, as well as weapons and drugs.  The majority of these 2000-plus pages of reports appear to deal with contraband that is not inherently dangerous, such as money.

Defendants contend that weapons and drugs have been "routinely" found in

---

[1]Witnesses used the terms "director" and "executive director" of CCDC interchangeably in their depositions.  Both terms refer to the same position.

possession of detainees arriving at the RCDC. Sheriff Defendants' Local Rule 56.1 Statement ¶ 26. Defendants do not, however, cite to any evidence supporting their claim that these items are "routinely" found. Rather, they cite general testimony about the types of contraband found over the years and refer to the 2000 pages of contraband reports as a group without providing detail regarding how many of those reports concern drugs, weapons, or other dangerous items. As plaintiffs correctly point out, however, it is not the Court's responsibility to go hunting through a record of this size unguided to try to find a factual dispute. Rather, it is the parties' obligation to draw the Court's attention to evidence they contend is relevant. *See, e.g.*, *Roger Whitmore's Auto Serv., Inc. v. Lake County*, 424 F.3d 659, 664 n.2 (7th Cir. 2005); *Ogdon v. Hoyt*, 409 F. Supp. 2d 982, 986-87 (N.D. Ill. 2006). Defendants have not satisfied this obligation by their general citation to the mass of contraband reports.

Similarly, the Sheriff Defendants contend that "[b]ased on the contraband report, misdemeanants were just as likely to carry contraband as detainees charged with more serious crimes." Sheriff Defendants' Local Rule 56.1 Statement ¶ 28. To support this contention they cite the testimony of their expert witness and contraband reports as a whole. The citation to defendants' expert does not support that statement. Defendants' expert testified that he considered the contraband reports as part of his opinion but did not indicate how many, if any, of those reports involved detainees charged with misdemeanors. And, as noted above, defendants' blanket citation to the 2000 pages of reports likewise does not properly support their contentions. In their briefs, defendants cite five specific examples from the reports of detainees allegedly charged with misdemeanors having been found with contraband, including weapons or drugs. *See*

4

Sheriff Defendants' Reply in Supp. of their Mot. for Summ. J. Based on Constitutionality of Search Policies at 4 (citing Sheriff Defendants' Local Rule 56.1 Statement Ex. 10 at QH 384, 421, 423, 461); Sheriff Defendants' Mem. in Supp. of their Mot. for Summ. J. Based on Qualified Immunity at 4 (citing Sheriff Defendants' Local Rule 56.1 Statement Ex. 10 at QH 470). They do not, however, provide any basis to support their contention that these events occur "routinely." Sheriff Defendants' Local Rule 56.1 Statement ¶ 26. Moreover, as discussed below, the evidence does not support defendants' contentions regarding the five suggested examples.

In addition, defendants have provided no information regarding how many of the 2000-plus contraband reports involve detainees charged with non-weapon, non-drug misdemeanors, much less how many such detainees were found to possess weapons or drugs. Plaintiffs correctly point out that the contraband reports do not always indicate whether the contraband was found in a detainee's body pursuant to a strip search or was instead found in a detainee's clothes (e.g., loose change in a pocket). The difference is significant; a strip search would not be needed to find items in pockets.

The searches conducted during the class period involved having detainees strip naked, bend over, and spread their buttocks, or by having the detainees squat and cough multiple times. Strip searches were conducted without regard to the seriousness of the charges against an individual detainee and without individualized reasonable suspicion that a strip search was necessary. Defendants contend that the seriousness of the charges against any given detainee had been considered by a judge at bond court prior to the commitment of the detainee to CCJ. Though true, this does not contradict plaintiffs' contention that new detainees were strip searched at CCJ

5

regardless of the level or the nature of the offense charged. As a result, a detainee who (for example) was unable to make bail on a misdemeanor charge was strip searched.

New female detainees arriving at CCJ ordinarily were not strip searched at the RCDC. Rather, they were searched with a body scanning machine at the RCDC and were later strip searched upon arrival at the residential division to which they were assigned. The women were strip searched in open-faced cubicles, a space similar to that provided by a privacy screen in a doctors' office, with dimensions of approximately five feet by five feet. Each cubicle contained a chair for the women's clothes, and the detainees could not see individuals in other cubicles. Throughout the class period, the squat-and-cough method was used for female detainees, not the bend-and-spread method.

The search procedures differed for male detainees. They were strip searched both at the RCDC and a second time upon arrival at a housing division. The strip searches at the RCDC were conducted using the bend-and-spread method until approximately February 2006. Since then, male detainees at the RCDC have been searched using the squat-and-cough method. Despite defendants' contentions to the contrary, the Rule 30(b)(6) witness for CCDC indisputably testified that he was not aware of any justification for using the bend-and-spread method for the men as opposed to the squat-and-cough method prior to February 2006. He also acknowledged that the squat-and-cough method is a more dignified way to conduct a search. The squat-and-cough method is as effective in conducting searches as the bend-and-spread method, and CCJ has not experienced any problems due to the

change in methodology.

At the RCDC, male detainees were lined up in a hallway for their strip search. At times, detainees would cover the entire length of the hallway wall. Plaintiffs allege that the RCDC staff did not conduct searches until the holding bullpen was full, but defendants have presented evidence that searches sometimes take place before the bullpen was full. Defendants admit that guards took groups of seventy-five men for strip searches in the hallway, but they note that the last group searched at night was typically smaller. Plaintiffs present evidence that strip searches were occasionally conducted in a group of over 100 detainees at the same time, though defendants dispute that more than seventy-five detainees were ever searched at a time. CCDC's Rule 30(b)(6) witness could not rule out the possibility, however, that more than eighty detainees were sometimes searched in a single group at the RCDC.

The RCDC hallway where male detainees were strip searched in groups did not contain any privacy screens before January 31, 2007. Defendants' expert, Norman Carlson, is unaware of any other jails that have conducted group strip searches without privacy dividers in the last twenty years. When his deposition was taken in November 2006, CCDC's Rule 30(b)(6) witness stated that he was unaware whether CCDC had ever investigated the possibility or cost of installing privacy dividers in the hallway where men were strip searched at the RCDC. In or around February 2007, privacy screens were installed in the hallway where groups of men are strip searched at the RCDC.[2]

_____

[2]Defendants argue that evidence regarding the privacy screens is inadmissible as a subsequent remedial measure. Federal Rule of Evidence 407 "does not require the exclusion of evidence of subsequent measures when offered  [to demonstrate]
(continued...)

