IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KIM YOUNG, RONALD JOHNSON, )
and WILLIAM JONES, on behalf of )
themselves and a class of others )
similarly situated, )
 )
        Plaintiffs, )
 )
  vs. )    Case No. 06 C 552
 )
COUNTY OF COOK, MICHAEL F. )
SHEAHAN, CALLIE BAIRD, SCOTT )
KURTOVICH, and SALVADOR GODINEZ, )
 )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Defendants have moved for reconsideration of this Court's February 24, 2009 decision ("Decision"). They argue that the Court should not have granted summary judgment for plaintiffs as to liability on certain claims and should have granted summary judgment in defendants' favor on all claims. The Court denies the motion for the reasons stated below.[1]

**1.    The evidence regarding contraband**

Defendants' motion focuses on what defendants characterize as the Court's

---

[1] The key points in the motion are addressed in this decision. Concurrently with this decision, the Court is issuing a revised version of the February 24 Decision to deal with certain other points defendants made in the motion. The Court has considered all of defendants' arguments, even if they are not directly addressed in this decision or the revised February 24 Decision.

disregard of the dangerousness of contraband in a jail setting and of the evidence regarding discovery of contraband from misdemeanor detainees. Defendants also take great issue with the Court's statement that they did not bring to the Court's attention evidence to support their contention that Cook County Jail (CCJ) has experienced a pervasive problem of contraband being brought in by misdemeanor detainees. They say the Court "ignored, ... downplayed, and ... distorted" the evidence. Motion at 8.

Not so. With their submissions, defendants submitted volumes of exhibits that, if stacked up, create a pile over fifteen inches high. A significant proportion of this consisted of 2,000-plus pages of CCJ reports concerning the seizure of contraband during the strip search process. With minor exceptions (noted below), however, defendants made no effort, in the five briefs they filed in connection with the summary judgment motions, to summarize the reports or to identify what, in particular, they contained of significance. The Court discussed this in detail in the February 24 Decision.

With their motion for reconsideration defendants have, for the first time, attempted to extract from the reports what they now deem to be the critical evidence. This takes the form of a chart that reflects on its face that it was prepared by defendants' counsel ("Q&H") on March 4, 2009, *after* the Court's decision. The chart lists instances – 832 of them, defendants say – on which persons purportedly charged with misdemeanors between early 2004 and late 2006 were found during the strip search process to have contraband – money, in the overwhelming majority of these instances.

This submission is deficient on several levels. First, the time for defendants to

make the effort to extract this sort of evidence from the reports was during the extensive summary judgment briefing process, not in a motion for reconsideration. The fact that evidence claimed to support defendants' contentions might have been somewhere within the mass of materials that defendants submitted is of no consequence. The Court repeats what it said on this topic in the February 24 Decision:

> [I]t is not the Court's responsibility to go hunting through a record of this size unguided to try to find a factual dispute. Rather, it is the parties' obligation to draw the Court's attention to evidence they contend is relevant. *See, e.g., Roger Whitmore's Auto Serv., Inc. v. Lake County*, 424 F.3d 659, 664 n.2 (7th Cir. 2005); *Ogdon v. Hoyt*, 409 F. Supp. 2d 982, 986-87 (N.D. Ill. 2006).

Decision at 4. Indeed, it is rather unseemly, to say the least, for defendants to accuse the Court of "ignor[ing]," "downplay[ing]," or "distorting" evidence that they themselves did not bother to detail in their own summary judgment submissions.

Having bypassed the opportunity to properly bring this evidence to the Court's attention during the summary judgment briefing process, defendants forfeited the point. A motion for reconsideration is an opportunity to correct things the Court mistook or overlooked, not to correct deficiencies in a party's own presentation. Defendants had ample opportunity to focus the Court's attention on the details of the contraband reports during the summary judgment briefing process; they chose not to do so; now is too late.

Even were the Court to consider defendants' belated submission, it would remain deficient. A key feature of defendants' chart is its listing of the charges against the persons on whom contraband was found; that is what supposedly shows they were charged with misdemeanors or lesser offenses. But that information appears nowhere in the contraband reports themselves, as previously noted in the February 24 Decision.

Defendants – or, more likely, their counsel – obviously got this information somewhere, but they have made no effort to explain where or how. In short, they have not established a proper foundation for the admissibility of the chart.

