# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LEE MERCADO, ALLEN GORMAN, et al. on behalf of themselves and a class of others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>THOMAS DART, OFFICE OF THE SHERIFF OF COOK COUNTY,<br><br>     Defendants. | No. 06 C 0552<br><br>Judge Matthew Kennelly |

## DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

NOW COMES DEFENDANT, THOMAS DART, SHERIFF OF COOK COUNTY, by and through his attorneys, Querrey & Harrow, Ltd., and respectfully requests this Court grant Judgment as a Matter of Law against Plaintiffs.

## INTRODUCTION

Three axioms guide this case. First, deference is afforded to correctional administrators in matters of correctional security. Second, profane language, foul odors, and the presence of female officers do not violate the Constitution. Third, because contraband fosters escapes, riots, and murders, detainees must comply with officers' instructions. These principles foreclose Plaintiffs' case. The Court need only agree that one is dispositive to grant this Motion. For Plaintiffs to prevail, they must circumvent all three. Even examining the evidence and testimony in a light most favorable to Plaintiffs, there is no evidence that a reasonable jury could rely upon to conclude the manner of the searches violated Plaintiffs' constitutional rights. Thus, judgment as a matter of law is proper.

## BACKGROUND

This Motion is brought pursuant to Federal Rule of Civil Procedure 50. Per Rule 50, the Court can find that a reasonable jury would not have a legally sufficient evidentiary basis to find for a party on an issue. Fed. R. Civ. Pro. 50 (A)(1). If it so finds, the court can resolve the issue against that party and grant a motion for judgment as a matter of law. *Id.* A party

may move for judgment as a matter of law at any time before the case is submitted to the jury. *Id.*

This trial involves claims by a class of male detainees at the Cook County Jail from February 2007 through the present. The claims heard by the jury have three facets. First, whether the differential treatment of male detainees as compared with females contravenes the Equal Protection Clause. Second, whether the searches were an improper infliction of punishment in violation of the Eighth Amendment and the Due Process Clause. Third, whether the searches ran afoul of the Fourth Amendment.

Plaintiffs' approach to this case is death by a thousand cuts. Alone, each witness' complaint about their experience is insufficient to show a constitutional violation. Yet somehow the confluence of complaints enables them to cross that threshold. Plaintiffs have described the search process as "dehumanizing" and "humiliating." Their testimony has different shades, but at its core a single theme: they were uncomfortable during the search. The Sheriff does not dispute that searches are embarrassing, but uncomfortable is not unconstitutional.

The collective experience of the Plaintiffs highlights why their claims do not pass constitutional muster. Male detainees are searched in groups of between 30 and 80 men. They are typically monitored by 3 to 4 officers. Given this disparity, maintaining order and discipline is imperative. More so because the officers are defenseless. They carry no gun, baton, tazer, or pepper spray. On the other hand, detainees are not handcuffed or shackled. (Tr. at 580).[1] Some are violent offenders harboring animus towards law enforcement. In this milieu, the safety of correctional staff demands detainees follow instructions.

The search process begins with the detainees removing their clothing article by article. (Tr. at 574). They are instructed to do so in a uniform fashion. (Tr. at 573-74). After removing their clothes, they then follow a series of instructions to convince officers no contraband is being hidden. (Tr. at 573-74). This includes a bend and spread or squat and cough exercise. These methods ensure contraband is not being secreted in the anus-a common method of concealing contraband.

---

[1] Citations to the trial transcript are denoted as "Tr."

## ARGUMENT

### A. No Reasonable Jury Could Conclude Plaintiffs Have Established an Equal Protection Violation Because Male and Female Detainees Are Not Similarly Situated and the Sheriff Did Not Have a Discriminatory Motive.

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To assert a viable Equal Protection claim, Plaintiffs had to first show they were treated differently from others similarly situated. *Id.* Plaintiffs also had to show the Sheriff acted with the intent to discriminate against them. *McClesky v. Kemp*, 481 U.S. 279, 292 (1987). They have shown neither.