7

The screens were spaced approximately four feet apart, and the hallway was large enough to accommodate thirty-seven stalls.  Since the stalls were installed, the number of men searched at one time has been limited to the number of available stalls. Defendants dispute this is the case, but the evidence they cite does not support their contention.  Sometime after January 2007, a body scanning machine was also installed in the male section at the RCDC.  The parties dispute how long it takes the machine used on the male side of the RCDC to complete a scan.

Plaintiffs and defendants both compare defendants' policies to those used by the federal Bureau of Prisons (BOP).  Defendants concede that BOP's procedures for strip searches of incoming detainees are reasonable under the circumstances facing BOP. By 1987, all BOP facilities had privacy screens for all detainees undergoing strip searches.  Defendants' expert witness is unaware of any jurisdictions other than Cook County that conduct strip searches of all detainees charged with misdemeanors without giving them the option to avoid a strip search by remaining outside of the jail's general population.

**3.      Plaintiffs' claims**

Plaintiff Jones is a fifty-two year-old man.  He was taken to CCJ after failing to comply with a condition of his bond for a misdemeanor traffic violation.  During his intake at CCJ, Jones was strip searched with a group of fifty other men.  Jones claims

---

[2](...continued)
feasibility of precautionary measures, if controverted . . . ."  Fed. R. Evid. 407. Defendants argue that use of privacy dividers and body scanning machines were and are not always feasible for a number of reasons.  The Court has considered evidence of subsequent measures taken by defendants only to the extent it bears on these feasibility issues, which the Court addresses further in the discussion below.

that during the search, he and the other men were lined up shoulder-to-shoulder and were required to bend over with their buttocks spread apart while a guard walked up and down the line. Defendants deny that the men in the group strip search would have touched each other and claim they would have been at least six inches apart based on the practice at CCJ. After posting bond later that same night, Jones was released from custody.

Plaintiff Johnson is a forty-four year-old man. He was arrested for felony possession of a controlled substance. Johnson alleges he was falsely arrested. He was taken to CCJ and strip searched in a hallway, allegedly with 100 other men. Johnson claims the search was so crowded that the naked men were touching each other. Defendants cite Johnson's deposition testimony to contend that the prisoners during the search were not touching each other. This takes Johnson's testimony out of context. When read in its entirety, it is clear that Johnson only denied that someone reached out and affirmatively tried to touch him. *See* Sheriff Defendants' Resp. to Pls.' 56.1 Statement Ex. 4 at 59-64. He unequivocally stated the crowding of the search resulted in poisoners touching each other: "Q. Nobody touched you or nobody touched you in the way that you were offended by? A. Offended by. I mean it was so crowded, I was touched but it wasn't done offensively." *Id.* at 59:23-60:2.

Plaintiff Young is a forty-seven year-old woman. She was arrested for failure to appear in court on a misdemeanor traffic violation and was taken to CCJ. While waiting for delivery of $200 for her bond, Young was subjected to an intake strip search.

On April 25, 2007, the Court, pursuant to Federal Rule of Civil Procedure 23, certified two classes of plaintiffs. Class I consists of "all males who were subjected to a

strip search and/or a visual body cavity search as new detainees at the Cook County Jail on or after January 30, 2004." Dkt. No. 92 at 16. Jones and Johnson are the class representatives for Class I. Class II consists of "all persons charged only with misdemeanor or lesser offenses not involving drugs or weapons who were subjected to a strip search and/or a visual body cavity search as new detainees at the Cook County Jail on or after January 30, 2004." *Id.* Jones and Young are the class representatives for Class II.[3]

In addition to information about the class representatives, plaintiffs have submitted sworn declarations from over 500 men, selected randomly, who were strip searched at the RCDC during the class period. Defendants dispute the factual content of these declarations based on testimony regarding the general experiences of CCJ officials and employees, but not based on first-hand knowledge concerning the specific allegations contained in the declarations. Cook County also repeatedly contends that none of the affidavits are trustworthy, but it has submitted no evidence in support of that contention.

One RCDC employee testified that detainees have about six inches of space between each other during the strip searches. In nearly ninety percent of the declarations submitted by plaintiffs, the declarants claimed that the strip searches at the RCDC were so crowded that detainees made physical contact with one or more other

---

[3]Cook County contends that Jones and Young were not arrested on misdemeanors and cannot represent Class II. The Court rejected that argument in granting the motion for class certification. *Young v. County of Cook*, No. 06 C 552, 2007 WL 1238920, at *6 (N.D. Ill. Apr. 25, 2007). Cook County has presented no new evidence that would call for reconsideration of the previous ruling.

detainees.  Most declarants also reported being able to see other detainees' naked bodies.  Cook County contends that the detainees do not see each other because they are ordered to face the wall or look at the floor.

Though not necessarily experienced by the class representatives, many of the declarations submitted by plaintiffs detail additional problems during the group strip searches at the RCDC.[4]  Many of the declarants complained of strong, foul odors during the strip searches.  The declarants also claim that bodily fluids were often present during the male group strip searches.  Defendants dispute how often such fluids – including vomit, diarrhea, and blood – were actually present during searches.  Over 400 of plaintiffs' declarants also claim that the guards used insults or abusive language during strip searches.  These included insults about body odor, anatomy, sexual orientation, and race.  On occasion, entire groups would be required to repeat the strip search, or portions of it, after one detainee made a mistake during the process.  Plaintiffs contend that dogs were used to threaten, frighten, and intimidate detainees during strip searches and that at times the dogs were not muzzled or leashed.  Defendants deny these contentions and claim that dogs were only used occasionally in the search area.

Plaintiffs also claim that the Sheriff Defendants never looked into how often

_____

[4]To dispute most of the allegations made by the declarants, defendants rely only on the deposition testimony of the class representatives – specifically, the absence of testimony by the class representatives regarding similar allegations.  Unless they denied observing those conditions, the fact that the class representatives did not testify about them does not mean they did not experience or observe them; rather, it reflects only that defendants' counsel did not ask questions about them during the depositions. Moreover, the fact that a class representative did not experience a particular adverse condition at the RCDC is not evidence that the same was true of the declarants.