Finally, even were defendants able to clear these two hurdles, the chart would not carry the day or create a genuine issue of material fact, because it provides virtually no information about where or how the contraband was recovered. The Court has examined a significant number of the underlying reports to determine whether such information, missing from defendants' written submissions or their belated chart, appears there. A significant proportion of the reports give no information at all about where the detainee had the currency or other contraband before it was recovered – in his pockets? in a shoe? in his mouth? or in a body cavity? Rather, they say simply that money or other contraband was recovered during a strip search. Such reports are unhelpful in assessing the legitimacy of the asserted need for a full-strip, body-cavity search – for all anyone knows, the item was in the detainee's pockets or somewhere else where it would have been discovered via methods far less invasive than a body cavity search with the detainee completely unclothed. In addition, a number of the reports say that the contraband was recovered from a detainee's shoe, his pockets, or his mouth, and others say the contraband was recovered from a container – such as a glasses case or a "property bag" – not from the detainee's person. In these situations, the recovery likewise would have taken place without anything approaching the full-strip, body-cavity search that defendants performed.

One would assume that if defendants had evidence reflecting some need for the most intrusive aspects of their search – the requirement that the detainee strip naked

4

and submit to an examination of his body cavities – they would have zeroed in on it. Even now, they have not done so.

In their summary judgment briefs, defendants cited specifically to only five of the contraband reports as evidence that misdemeanor detainees possessed drugs or weapons. As indicated above, the reports do not indicate the nature of the charges against these particular detainees. Of those five reports, two involved finding contraband in pockets or shoes, and in one instance, the detainee voluntarily handed the contraband to officers. One report did not state where or how the contraband was found. The fifth report was the only one the defendants specifically identified as involving contraband discovered during a squat-and-cough visual body cavity search. The Seventh Circuit, in *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983), concluded that evidence "that only a few items have been recovered from the body cavities of women arrested on minor charges over the years" was insufficient to justify a policy of strip searching all persons detained on such offenses. *Id.* at 1272-73. The same is true in this case.

Defendants argue that *Mary Beth G.* does not apply in a setting like the CCJ. They contend the facts are not comparable because (among other things) the detainees in *Mary Beth G.* did not pose a security risk, whereas CCJ is a "facility where assault, rape, and murder are *de rigueur*." Motion at 4. There is no doubt that CCJ can be a dangerous place. The question, however, is whether detainees initially entering the jail on misdemeanor and lesser charges pose a risk that warrants conducting full-strip, body cavity searches of all of them, or whether there is some other basis allowing

5

the CCJ to perform such searches on a blanket basis.  In *Mary Beth G.*, the court – like this Court – acknowledged that a detention facility is "a place 'fraught with security dangers,'" *Mary Beth G.*, 723 F.2d at 1273 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)), but that was not enough, by itself, to justify strip searches of all entrants into the facility.  Rather, the court in *Mary Beth G.* looked at the evidence regarding the particular sorts of detainees at issue in that case.  That is what this Court has done in the present case; it examined the evidence regarding whether the particular category of detainees at issue in Class II – persons entering the jail for the first time after being detained on a misdemeanor or lesser charge – pose, as a category, some danger or risk that warrants subjecting them to the same sort of intrusive search as a person detained on a charge for a violent felony.  That is where defendants' evidence fell short and still falls short.

Defendants also chastise the Court for supposedly failing to give serious consideration to contraband that consists of money.  The Court does not doubt, and has at no time doubted, the legitimacy of defendants' contention that it is important to keep money out of the jail and that its presence there poses its own set of potential dangers.  The real problem with defendants' submissions – including the motion for reconsideration – is not that they reveal that most contraband recovered from Class II members is money, but rather that defendants have not connected up the fact of recovery of contraband with the need for a full-strip, body-cavity search.  If the February 24 Decision did not make that clear, the Court is making it clear now.

**2.     *Bell v. Wolfish*, deference, and the law**

One might object – and defendants do object – that the Court has imposed some sort of improper, and impossible, standard on CCJ by pointing out the absence of *evidence* supporting their body cavity search policy. Defendants contend the Court disregarded the admonition of *Bell* and its progeny that courts must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (*quoted in* Def. Motion at 1).