A regulation challenged under the Equal Protection Clause will be sustained "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 319-20 (1993). Outside of the correctional context, a gender-based classification is subject to an intermediate level of scrutiny. *United States v. Virginia*, 518 U.S. 515, 533 (1996). A gender-based classification does not violate the Equal Protection Clause where it is substantially related to the achievement of an important governmental objective. *Id.*

The standard in the correctional context was articulated in *Turner v. Safley*, 482 U.S. 78 (1987). *Turner* elevated the deference to correctional administrators and concluded that an institutional regulation is valid if reasonably related to legitimate penological interests. *Id.* at 89. *Turner's* analysis "applies to all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224 (1990). Heightened scrutiny is inapplicable to Equal Protection challenges to prison regulations "even where the regulations distinguish among groups of inmates within a prison." *Hammer v. Ashcroft*, 512 F.3d 961, 968 (7th Cir. 2008). Thus, the applicable standard favors the Sheriff.

### 1. Plaintiffs have not shown female detainees were similarly situated.

Plaintiffs' case is flawed because the Constitution does not require dissimilar people be treated similarly. Whether male and female detainees are similarly situated requires consideration of various factors. *Keevan v. Smith*, 100 F.3d 644, 648 (8th Cir. 1996). They include the size of the two populations, underlying charges, security classifications, criminal

history, and any special characteristics. *Id.* If these factors reveal wide disparities between men and women, they are not similarly situated and no Equal Protection claim can be made.

Correctional officials must consider the special characteristics of detainees and the differences in the populations in formulating policies. For instance, segregation of male and female inmates by gender is "unquestionably constitutional." *Women Prisoners of District of Columbia v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996). The contrast between men and women at the Cook County Jail is stark. Men outnumber women by almost 10 to 1. (Tr. at 813). In contrast, female inmates tend to have more medical problems and more complex hygiene issues. (Tr. at 669). There are two maximum security classification divisions for the men, and only one such tier for the women. (Testimony of Scott Kurtovich). This factor demonstrates the different security risks posed by each group. Thus, the search process differed not due to gender but different security concerns and characteristics of the detainees.

The following case law highlights the impediments of Plaintiffs' Equal Protection argument. Male prisoners challenged the differences in privacy for male and female prisoners in *Timm v. Gunter*, 917 F.2d 1093 (8th Cir. 1990). They pointed to the absence of partitions in the men's showers and toilet areas. They also complained that strip searches were performed in the bullpen area, which was visible from the hallway. *Id.* at 1096. Plaintiffs claimed their right of privacy was violated as a result of being viewed nude while showering, using toilet facilities, and undressing. They complained that greater privacy protections were afforded to female inmates in those same areas of the women's facility. *Id.* at 1097. The Eighth Circuit concluded that the male and female inmates were not similarly situated. The court pointed to the higher number of males, the crimes committed by them, and the frequency of violent incidents, escapes, and contraband recovery. These factors justified the differences in the security measures. *Id.* at 1103.

Similarly, in *Klinger v. Dep't of Corrections*, 31 F.3d 727 (8th Cir. 1994), the court rejected an Equal Protection challenge brought by female prisoners. Concluding that the female prisoners were not similarly situated to their male counterparts, the court pointed to the higher number of male prisoners and the differences in the respective security classifications. The court also observed that female prisoners are "more likely to be single parents with the primary responsibility for child rearing [and] that they are more likely to be

4

sexual or physical abuse victims. Male inmates, in contrast, are more likely to be violent and predatory than female inmates." *Id.* at 731-32.

Finally, in *Oliver v. Scott*, 276 F.3d 736 (5th Cir. 2002), male prisoners claimed their Equal Protection rights were violated because the showers and toilet areas for the female prisoners had partitions but the males did not. The Fifth Circuit observed: "Courts should consider the number of inmates housed in each facility, their average length of stay, their security levels and the incidence of violence and victimhood." *Id.* at 746. The inmates were not similarly situated because the jail housed more men than women, the male inmates were convicted of violent crimes, and male units had a higher incidence of gang activity and sexual predation. *Id.* at 747.

These cases establish that there can be no meaningful comparison for Equal Protection purposes between Plaintiffs and female detainees who are not similarly situated. Additionally, deference must be afforded to the Sheriff's decision to search the males in a group setting.