11

individuals accused of misdemeanors brought contraband items to CCJ.  Defendants

dispute this, citing generally to exhibit 10 to the Sheriff Defendants' Local Rule 56.1

statement.  As noted above, defendants' submissions provide minimal detail about

these 2000-plus pages of reports.  The reports do not indicate whether the detainees

identified in them were charged with misdemeanors or felonies.  Moreover, defendants

cite no evidence indicating that CCJ officials considered these reports or other similar

information before adopting the blanket strip search policy for all detainees, including

those charged with misdemeanors.  Indeed, many of the contraband reports are from a

period long after the strip search policy had been implemented.  CCDC's Rule 30(b)(6)

witness testified that he could not recall a specific instance of a strip search of a

detainee charged with a non-drug, non-weapons misdemeanor that resulted in the

discovery of drugs or weapons.

## Discussion

Summary judgment is appropriate if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To determine whether a genuine

issue of material fact exists, the Court must view the record in the light most favorable

to the nonmoving party and draw reasonable inferences in that party's favor.  *Anderson

v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d

467, 471 (7th Cir. 2002).  A genuine issue of triable fact exists only if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*,

477 U.S. at 248. "The fact that plaintiff and defendants have filed cross-motions for summary judgment does not change the applicable standard. The Court must consider each motion independently and must deny both motions if there is a genuine issue of material fact." *Egan Marine Corp. v. Great Am. Ins. Co. of N.Y.*, 531 F. Supp. 2d 949, 953 (N.D. Ill. 2007) (citations omitted).

**1.      Motion to strike plaintiffs' Local Rule 56.1 statement**

The Sheriff Defendants have moved to strike plaintiffs' Local Rule 56.1 statement and ask the Court to deny plaintiffs' motion for summary judgment due to their alleged failure to comply with the local rule. They first take issue with paragraphs 1-8, 16-28, and 126-29 of plaintiffs' statement on the ground that the facts contained in those paragraphs are immaterial. The Sheriff Defendants' only explanation regarding immateriality is that plaintiffs do not cite these paragraphs in their summary judgment brief. Nothing in the local rule, however, requires a summary judgment movant to cite to each paragraph of its statement of facts in its motion or brief. Moreover, the paragraphs the Sheriff Defendants seek to strike clearly contain material facts concerning the plaintiffs, their claims, and the defendants' procedures and policies – facts that are so fundamental that they form the basis of the parties' dispute.

The Court denies the motion to strike with respect to paragraphs 1-8, 16-28, and 126-29. The Court grants the motion with respect to paragraph 77 because it is immaterial for present purposes. In that paragraph, plaintiffs note that defendants' expert witness was the main defendant in the seminal Supreme Court case of *Bell v. Wolfish*, 441 U.S. 520 (1979).

Next, the Sheriff Defendants contend that a number of paragraphs in plaintiffs' statement do not comply with Local Rule 56.1 because they contain multiple factual assertions or multiple sentences and are overly descriptive of the evidence cited for support. To the extent these are technical violations of Local Rule 56.1 – it is not clear that they are – the Court, in its discretion, chooses to excuse them. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (noting that district courts have discretion to overlook failure to comply strictly with local rules regarding summary judgment). The Court also notes that defendants have not complied with Local Rule 56.1 in every paragraph of their factual statements. The Court has chosen to consider all proper evidence submitted by each of the parties, regardless of whether it was presented in strict compliance with Local Rule 56.1.

The Sheriff Defendants also contend that paragraphs 43-54 of plaintiffs' factual statement are inadmissible hearsay. Those paragraphs report statements made in articles that appeared in the Chicago *Tribune*. Plaintiffs counter that the articles are not hearsay because they are only submitted for purposes of demonstrating that defendants were on notice regarding claims about the conditions at CCJ – an issue that does not appear to be seriously disputed. The Court declines to strike paragraphs 43-54 but has not considered those paragraphs for purposes of this motion.

Last, the Sheriff Defendants challenge plaintiffs' submission of affidavits by class members regarding conditions at CCJ and, specifically, their experiences during strip searches. The Sheriff Defendants claim it is inappropriate for the Court to consider these affidavits because none of them were submitted by detainees who were processed and searched at the exact same time as the class representatives.

Defendants have not, however, cited any authority to support their contention, and their argument makes no sense: the claims of the class concern defendants' practices over an extended period. In any event, the Seventh Circuit and other judges in this district have considered similar affidavits, without commenting on the propriety of doing so. *See, e.g.*, *Little v. Walker*, 522 F.2d 193, 194 (7th Cir. 1977) (considering affidavits of putative class members regarding attacks in Illinois prisons on review of order dismissing complaint); *Bullock v. Sheahan*, 568 F. Supp. 2d 965, 975 (N.D. Ill. 2008) (considering affidavits submitted by class members regarding manner and conditions of strip searches in support of summary judgment motion); *Doe v. Calumet City*, 754 F. Supp. 1211, 1213-15 (N.D. Ill. 1990) (same). It is appropriate to consider the affidavits of class members submitted in support of plaintiffs' motion for summary judgment to the extent those affidavits contain admissible evidence. The Court denies the Sheriff Defendants' motion to strike these affidavits.

## 2.     Class II plaintiffs

Plaintiffs and defendants both contend they are entitled to summary judgment with respect to the claims of the Class II plaintiffs – detainees charged with misdemeanor offenses not involving drugs or weapons who were strip searched, including a visual body cavity search, upon intake into CCJ. Defendants admit that all detainees entering CCJ, including those in Class II, are strip searched. It is also undisputed that these searches were conducted without making individualized reasonable suspicion determinations.

Pretrial detainees retain their constitutional rights, including the protections of the

Fourth Amendment against unreasonable searches and seizures. *Bell*, 441 U.S. at 545; *Thompson v. County of Cook*, 412 F. Supp. 2d 881, 888-89 (N.D. Ill. 2005). Those rights, however, are limited due to the realities of confinement, most importantly the need to maintain security and order in jails and prisons. *Bell*, 441 U.S. at 545-46 ("There must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.") (internal quotation omitted). Plaintiffs' claims must be evaluated in this light, giving deference to the expertise of jail and prison officials. *Id.* at 546-48. In this regard, the Supreme Court prescribed a balancing test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case, it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559. In *Bell*, the Supreme Court determined that strip and body cavity searches of pretrial detainees that had engaged in contact visits with visitors from outside the jail complied with constitutional standards. *Id.* at 558.