One gets the sense from defendants' submissions that as they see it, deference means immunization from scrutiny – the equivalent of a rule that if a jail administrator utters the phrase "institutional security" or some other legitimate goal to support a particular practice, that is the end of the story. That is not how the Court reads *Bell* or its progeny. As the Court discussed in the Decision and will discuss below, *Bell* itself requires a court, in assessing the constitutional validity of a body cavity search, to consider more than just what jail administrators or their lawyers say. And the Seventh Circuit, whose decisions are controlling here, made it clear in *Mary Beth G.* that deference does not mean a free pass. As the Court has noted, in *Mary Beth G.*, the court found the defendant's security justification lacking because the evidence did not support it:

> The affidavits of the lockup personnel, which lack specificity, suggests that only a few items have been recovered from the body cavities of women arrested on minor charges over the years . . . . Although a detention center may be a place fraught with serious security dangers . . . the evidence does not support the view that those dangers are created by women minor offenders entering the lockups for short periods while

7

awaiting bail.

*Id.* at 1272-73 (internal quotation marks and citations omitted). Thus, even though this Court was and is required by *Bell* to accord deference to CCJ's expertise, it must nonetheless determine whether the evidence supports application of defendants' policy of subjecting newly arriving misdemeanor detainees to a blanket policy of a strip / body cavity search.

The Court's scrutinization of the evidence does not make this Court, or the Seventh Circuit, some sort of an outlaw jurisdiction, as defendants seem to think. *See, e.g.*, Def. Motion at 5-6 (accusing the Seventh Circuit of making, in *Mary Beth G.*, "errors [that] are entirely pedestrian" and a "glaring lapse" in reading *Bell*); *id.* at 6 (accusing this Court of "def[ying] precedent"); *id.* at 8 (saying the Court "subverts" institutional security); *id.* at 1 (accusing the Court of adopting an "ostrich-like response" to defendants' contentions); *id.* at 6. In *Bell*, the Supreme Court did not say that a jail administrator's invocation of institutional security is sufficient to remove a strip search policy from scrutiny. Rather, the Court made it clear that pretrial detainees "retain some Fourth Amendment rights upon commitment to a corrections facility," *Bell*, 441 U.S. at 558, and it expressly told courts that determining the reasonableness of a policy that implicates the Fourth Amendment – like CCJ's blanket body cavity search policy – requires a court to "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559. That is what this Court did in its February 24 Decision.

Nor has the Court ruled – as defendants contend – that absent individualized

reasonable suspicion, a strip search of a jail detainee is unjustified. Rather, what the Court said is that "[c]ourts have generally required jail officials to have either individualized suspicion or suspicion arising from the nature of the charged offense before conducting a strip search of a detainee charged with a misdemeanor that does not involve drugs or weapons." Decision at 19 (citing, among other cases, *Shain v. Ellison*, 273 F.3d 56, 63 (2d Cir. 2001); *Roberts v. State*, 239 F.3d 107, 112 (1st Cir. 2001); *Masters v. Crouch*, 872 F.2d 1238, 1254 (6th Cir. 1989)). And what the Court held is that "[d]efendants have not presented any evidence that reasonable suspicion existed to strip search *either members of Class II in general* or class representatives Young and Jones specifically." *Id.* at 20 (emphasis added). The Court thus clearly recognized that a jail's strip search policy may, under appropriate circumstances, be justified on a group basis. Indeed, the Court would have been foolish to do otherwise; the Supreme Court made just such a ruling in *Bell*. But the underlying circumstances in this case differ significantly from those in *Bell*, as the Court made clear in its February 24 Decision and will further discuss below. In short, the Court did not rule that strip searches can never be justified or that they always have to be justified on an individual basis. Rather, the Court ruled that defendants had failed to present evidence from which a jury reasonably could find that their particular strip / body cavity search policy was justified.

     Defendants point out that in *Bell*, the Supreme Court did not distinguish between detainees charged with felonies and those charged with misdemeanors. The strip search policy at issue in *Bell* applied to all persons detained at the particular facility.

9

*Bell*, 441 U.S. at 558. Specifically, the challenged policy was "a strip search conducted after every contact visit with a person from outside the institution. Corrections officials testified that visual cavity searches were necessary not only to discovery but also to deter smuggling . . . of contraband." *Id.* In those circumstances, the basis for the search – an existing detainee's contact visit with an outsider – applied equally to all detainees, regardless of the charges on which they were being held. Such a common trait is missing with respect to the members of Class II in this case. Unlike the plaintiffs in *Bell*, the Class II plaintiffs were strip searched upon their initial entrance into the CCJ. Because the circumstances are different from *Bell*, the fact that the Court in *Bell* did not consider the nature of the charges does not preclude doing so in this case.