In light of this case law, Plaintiffs' contention regarding the body scan machine falters. Plaintiffs have emphasized the body scan machine used for females but not males evinces discrimination. While the machine does demonstrate a difference in the process for men versus women, it shows little else. Plaintiffs have failed to show how the machine would be feasible for males. Testimony by Lieutenant Queen and Scott Kurtovich established the smaller number of women "on the new" (30-60) enabled the body scan machine process. In contrast, with approximately 300 men coming in daily, time constraints would make the body scan machine an impossibility. Additionally, the distance to the men versus the women's divisions provides that searching men in the RCDC is more logical. Because Plaintiffs have done nothing to show otherwise, the body scan machine argument is a red herring.

### 2. Plaintiffs have not shown a discriminatory purpose.

Plaintiffs also had to prove purposeful discrimination motivated the state action and caused the injury. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). Discriminatory purpose in the Equal Protection context implies that the decision maker acted at least in part because of the adverse impact it would have on an identifiable group. *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiffs cannot demonstrate the requisite intent. They offered no evidence of discriminatory motive by the Sheriff. Instead, they simply made global assertions of intentional gender-motivated discrimination. This is not enough. "Female inmates can always point out certain ways in which male prisoners are 'better' than theirs just as male inmates can always point out other ways in which female prisoners are 'better' then theirs"). *Klinger*, 31 F.3d at 732. The Sheriff's strip search process for male prisoners is not conducted because of any animus toward males. Rather, his motivation is simply to preclude weapons and contraband from being smuggled into the Jail. In other words, for their own protection. That is a legitimate penological reason. Additionally, the differences are mandated by the larger number of men and the larger number of security risks. These realities transcend intentional discrimination. Expediting the intake process is a requirement the Jail must follow, and searching in groups achieves that purpose. Because Plaintiffs have put forth no evidence of discriminatory intent, their Equal Protection claim fails.

In sum, the evidence at trial demonstrated the divergences in privacy protections afforded to males versus females stemmed from different security concerns, not gender.

**B.  No Reasonable Jury Could Conclude Plaintiffs Established a Fourth Amendment Violation.**

Plaintiffs face an uphill battle on their Fourth Amendment claim. Their difficulty is encapsulated by the Seventh Circuit's observation in *Peckham*: "it is difficult to conjure up too many real-life scenarios where prison strip searches of inmates could be said to be unreasonable under the Fourth Amendment." *Peckham v. Wisc. Dep't. of Corr.*, 141 F.3d 694 (7th Cir. 1998). Plaintiffs' case lends credence to this theory.

The central inquiry in evaluating an inmate's claim of alleged constitutional violations is whether the correctional policy is justified by legitimate institutional concerns. *Bell*, 441 U.S. at 547. "When an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in light of the central objective of ... safeguarding institutional security." *Id.* This is so because correctional facilities are unique places "fraught with serious security dangers." *Id.* at 559.

The expectations of privacy in a correctional facility are diminished. A prison "shares none of the attributes of privacy of a home, an automobile, an office or a hotel room." *Hudson v. Palmer*, 468 U.S. 517, 527 (1984). The Supreme Court held that an inmate does

not have a Fourth Amendment expectation of privacy in his prison cell in *Hudson*. Weighing society's interest in institutional security against a prisoner's interest in privacy, the Court stated: "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527-28. Thus, a "prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." *Id. Bell* and *Hudson* warrant judgment as a matter of law on Plaintiffs' Fourth Amendment claim.

Individuals housed in correctional settings retain a limited right to be free from unreasonable searches in connection with visual body cavity searches. *United States v. Lilly*, 576 F.2d at 1240 (5th Cir. 1978). The test for reasonableness under the Fourth Amendment "requires courts to consider the "scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. at 559.

In *Elliott v. Lynn*, 38 F.3d 188 (5th Cir. 1994), visual body cavity searches of prisoners were made in groups of five or six while other inmates were present. The manner of the searches did not violate the Fourth Amendment. While the searches could have been conducted with more privacy, correctional officers were not required to use the least restrictive means in performing the search. *Id.* at 190. Individual strip searches would have been time consuming and provided a greater opportunity to dispose of contraband. *Id.* at 192.