The Seventh Circuit has stated that "the balancing test prescribed in [*Bell*] does not validate strip searches in detention settings *per se*." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983). There are "few exercises of authority by the state that intrude on the citizen's privacy and dignity as severely as" visual body cavity and strip searches. *Id.* (citing authority describing strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission"). "The more intrusive the search, the closer

16

governmental authorities must come to demonstrating probable cause for believing that the search will uncover the object for which the search is being conducted." *Id.* at 1273 (citing *Terry v. Ohio*, 293 U.S. 1, 18 n.15 (1968)).

In *Mary Beth G.*, the plaintiffs claimed that their Fourth Amendment rights were violated by a City of Chicago policy to strip search all female detainees placed in Chicago Police Department detention facilities, without individualized suspicion for conducting the searches. *Id.* at 1267-68, 1273. The plaintiffs had been charged with misdemeanors and were being detained until they could make bond. *Id.* at 1272. The city attempted to justify the strip search policy based on security concerns. *Id.* at 1272-73. There was not, however, evidence that the women being strip searched posed serious security risks. Accordingly, the Seventh Circuit held the searches "bore an insubstantial relationship to security needs so that, when balanced against . . . privacy interests, the searches cannot be considered 'reasonable.'" *Id.* at 1273.

Following *Bell*, courts of appeal have generally ruled that a detainee held on a misdemeanor charge not related to weapons or drugs may not be strip searched absent individualized reasonable suspicion that he or she is carrying such contraband. *See, e.g.*, *Id.* at 1273; *Roberts v. State*, 239 F.3d 107, 112 (1st Cir. 2001); *Shain v. Ellison*, 273 F.3d 56, 62-66 (2d Cir. 2001); *Amaechi v. West*, 237 F.3d 356, 364-65 (4th Cir. 2001); *Chapman v. Nichols*, 989 F.2d 393, 395-96 (10th Cir. 1993); *Maters v. Crouch*, 872 F.2d 1248, 1253-54, 1257 (6th Cir. 1989); *Jones v. Edwards*, 770 F.2d 739, 741-42 (8th Cir. 1985); *Stewart v. Lubbock County*, 767 F.2d 153, 156-57 (5th Cir.

1985).[5]  The crux of these cases is that given the extreme intrusion into personal

privacy that a strip search or body cavity search entails, people charged with minor

offenses that do not involve drugs or weapons are not subject to such searches absent

individualized reasonable suspicion.

A number of courts in this district, including this one, have come to the same

conclusion.  *See Bullock*, 568 F. Supp. 2d at 974-76 (granting summary judgment for

plaintiffs on claim that policy of strip searching all detainees reentering CCJ while

waiting to be discharged after a court appearance violated Fourth Amendment);

*Thompson v. County of Cook*, 428 F. Supp. 2d 807, 812-15 (N.D. Ill. 2006); *Calvin v.

Sheriff of Will County*, 405 F. Supp. 2d 933, 938-45 (N.D. Ill. 2005) (blanket policy of

strip searching detainees arrested for failure to appear in court for misdemeanor and

traffic violation cases violated Fourth Amendment); *Gary v. Sheahan*, No. 06 C 7294,

1998 WL 547116, at *10-13 (N.D. Ill. Aug. 20, 1998) (policy of strip searching female

inmates following judicial determination that they must be released from custody

violated Fourth Amendment); *Doe v. Calumet City*, 754 F. Supp. at 1220-21 (same).

Defendants challenge the continuing validity of *Mary Beth G.* and similar cases,

relying on the Eleventh Circuit's decision in *Powell v. Barrett*, 541 F.3d 1298 (11th Cir.

2008) (en banc).  In *Powell*, the Eleventh Circuit, acknowledging *Mary Beth G.* and

other cases, held that there is no need, when evaluating a Fourth Amendment

_____

[5]The Ninth Circuit has gone even further, finding unconstitutional a police
department policy of strip searching all detainees charged with a felony without any
analysis of individualized suspicion.  *See Kennedy v. Los Angeles Police Dep't*, 901
F.2d 702, 716 (9th Cir. 1990), *overruled in part on other grounds*, *Hunter v. Bryant*, 502
U.S. 224 (1991).  Plaintiffs do not argue for such a broad rule in this case.

challenge to strip searches of detainees, to consider whether the detainees have been arrested for misdemeanors or for more serious crimes. *Id.* at 1309-10. This Court, even if it were so inclined, has no authority to disregard *Mary Beth G.* – even though the Eleventh Circuit believes that case was decided incorrectly.

Defendants focus on the need to maintain security at CCJ, especially with respect to the prevention of violence, as a justification for strip searching the Class II plaintiffs. As noted above, this is an important concern at a facility like CCJ, one that can justify strip searches of detainees. The problem with defendants' contention in this case, however, is that they have not provided an evidentiary basis from which any reasonable jury could find the searches of Class II plaintiffs were reasonable, either with respect to misdemeanor detainees in general or each individual detainee, under the balancing test established in *Bell* and *Mary Beth G.*

Courts have generally required jail officials to have either individualized suspicion or suspicion arising from the nature of the charged offense before conducting a strip search of a detainee charged with a misdemeanor that does not involve drugs or weapons. *See, e.g.*, *Shain*, 273 F.3d at 63; *Roberts*, 239 F.3d at 112 (requiring "a reasonable suspicion that the individual inmate is concealing contraband"); *Masters v. Crouch*, 872 F.2d 1248, 1254 (6th Cir. 1989) (analysis of validity of strip search justification requires "consideration of the nature of the offense and the question of whether there is any reasonable basis for concern that the particular detainee will attempt to introduce weapons or other contraband"); *Stewart*, 767 F.2d at 156-57 (strip searches of "minor offenders awaiting bond when no reasonable suspicion existed that

they as a category of offenders or individually might possess weapons or contraband"
violated Fourth Amendment); *Bullock*, 568 F. Supp. 2d at 975 (requiring "individualized
reasonable suspicion"); *Thompson*, 412 F. Supp. 2d at 890.  Defendants have not
presented any evidence that reasonable suspicion existed to strip search either
members of Class II in general or class representatives Young and Jones specifically.
Nor have defendants attempted to present evidence that individualized suspicion
existed to conduct a strip search of any particular member of Class II.