Nor, to be clear, may defendants justify their blanket strip-search, body cavity-search policy by reliance on their own choice to house persons detained on charges for misdemeanors and lesser offenses together with those detained on felonies. The Court agrees with the Sixth Circuit that a jail's decision to intermingle all types of detainees does not by itself justify blanket strip / body cavity searches of new, incoming detainees that are conducted without regard to the nature of the offense. *See Masters*, 872 F.2d at 1254.

In their motion for reconsideration, defendants contend that the Court has improperly elevated the importance of non-binding district court decisions. Nothing in the Court's decision reasonably can be read to suggest that it considered district court decisions as controlling. They are, however, persuasive authority in light of the fact that they rely on the Seventh Circuit's holding and analysis in *Mary Beth G.* and the fact that

they are consistent with the decisions of every federal appellate court to address the issue, aside from the Eleventh Circuit's recent decision in *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (en banc).[2] And contrary to defendants' vehement contentions, the Court did not ignore *Powell*. Rather, it simply acknowledged that *Powell* is not controlling in this Circuit and that it stands in opposition to the decisions, and mode of analysis, of the Seventh Circuit and virtually every other court of appeals to address this or similar issues.

Finally, in its February 24 Decision the Court cited a decision by another judge in this District. That decision has since been superseded as a result of the judge's partial grant of the Sheriff's motion for reconsideration. *See Bullock v. Dart*, --- F. Supp. 2d ---, 2009 WL 507062 (N.D. Ill. Feb. 27, 2009), *superseding Bullock v. Sheahan*, 568 F. Supp. 2d 965 (N.D. Ill. 2008). The fact that the original decision in *Bullock* was vacated does not affect this Court's February 24 Decision, as the Court cited *Bullock* only as persuasive authority.[3] Nor does the other judge's reconsideration change things in this case: *Bullock* involved searches of existing detainees returning from court hearings, not searches of newly-arriving detainees, and thus it is more akin to the searches in *Bell* than those at issue in the present case.

---

[2] *Peckham v. Wisconsin Department of Corrections*, 141 F.3d 694 (7th Cir. 1998), cited by defendants in their motion for reconsideration, is inapposite. That case involved a convicted felon, not a pretrial detainee charged with a misdemeanor, and strip searches that followed doctor visits, court visits, contact visits with non-prisoners, and general cell block searches. *Id.* at 697. *Peckham* is factually akin to the searches in *Bell*, not the searches of incoming detainees that were at issue in *Mary Beth G.* or in the present case.

[3] In the revised decision being issued this date, the Court has removed the citations to *Bullock*.

3. **The issue of "less intrusive methods"**

Defendants say the Court determined that if there is a less intrusive method of conducting a search, then use of a more intrusive method is improper. *See* Def. Motion at 14 ("The Decision concludes that the matter in which the searches were conducted . . . violates the Fourth Amendment because less restrictive alternatives – such as those provided to women – were available."). Again, not so. Defendants attempted to justify their policy by arguing that the use of privacy screens was not feasible, at least during the time period at issue in this case. *See* Sheriff Defs.' Resp. to Pls.' Mot. for Summ. J. at 12; Sheriff Defs.' LR 56.1 Stat. of Undisputed Facts ¶ 41 (saying that partitions pose their own dangers). By doing this, defendants themselves injected the issue of feasibility into the case, entitling plaintiffs to present evidence – undisputed by defendants – that such screens had been used without problem. *See* Fed. R. Evid. 407. By considering that evidence, the Court did not hold that the existence of less intrusive security measures rendered defendants' practice unconstitutional. Quite the contrary, as the Court made clear in its decision, it considered the evidence about the installation of privacy screens only with respect to defendants' feasibility arguments. Indeed, had the Court adopted a "less restrictive alternative test" as defendants contend, it would have granted summary judgment for plaintiffs on their claim that the failure to use a body scanning machine rather than a strip search of male detainees violated the Class I members' rights.

**Conclusion**

For the reasons stated above, the Court denies defendants' motion for

reconsideration [docket no. 279].

_____
MATTHEW F. KENNELLY
Date: April 2, 2009     United States District Judge