A complaint about searches in front of other inmates was made in *Fernandez v. Rapone*, 926 F.Supp. 255 (D. Mass. 1996). Rejecting the inmates' contentions, the court noted, "the fact that plaintiffs were often searched in the presence of other inmates being searched does not render the searches unreasonable." *Id.* at 262. The court reasoned that inmates shared cells, showered together and were observed throughout the day by inmates and correctional officers while dressing, bathing, and defecating.

In *Zunker v. Bertrand*, 798 F.Supp. 1365 (E.D. Wis. 1992), the defendant initially did not install privacy curtains because of a belief that they would impede the officer's view and allow inmates to hide contraband. *Id.* at 1369-70. That the defendant later decided to provide inmates with the privacy curtains did not render the initial decision or the initial searches unreasonable. *Id.* at 1370. The court concluded that the privacy interest in not having other

7

inmates view the strip searches did not outweigh the security interests of the prison. *Id.* In *Thompson v. Souza,* 111 F.3d 694, 699 (9th Cir. 1997), an inmate argued that the strip searches should have been conducted out of view of the other prisoners. The court rejected this argument, indicating that it would not question correctional officials' judgment.

The use of partitions in a jail was at issue in *Mitchell v. Arpaio*, 2006 WL 1050499 (D. Ariz. 2006). The suit claimed an invasion of privacy because the toilets had no partitions for toilets. The court found plaintiff "failed to allege that he had a privacy right in dividers in the bathrooms." *Id.* at *3. Thus, "the jail has a reasonable penological interest in not providing dividers or stalls in the bathroom due to security issues." *Id.* These cases demonstrate Plaintiffs have no actionable claim under the Fourth Amendment.

**C. No Reasonable Jury Could Conclude that Plaintiffs Established The Manner of the Searches Was Unconstitutional Because Their Claims Do Not Rise to the Level of a Constitutional Violation.**

Plaintiffs' strategy is simple. The case is premised on their feelings of humiliation during the search. But discomfort stemming from foul odors, offensive language, and being strip searched does not implicate the Constitution. To bridge the gap between uncomfortable and unconstitutional, Plaintiffs pluck a few isolated incidents where officers were allegedly physical with unnamed detainees. They meld these remote occurrences into a widespread pattern of "dehumanizing" behavior. The flaws of this approach demonstrate why judgment as a matter of law is proper.

A regulation impinging constitutional rights is valid "if it is reasonably related to legitimate penological interests." *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). *Bell* acknowledged that occasionally a guard might conduct a search in an abusive fashion and that such abuse cannot be condoned, but nonetheless, upheld the blanket policy at issue. *Id.* at 560. This Court should do the same.

The facts alleged by Plaintiffs are insufficient to state an Eighth Amendment claim. A detainee must satisfy both an objective and a subjective inquiry to state an Eighth Amendment violation. *Chandler v. Crosby*, 379 F.3d 1278, 1289-90 (11th Cir. 2004). Under the objective component, a detainee must prove the condition is sufficiently serious to violate the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 8, (1992). An injury satisfies the objective component "only if there is more than de minimis injury." *Boxer X v.*

*Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006). For example, female guards' solicitation of sexual acts by a male prisoner "does not present more than de minimis injury." *Id.* Lack of privacy is a lesser injury and, therefore, fails to state an Eighth Amendment claim.

### 1. Plaintiffs' evidence concerning the presence of female officers was negligible, and in any event, does not contravene the Constitution.

Plaintiffs contend the presence of female officers during the search is indicative of the unconstitutional manner. Two flaws eviscerate this argument.

First, Plaintiffs' claim is belied by the record. Plaintiffs' evidence that female officers were present is remarkably scant. Hytrek, Gorman, Liptak, Lamour, Santiago, and Wilson did not see any females during their search. Only Beck and Gray saw females in the vicinity of the search. (Tr. at 412). Importantly, however, the female officers were not conducting or participating in the search.

The isolated instances of females in the area are not surprising. The Jail has a policy prohibiting cross-gender monitoring during the search. (Tr. at 481, 812). This policy is strictly enforced. (Tr. at 481-82). In fact, Lieutenant Queen has never assigned a female to participate or monitor a search of male detainees. (Tr. at 481-82).