Lacking any evidence of individualized suspicion of the Class II representatives
or the members of Class II, defendants raise several additional arguments as to why
security concerns at CCJ necessitate the blank strip search policy.  In particular,
defendants cite to the 2000-plus pages of contraband reports to support their argument
that security at CCJ requires strip searching all detainees charged with misdemeanors
that do not involve weapons or drugs.  Those reports, however, would not enable a
reasonable jury to reach that conclusion.  First, many, if not most, of the reports indicate
that the contraband found was money, not drugs or weapons that could lead to violence
at CCJ.  Though CCJ has an interest in preventing detainees from bringing into the jail
non-dangerous contraband, such as money or cigarettes, that type of contraband does
not pose the same security risk so as to justify highly intrusive strip searches of
misdemeanor detainees absent individualized reasonable suspicion.

Second, the reports do not indicate the nature of the charges against the
detainees who possessed contraband.  Thus there is no evidence that members of
Class II or misdemeanor detainees – a subset of all CCJ detainees – routinely
possessed contraband.  The Sheriff Defendants cite specifically to only five of the

contraband reports in their briefs as specific evidence that misdemeanor detainees possessed drugs or weapons. The reports they cite, however, do not indicate the nature of the charges against the detainees in question. Without evidence of the nature of those charges, there is no basis upon which a jury reasonably could find that security concerns justify conducting extremely invasive searches of all Class II members. Though a history of security and violence issues might, along with other considerations, justify a blanket strip search policy, defendants have not presented any evidence that would justify such a policy with respect to misdemeanor detainees.

Finally, the reports do not always indicate whether the contraband was discovered as result of a strip search or instead was found in a detainee's clothing or willingly surrendered. In the five reports cited in the Sheriff Defendants' briefs, two of them involved finding contraband in pockets or shoes, and in one instance, the detainee voluntarily handed the contraband to officers. One report does not state whether the contraband was found in the detainee's body cavities or clothes. Only one of those five reports involved contraband discovered during a squat-and-cough visual body cavity search. This is insufficient, as a matter of law, to justify highly intrusive strip searches of detainees charged with minor offenses without individualized reasonable suspicion that they possess contraband or pose a security risk. *Roberts*, 239 F.3d at 112 ("The lack of specific instances where a body cavity search was necessary to discover contraband supports a finding that the policy of searching all inmates is an unreasonable one."); *Calvin*, 405 F. Supp. 2d at 944.

Defendants also argue that strip searches of the persons in Class II are justified because members of that class were admitted to the general population at CCJ, where

they would come into contact with detainees facing more serious charges and might be attempting to smuggle contraband to them. Though the Supreme Court in *Bell* recognized the security risk posed by detainees that could attempt to smuggle dangerous contraband into jail following a contact visit, *Bell*, 441 U.S. at 558-60, the Class II plaintiffs present a different situation. Unlike detainees returning from contact visits who may have planned to use such a visit in an effort to obtain contraband and hide it in a body cavity, there is no basis to think the Class II plaintiffs knew they were about to be arrested, depriving them of the opportunity to hide something in their bodies. *See Shain*, 273 F.3d at 63; *Thompson*, 412 F. Supp. 2d at 890. The unexpected nature of the detainees' arrest also undermines any deterrence argument, contrary to the situation with the plaintiffs in *Bell*, who could have used scheduled contact visits as an opportunity to attempt to smuggle contraband. *Shain*, 273 F.3d at 63.

Second, though intermingling with general prisoners may be one factor in evaluating the reasonableness of a strip search policy, that fact standing alone is not enough to justify strip searches in the absence of individualized reasonable suspicion. *See Chapman v. Nichols*, 989 F.2d 393, 396 (10th Cir. 1993); *Masters*, 872 F.2d at 1254; *Calvin*, 405 F. Supp. 2d at 943.[6] It is telling that defendants' own expert testified that he is not aware of any jail that conducts strip searches of all detainees charged

---

[6]One ruling in this district implies that strip searches may be reasonable where the detainee will intermingle with the general jail population. *See Roscom v. City of Chicago*, 570 F. Supp 1259, 1262 (N.D. Ill. 1983). That case did not address the issue at great length or consider whether prisoner mingling renders strip searches reasonable *per se*. Moreover, *Roscom* was decided before the Seventh Circuit's ruling in *Mary Beth G.*, which does not prescribe such a rule.

only with misdemeanors without giving those detainees the option to remain outside of the jail's general population.

Moreover, courts have noted that a general policy to place detainees charged with minor offenses in the general jail population along with persons charged with more serious crimes does not justify a blanket strip search policy. *See Roberts*, 239 F.3d at 112-13; *Chapman*, 989 F.2d at 396; *Calvin*, 405 F. Supp. 2d at 944-45 (holding that "administrative concerns such as 'space constraints' are not sufficient to justify blanket strip search policies"). The Court finds the reasoning of those cases persuasive in light of past rulings by the Supreme Court and the Seventh Circuit. As discussed above, *Bell* and *Mary Beth G.* require this Court to balance CCJ's interests against the severity of the searches that were conduced on members of Class II. Defendants have not offered an explanation or any evidence as to why all misdemeanor detainees must be held in CCJ's general population. Instead, they rely on their general contentions about jail security, exactly the kind of reasoning the courts cited above found insufficient to justify blanket strip search policies for misdemeanor detainees. After balancing the interests in this case, the Court is persuaded that the CCJ's choice of a policy that permits misdemeanor detainees to have contact with detainees charged with more serious offenses does not come close to outweighing the serious infringement on a misdemeanor detainee's Fourth Amendment rights that occurs when a strip search is conducted.[7] No reasonable jury could reach the opposite conclusion.

---

[7]The Court also notes that Illinois law (though it does not affect plaintiffs' constitutional claims) requires, whenever possible, that detainees charged with minor offenses be housed separately from those charged with felonies. *See* 20 Ill. Admin.

(continued...)

If CCDC officials suspect a particular detainee may be attempting to smuggle contraband into the jail's general population (e.g., based on criminal history), they may have reasonable suspicion to conduct a strip and body cavity search of that detainee. *See Calvin*, 405 F. Supp. 2d at 944. But the possibility that this could occur in a given case does not justify conducting such searches against all detainees charged with misdemeanors that do not involve weapons or drugs.