Second, even accepting two random incidents as evidence of a pattern, Plaintiffs' contention clashes with case law. Specifically, it defies Seventh Circuit precedent. "Monitoring of naked prisoners is not only permissible ... but also sometimes mandatory." *Johnson v. Phelan*, 69 F.3d at 150. Opposite-sex surveillance of male inmates is constitutionally permissible. *Timm v. Gunter*, 917 F.2d 1093, 1102 (8th Cir. 1990). As one court explained, "so long as there is sufficient justification for a guard to view an unclothed male inmate, and the guard behaves in a professional manner, the gender of the guard is irrelevant." *Canell v. Arkemikis*, 840 F. Supp. 783, 784 (D. Or. 1993).

Most debilitating to Plaintiffs' position is *Johnson v. Phelan*. An inmate challenged a state prison policy allowing female correctional officers to monitor and observe male inmates in their cells, showers, and bathrooms. 69 F.3d at 145. The Seventh Circuit identified two reasons cross-gender monitoring was permissible. First, the interest in efficient deployment of staff. *Id.* at 147. Second, limiting the need to make gender a criterion of employment, and thus reducing conflict with Title VII and the Equal Protection Clause. *Id.* Plaintiffs' argument

ignores *Johnson*. It also would force the Sheriff to choose between exposure to inmate privacy suits and Title VII claims, precisely what *Johnson* sought to eliminate.

While the above case law considered cross-gender monitoring of showers, precedent holds similarly in the search context. The Fifth Circuit considered whether the presence of female guards during a strip search violated a male's privacy rights in *Letcher v. Turner*, 968 F.2d 508 (5th Cir. 1992). Holding no constitutional violation existed, the court reasoned that maintaining security justified their presence. Other Circuits agree. The Ninth Circuit held that officers may conduct strip searches in view of female employees and other inmates in *Michenfelder v. Sumner*, 860 F.2d 328, 332-34 (9th Cir. 1988). The Eighth Circuit held that female guards may, in addition to monitoring male prisoners during showers, conduct 'pat' searches of male inmates. *Timm*, 917 F.2d at 1099-1102.

### 2. Plaintiffs' evidence concerning officers' foul language is insufficient as a matter of law.

Foul language by officers features prominently in Plaintiffs' case. Plaintiffs' emphasis on this point is odd because coarse language is of no constitutional import.

Verbal abuse by correctional employees does not state a constitutional claim. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989); *Mitchell v. Justus*, 2006 U.S. Dist. LEXIS 36656 at *3 (W.D. Vir. 2006). One Northern District Court's comments are noteworthy, "[t]he court notices judicially that foul language and name-calling occur all of the time in prison settings." *Joyner v. Elrod*, 1985 U.S. Dist. LEXIS 23519 (N.D. Ill. 1985). If such occurrences were actionable, "our courts would become arbitrators in thousands of prisoner complaints deciding how actionably obscene was the language." *Id.* at *2.

A central focus of Bradley Hytrek's testimony concerned the language and comments made by correctional officers. "They used terms like bitch, faggot." (Tr. at 341). Hytrek also heard comments such as, "look at that fat ass"; "a few less donuts"; "look at those ugly feet." (Tr. at 340-41). Hytrek said this language caused him to be "humiliated and dehumanized." (Tr. at 341). In the same breath, however, Hytrek admitted he had heard such language outside of the Jail. (Tr. at 366). He also conceded the searches were integral to jail security: "I don't want my life to be in jeopardy in any way, and so I don't have a problem with it." (Tr. at 327).

### 3. Plaintiffs' evidence concerning the surrounding conditions is insufficient as a matter of law.

Virtually every Plaintiff has complained about the smell of the hallway where the searches transpired. These smells ranged from "musty" to "pissy." (Tr. at 453, 615, 917). While the smell of urine was commonly cited, no one saw any urine. Also, almost every witness admitted to not seeing vomit or feces. (Tr. at 447, 631). Also, with minimal exceptions, no witness testified about seeing dogs during the search. (Tr. at 448, 632).