Finally, defendants argue that the strip search procedure at CCJ is justified because a judge has already found probable cause that an offense has been committed by a detainee. The First Circuit found this was not a compelling reason that would justify a strip search of a detainee being held on a minor traffic violation. *Roberts*, 239 F.3d at 111. The Court agrees with the First Circuit. The existence of probable cause that a detainee committed a misdemeanor, by itself, has nothing to do with whether that detainee might have contraband on him or might attempt to smuggle contraband into CCJ. Defendants offer no explanation why a finding of probable cause that an individual has committed a misdemeanor unrelated to drugs or weapons provides any basis for conducting a highly intrusive strip or body cavity search of that detainee.

In light of *Mary Beth G.* and numerous similar rulings in other cases, the strip searches of all detainees held on misdemeanor or lesser charges not involving drugs or weapons, without individualized reasonable suspicion, violated their Fourth Amendment rights as a matter of law. No reasonable jury could find otherwise. As one judge in this

---

[7](...continued)
Code § 701.70(b)(4).

district summarized:

> The facts in cases where searches have been upheld suggest some reasonable cause on the part of the authorities to suspect that the detainees might be trying to smuggle weapons or contraband into the jail. Such cause may be furnished by the nature of the offense or the nature of the offender.

*Simenc v. Sheriff of DuPage County*, No. 82 C 4778, 1985 WL 4896, at *3 (N.D. Ill. Dec. 9, 1985). Defendants have not presented any evidence that blanket strip searches are necessary with respect to the members of Class II generally. Nor have they presented evidence of individualized suspicion of the class representatives or other members of Class II to justify the strip searches. Weighing the nature of the searches at issue against the justifications and evidence provided by defendants, no reasonable jury could find defendants' policies with respect to the Class II plaintiffs complied with the requirements of the Fourth Amendment. Accordingly, the Class II plaintiffs are entitled to summary judgment on their Fourth Amendment claims.

**3.     Class I plaintiffs**

Class I includes "all males who were subjected to a strip search and/or a visual body cavity search as new detainees at the Cook County Jail on or after January 30, 2004." Dkt. No. 92 at 16. Plaintiffs challenge the searches of the Class I members under the Fourth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Both sides contend they are entitled to summary judgment with respect to the Class I plaintiffs.

**a.     Fourth Amendment**

For purposes of the summary judgment motions, plaintiffs concede that it is

proper for CCJ to conduct strip searches of the Class I members in groups. They

challenge the manner in which those group searches were conducted. Defendants

argue that the manner in which the searches were conducted did not violate the Fourth

Amendment as a matter of law.

*Bell v. Wolfish* is again the starting point for the Court's analysis. The Supreme

Court made clear, otherwise permissible strip "searches must be conducted in a

reasonable manner." *Bell*, 441 U.S. at 560; *see also Campbell v. Miller*, 499 F.3d 711,

718 (7th Cir. 2007) (finding unreasonable a strip search conducted in the backyard of a

house in full view of the public).

The full extent of the circumstances of the group searches of the Class I

members is factually disputed. The following facts concerning those searches,

however, are undisputed: (1) men at CCJ have been routinely strip searched in groups

of up to at least seventy-five individuals; (2) until approximately February 2007, there

were no privacy screens in the hallway where the members of Class I were searched at

the RCDC – meaning they were searched in full view of the other detainees in the

group being searched[8]; (3) on occasion, bodily fluids have been present in the hallway

where the searches of the Class I members occurred; (4) the members of Class I had,

at times, no more than six inches of space between each other during the strip

---

[8]Defendants attempt to dispute whether Class I members could see each others'
naked bodies by stating that the detainees are ordered to look forward or down at the
floor. Though defendants are entitled to reasonable inferences in response to plaintiffs'
motion, no reasonable fact finder could infer that seventy-five naked men standing in
close quarters for purposes of a strip search will not, incidental to those circumstances,
observe other men's naked bodies. Such an inference would defy common sense.
Regardless, it is undermined by the unrebutted class member declarations submitted by
plaintiffs.

searches before the privacy screens were installed; (5) individuals in the group searches, prior to the installation of the privacy screens, would accidentally bump into and touch each other; and (6) prior to some time in 2006, men were searched using the less dignified bend-and-spread method, whereas women were searched using the squat-and-cough method.

In light of these undisputed facts, the Court finds that the strip searches of the members of Class I before the privacy screens were installed at the RCDC were unreasonable and violated the Fourth Amendment as a matter of law. During that period, the class members, who were undergoing one of the most intrusive types of searches the government may permissibly conduct, were subjected to conditions that greatly enhanced their discomfort and humiliation. They were herded together with dozens of other men and forced to strip and bend over or squat in front of a large group, with less than a foot of space between them.

Though the officials at CCJ were entitled to conduct these strip searches (except as to Class II members) so long as they did so in a safe and efficient manner, the extreme conditions of the searches violated the Fourth Amendment. The search in *Campbell* was not conducted at a jail, but that case is still instructive for the Seventh Circuit's clear denunciation of the search of a naked detainee in public view. *Campbell*, 499 F.3d at 718-19 (collecting cases); *see also Amaechi*, 237 F.3d at 361-62 (noting that reasonableness of strip search depends in large part on whether it was conducted in private). "When [strip] searches are conducted in public, the intrusion is considered even more severe." *Bullock*, 568 F. Supp. 2d at 975 (citing *Campbell*, 499 F.3d at 718-19) (holding strip search at CCJ violated Fourth Amendment as a matter of law).

Defendants' attempt to distinguish *Campbell* on the basis that the search in that case occurred at a private residence is unpersuasive. Finding that strip searches in "public" violate constitutional principles, the Seventh Circuit cited cases where the "public" search was conducted at a detention facility. *See Campbell*, 499 F.3d at 719 (citing *Hill v. Bogans*, 735 F.2d 391, 392, 395-95 (10th Cir. 1984); *Logan v. Shealy*, 660 F.2d 1007, 1010 (4th Cir. 1981)).