Finally, the recent decision of *Mays v. Springborn*, 2009 WL 2046484 (7th Cir. 2009), is inapplicable. First, the case was disposed of at the summary judgment stage. Second, the court's analysis was largely limited to whether there was an issue for the jury. Third, two of the three objections concerned elements not at play here – dirty gloves and a cold room. Fourth, the discomfort of being naked with other inmates was never broached by the *Mays* Court. These distinctions render *Mays* inapt.

### D. The Sheriff Has Conducted Strip Searches Consistent With Illinois Law, Thereby Making Him A State Actor Under The Eleventh Amendment.

The final issue involves the Eleventh Amendment, which the Sheriff raises in order to preserve for appeal. The Sheriff has previously invoked Eleventh Amendment immunity in his Answer and Affirmative Defenses to Plaintiffs' Third Amended Complaint. *See* Dkt. No. 154 at p.43. The Sheriff also raised this defense in his Answer and Affirmative Defenses to Plaintiffs' Fifth Amended Complaint. *See* Dkt. No. 350 at p.47.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The jurisdictional bar of the Eleventh Amendment is so fundamental that it can be raised at any time during litigation. *Edelman v. Jordan*, 415 U.S. 651, 677-78 (1974).

As a general matter, the Eleventh Amendment does not apply to suits against counties or other local governmental entities. *Richman v. Sheahan*, 270 F.3d 430, 439 (7th Cir. 2001). Although Sheriffs are classified as county, not state officials under Illinois law, a county sheriff in Illinois may act as an arm of the state when performing certain functions. *Id.* When

he does so, a suit challenging that conduct is against the state, and the claim for damages may not be brought in federal court. *Id.* Such is the case here.

In determining whether the Sheriff is an agent of Illinois government insofar as requiring the strip searching of detainees at intake, the Court looks at two factors. First, the degree of control exercised by Illinois government over the conduct at issue. Second, whether the Eleventh Amendment policy of avoiding interference with the State of Illinois (as opposed to the County of Cook) policy is offended by the suit. *Id.* In the instant lawsuit, the Sheriff has established through fact and opinion witnesses that he is required to strip search all inmates upon intake. (Tr. at 806). He is mandated to do so through the Illinois jail standards (Illinois Administrative Code), 20 Ill. ADC. 701.40. (Tr. at 811). This section provides:

> A strip search shall be performed in an area that ensures privacy and dignity of the individual. The individual shall not be exposed to the view of others who are not specifically involved in the process. Strip searches shall be conducted by a person of the same sex. All personal clothing shall be carefully searched for contraband.

In light of *Richman* and §701.40 of the Illinois Administrative Code, Plaintiffs' claims cannot be brought in federal court. Therefore, the Sheriff is immune under the Eleventh Amendment and judgment as a matter of law is proper.

## CONCLUSION

Movement is a fixture of the CCJ. This fact makes the possibility of contraband more prevalent at the CCJ than in a prison. The amount of movement in a year at the CCJ is staggering. That officers demand strict compliance, sometimes in forceful tones, reflects the high stakes. Uncovered contraband diminishes the possibility of rape and murder. Thus, this vigilance, coupled with negligible privacy rights and deference to correctional administrators warrants judgment as a matter of law.

WHEREFORE, the Sheriff satisfies the standard for the entry of a judgment as a matter of law under Rule 50 and respectfully requests the Court grant judgment in his favor and against the Plaintiffs, and any other relief the Court deems just.

Respectfully submitted,

Defendant, Thomas Dart, Sheriff of Cook County.

By:   /s/ Daniel F. Gallagher
       One of their attorneys

Daniel F. Gallagher, Esq.
Paul O'Grady, Esq.
Larry S. Kowalczyk, Esq.
QUERREY & HARROW, LTD.
175 West Jackson, Suite 1600
Chicago, Illinois 60604
Phone: 312/540-7000
Fax:   312/540-7001

                            ANITA ALVAREZ
                            State's Attorney for Cook County

                            By: s/ Francis J. Catania
                            Francis J. Catania, Attorney for Defendants

Francis J. Catania
Cook County State's Attorney's Office
Richard J. Daley Center
50 W. Washington Street, Room 500
Chicago, IL 60602
(312) 603-6572
I.D. #6203188