*Elliott v. Lynn*, 38 F.3d 188 (5th Cir. 1994), cited by defendants, provides an instructive contrast to the pre-privacy screen searches conducted at the RCDC. In *Elliott*, the warden ordered an institution-wide "shakedown" at a Louisiana penitentiary that included strip searching every prisoner incarcerated there. *Id.* at 189-90.[9] This was done in response to a rash of murders, stabbings, and other attacks among the general population at the prison. *Id.* The plaintiffs in *Elliott* did not challenge the propriety of conducting strip searches, just the manner in which they were conducted. *Id.* at 190. Due to the need to search all 3,164 prisoners as quickly as possible, the prisoners were searched in groups of five or six in one area of the prison while fifty-five other inmates were present awaiting inspection. *Id.* There is no indication that the prisoners were piled together without personal space while being searched; rather, the searches took place in small groups while other prisoners stood apart from those being searched. The Fifth Circuit found the searches were reasonable under the circumstances, especially considering the need to conduct them quickly. *Id.* at 191-92.

---

[9]As convicted prisoners, those searched in *Elliott* enjoyed even more limited constitutional protections against unreasonable searches than the pretrial detainees in the current case. *See Thompson*, 412 F. Supp. 2d at 888-89 (collecting cases).

The current case involves far less pressing needs, as there is no contention that violence would erupt if the searches of the Class I plaintiffs were conducted with fewer detainees at a time. Though other prisoners were present and possibly watching the searches in *Elliott*, that was due only to the emergency situation. Even facing such circumstances, the prison officials in *Elliot* searched only five to six men at a time, thereby calculating their efforts to preserve some dignity. Defendants submit no evidence that they made any such efforts during the period before they installed the privacy screens.

Defendants contend that privacy screens or partitions are not constitutionally required, and state, in this regard, that "[i]institutional security trumps detainees' desires." Sheriff Defendants' Resp. to Pls.' Mot. for Summ. J. at 12. This contention implicates the feasibility of using screens in the RCDC hallway because defendants are arguing that the desire for privacy screens must give to way to security concerns. Such a contention, however, is undermined by the fact that in 2007, privacy screens were installed in the hallway at the RCDC and have been used without problems since that time. Moreover, defendants' expert witness testified that he was unaware of any facility (other than CCJ) that has conducted group strip searches without providing some sort of privacy partitions for the last two decades.

Based on the undisputed facts, no reasonable jury could find that the group strip searches of the Class I members prior to the installation of the privacy screens complied with the requirements of the Fourth Amendment. Accordingly, the Court enters summary judgment as to liability in favor the Class I plaintiffs for searches occurring before the installation of the privacy screens in the hallway at the RCDC in or

around February 2007.

The Court will not, however, grant either side's motion for summary judgment with respect to Class I's alleged Fourth Amendment violations for the period after the privacy screens were installed at the RCDC. Disputed questions of material facts exist with respect to those searches. Those disputed facts include, at a minimum, (1) whether the privacy screens were always used; (2) the frequency and prevalence of bodily fluids present in the strip search area; (3) the alleged use of dogs for intimidation and humiliation purposes; and (4) other allegedly abusive conduct by CCJ officials. Though any one of these allegations, if proven by plaintiffs, arguably might not cause the searches to violate the Fourth Amendment, proof of some or all of them might be sufficient to do so. Accordingly, due to the existence of disputed factual issues, the Court denies plaintiffs' and defendants' motions for summary judgment on this part of Class I's claims.

### b. Equal protection

The Class I plaintiffs also claim that the manner of the group strip searches conducted at the RCDC violates the Equal Protection Clause of the Fourteenth Amendment because male detainees were searched in a significantly different manner than female detainees, without justification for doing so. One difference between the male and female searches is that the female searches were conducted with privacy screens long before the men. Another difference has to do with the use of body scanning machines. As with the Class I plaintiffs' Fourth Amendment claims, the facts are undisputed with respect to certain aspects of the strip searches prior to the time when the privacy screens were installed at RCDC. Accordingly, the Court will analyze

30

the propriety of summary judgment based on those limited, undisputed facts.

It is undisputed that the strip searches policies upon entry to CCJ expressly treated men and women differently.  When a "challenged policy expressly discriminates . . . on the basis of gender, it is subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment."  *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723 (1982).  A proponent of a policy that treats men and women in a significantly different way, as in this case, "must carry the burden of showing an exceedingly persuasive justification for the differing treatment.  The burden is met only by showing at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Id.* at 724 (internal quotations omitted); *see also Mary Beth G.*, 723 F.2d at 1273-74 (applying the same rule in context of strip search policies).  This comports with the general rule that gender-based classifications are subject to heightened scrutiny.  *Varner v. Ill. State Univ.*, 226 F.3d 927, 934 (citing *J.E.B. v. Alabama*, 511 U.S. 127, 136 (1994)); *Bullock*, 568 F. Supp. 2d at 973.

Defendants cite institutional security as a justification for the difference in the strip search policies between male and female detainees.  Specifically, defendants focus on the greater number of men held at CCJ and processed through the RCDC.  Defendant Sheahan made a similar argument in *Bullock*.  *See Bullock*, 568 F. Supp. 2d at 972, 974 & n.2.  Defendants certainly had a legitimate interest in processing detainees entering CCJ in a safe and efficient manner.  They have not, however, presented any evidence that the difference in search policies between men and women

"substantially furthers" that interest.  *See J.E.B.*, 511 U.S. at 136-37; *Mary Beth G.*, 723 F.2d at 1273-74.  Though it is undisputed that CCJ houses more men than women, that fact alone does not explain why, prior to the installation of the privacy screens, men were strip searched in such large groups, without any privacy, and packed together so tightly that they could not help seeing and touching each other.  Nor does it explain why the squat-and-cough was not utilized for male detainees until long after it was used for female detainees.  No reasonable juror could find that such a search furthers a substantial governmental interest.

Defendants also cite the fact that men and women are searched in different areas of CCJ as justification for the different policies.  Several courts in this district have previously determined that such "logistical" concerns cannot justify the treatment of a specific group of detainees.  *See Bullock*, 568 F. Supp. 2d at 973-74; *Gary*, 1998 WL 547116 at *2, 9.[10]  This Court agrees.  Again, the logistics of processing male and female detainees in different areas does not justify treating men and women differently.

Cook County also contends that women's menstrual cycles justify a policy affording female detainees greater privacy.  This is not an "exceedingly persuasive" justification for the difference between the male and female searches.  Male detainees also present hygiene issues.  The fact that some female detainees present one different or additional hygiene issue is insufficient to justify the stark gender-based differences between the search policies prior to the time the privacy screens were

---

[10]The cases from the Fifth, Sixth, Eighth, and Ninth Circuits that the Sheriff Defendants cite in support of their contentions are inapposite, because none of them concerned disparate gender treatment with respect to strip search policies.

installed in the male search area at the RCDC.

Last, defendants contend that the differences in charges against men and women justify the differing strip search policies. Apart from the inconsistency that arises from defendants' desire to consider the nature of detainees' charges with respect to Class I and their contrary arguments with respect to Class II, defendants fail to cite any evidence to support the contention that men and women were charged with materially different crimes or posed different security risks.

The undisputed facts show, as a matter of law, that the strip searches of the Class I members prior to the installation of privacy screens at the RCDC violated the Equal Protection Clause of the Fourteenth Amendment. The Court enters summary judgment in favor of plaintiffs on that basis. The Court denies both parties' motions for summary judgment, however, with respect to remainder of the Class I plaintiffs' equal protection claims, due to the existence of disputed material facts. Those facts include those that precluded summary judgment for either side on part of the Class I plaintiffs' Fourth Amendment claims, as well as disputed facts concerning the viability of using body scanning machines for male detainees and the necessity of subjecting male detainees to two strip searches.

### c. Unlawful punishment

The Class I plaintiffs contend that certain aspects of the strip search procedures constitute unlawful punishment. The Eighth Amendment does not apply to pretrial detainees. *Bell*, 441 U.S. at 535 n.16; *Tesch v. County of Green Lake*, 157 F.3d 465, 472-73 (7th Cir. 1998). Pursuant to the Due Process Clause of the Fourteenth Amendment, however, pretrial detainees may not be punished, except in connection

with infractions committed while in custody.  *Bell*, 441 U.S. at 535; *see also Thompson*, 412 F. Supp. 2d at 887 (collecting authorities).  Due process protections for pretrial detainees in this case are at least as great as the protections afforded to convicted criminals under the Eighth Amendment.  *Tesch*, 157 F.3d at 473.  Pretrial detainees "have an interest in being free from gratuitously severe restraints and hazards."  *Hart v. Sheahan*, 396 F.3d 887, 893 (7th Cir. 2005).  Plaintiffs do not have to establish intent. *See id.* at 892 ("Punishment is not the only motive for brutal treatment.  But whatever the motive is, if the brutal treatment is gratuitous, due process in its substantive sense has been violated.").

As with the Class I plaintiffs' Fourth Amendment claims, the Court denies summary judgment with respect to the post-privacy screen period, in which significant facts are disputed.  For the policies during the earlier period to the extent there are no material factual disputes (the same as recounted above in the Fourth Amendment analysis), it is appropriate to enter summary judgment in favor of the Class I plaintiffs. Again it is undisputed that members of Class I, prior to the installation of privacy screens in the RCDC hallway, were strip searched in large groups, without any minimal form of privacy, where they saw and touched one another.  No reasonable jury could find that this policy was "reasonably related to a legitimate goal."  *Tesch*, 157 F.3d at 474 (quotation omitted).  Rather, this is an example of "unreasonably harsh treatment meted out to inmates who have not yet been convicted of any crime."  *Hart*, 396 F.3d at 892.

Accordingly, the Court grants summary judgment to the Class I plaintiffs on their

unlawful punishment claim for the period prior to the installation of the privacy screens at the RCDC and otherwise denies their motion on the punishment claims.  The Court denies defendants' motions for summary judgment on the punishment claims.

**4.      Qualified immunity**

The Sheriff Defendants filed a second summary judgment motion contending they are entitled to qualified immunity.  Plaintiffs have sued the Sheriff Defendants in their individual and their official capacities.  "[I]t is well established that the qualified immunity doctrine does not apply to official capacity claims."  *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001) (quotation omitted).  The Court therefore denies Sheriff Defendants' motion with respect to plaintiffs' official capacity claims.  Plaintiffs concede the Sheriff Defendants' motion with respect to plaintiffs' individual capacity claims.  Accordingly, the Sheriff Defendants are entitled to summary judgment on qualified immunity grounds in their individual capacities.

**5.      Cook County's liability**

In its summary judgment motion, Cook County contends there is no basis to hold it liable for constitutional violations that occurred at CCJ.  Under Illinois law, the Cook County Sheriff is an elected county officer.  Cook County cannot be held vicariously liable for the Sheriff's, or his staff's, conduct.  *Moy v. County of Cook*, 159 Ill. 2d 519, 528-32, 640 N.E.2d 926, 929-31 (1994); *see also Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995).  Thus Cook County is entitled to summary judgment on count seven of plaintiffs' third amended complaint, which seeks to impose liability against Cook County under the doctrine of *respondeat superior*.

Cook County is mistaken, however, when it contends that plaintiffs have not asserted a claim for indemnification against it. Count eight of the third amended complaint asserts such a claim. Cook County acknowledges that with respect to section 1983 claims against county sheriffs, Illinois counties have a duty to indemnify judgments, rendering the counties necessary parties. *Carver v. Sheriff of LaSalle County*, 324 F.3d 947, 948 (7th Cir. 2003). Accordingly, Cook County's motion for summary judgment is denied with respect to count eight.

**Conclusion**

For the foregoing reasons, the Court grants the Sheriff Defendants' motion to strike plaintiffs' Local Rule 56.1 statement with respect to paragraph 77, but otherwise denies that motion [# 259]. The Court grants the Sheriff Defendants' motion for summary judgment based on qualified immunity with respect to the Sheriff Defendants in their individual capacities but otherwise denies that motion [# 206]; denies the Sheriff Defendants' motion for summary judgment based on constitutionality of the search policy [# 204]; and grants Cook County's motion for summary judgment with respect to plaintiffs' *respondeat superior* claims but otherwise denies that motion [# 223]. The Court grants plaintiffs' motion for summary judgment with respect to the claims by the Class II members and the Fourth and Fourteenth Amendment claims of the Class I members for searches that occurred prior to the installation of privacy screens in the hallway at the RCDC but otherwise denies the motion [#228]. The Court denies as moot plaintiffs' motion to strike defendants' expert [# 255]. This case is set for a status hearing on March 10, 2009 at 9:30 a.m. Each side is to file a status report by March 6,

2009 addressing what issues and claims remain unresolved and how the Court should

proceed.

_____
                    MATTHEW F. KENNELLY
                    United States District Judge

Date:  February 23, 2009