IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LEE MERCADO, ALLEN GORMAN, et al. on behalf of themselves and a class of others similarly situated,<br><br>            Plaintiffs,<br><br>            v.<br><br>THOMAS DART, OFFICE OF THE SHERIFF OF COOK COUNTY,<br><br>            Defendant. | No. 06 C 0552<br><br>Judge Matthew Kennelly |

## THE SHERIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL

Defendant, Sheriff of Cook County Thomas Dart, through his attorneys, Querrey & Harrow, Ltd., moves for Judgment as a Matter of Law or a New Trial, and states:

### INTRODUCTION

Motions for a new trial are not granted lightly. But when a case combines salacious facts and novel legal questions, errors are bound to occur. The jury fixated on the discomforting nature of strip searches and forgot the penological interests underlying them. Evidentiary rulings further clouded the jury's grasp of the searches' context. Finally, the jury was precluded from understanding the consequences of their verdict—the issues of contraband and dangerous detainees were treated in a truncated fashion. These factors warrant a new trial.

### BACKGROUND

Plaintiffs brought this class action for alleged violation of constitutional rights under 42 U.S.C. §1983. A jury trial was held solely on the Sheriff's liability for Plaintiffs' claims. The trial involved three claims. First, whether the differential treatment between male and female detainees contravened the Equal Protection Clause. Second, whether the searches were an improper infliction of punishment in violation of the Eighth Amendment and Due Process Clause. Third, whether the searches violated the Fourth Amendment.

Before the verdict, the Sheriff presented a Motion for Judgment as a Matter of Law. (Dkt. 415). The Court denied the Motion on August 12, 2009. (Tr. Vol. VIII at 1904). The jury found the Sheriff liable on all three claims.

## ARGUMENT

I.  **The Sheriff is Entitled to Judgment as a Matter of Law or a New Trial.**

When there is no legally sufficient basis for a reasonable jury to find for that party, the court may grant a motion for judgment as a matter of law. Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law is nothing more than the renewal of the same motion brought before the matter was submitted to the jury. Fed. R. Civ. P. 50(b). Pursuant to Rule 50(b), the Sheriff renews his Rule 50 Motion for Judgment as a Matter of Law and incorporates by reference all arguments of that Motion.[1] In evaluating a Rule 50 Motion, the court reviews whether the evidence is sufficient to support the verdict in the light most favorable to the non-movant. *Mathur v. Bd. of Trustees of S. Illinois Univ.*, 207 F.3d 938, 941 (7th Cir. 2000).

The Sheriff also contends the jury's finding of liability is against the manifest weight of the evidence and warrants a new trial. Under Rule 59(a), the standard for granting a new trial is less stringent than that for judgment as a matter of law. *Jamsports v. Paradama*, 382 F. Supp. 2d 1056, 1058 (N.D. Ill. 2005). A new trial may be granted even if substantial evidence supports the jury's verdict. *Mono v. Peter Pan Bus Lines, Inc.*, 13 F. Supp. 2d 471, 475 (S.D.N.Y. 1998). A motion for a new trial will be granted if "the verdict is against the weight of the evidence . . . [or] . . . the trial was not fair to the moving party." *Jamsports*, 382 F. Supp. 2d at 1058.

II. **The Court's Evidentiary Rulings Led To a Verdict Against the Manifest Weight of the Evidence.**

The jury was clearly confused, and the Sheriff thereby prejudiced, by erroneous evidentiary rulings. These determinations precluded the jury from focusing on the salient issues. Each error individually and collectively constituted prejudicial error.

A.  **It Was Error To Admit The CRIPA Letter.**

The Court foreclosed the Sheriff from introducing evidence that was produced in May 2009 because it found the production untimely. (Tr. Vol. VIII at 1901-04). However, the Court

---

[1] This Motion for Judgment as a Matter of Law does not include the 11th Amendment immunity issues previously raised in the Rule 50 Motion filed during trial or the pending Notice of Appeal.

found Plaintiffs' June 30, 2009 disclosure of the 2008 DOJ letter, long after discovery and the Court's deadline for exchanging exhibit lists, acceptable. Permitting this patent discovery violation was wrong.

The letter's twelfth hour entrance belied its import. The letter featured prominently. Plaintiffs referenced it in their opening and closing arguments, and made it a fixture of their examinations of correctional officials. (Tr. Vol. I at 259). Admitting the CRIPA letter had a substantial and injurious effect on the outcome of the trial as the following portion read to the jury during opening argument shows: "inmates are especially vulnerable to abuse when they are taken in large groups to be strip searched in an isolated area out of the view of non-security intake staff." (Tr. Vol. I at 260). Thus, the letter's role in Plaintiffs' case cannot be overstated. The Sheriff sought to exclude the letter or any reference to it in a Motion in Limine. (Dkt. 357).

The CRIPA letter was rife with hearsay. It contained findings and conclusions not based upon the investigating officers' personal knowledge. The investigation also relied upon written documents which were hearsay. Precedent dictates these attributes defy admissibility. The Seventh Circuit recently held a report "unreliable based on the multiple levels of hearsay and lack of precise factual statements." *Mister v. Northeast Ill. Commuter*, 571 F.3d 696, 699 (7th Cir. 2009). Reports were excluded as untrustworthy where they contained double hearsay in *McKinnon v. Skil Corp.*, 638 F.2d 270, 278 (1st Cir. 1981). Another investigatory report was excluded because it relied upon hearsay statements of witnesses interviewed by the investigator in *Miller v. Caterpillar Tractor Company*, 697 F.2d 141, 144 (6th Cir. 1983). *See also McClure v. Mexia*, 750 F.2d 396 (5th Cir. 1985) (trial court erred in admitting EEOC report because it contained various hearsay statements). The results of the DOJ's investigation were opinions and conclusions about the Sheriff's handling of inmates. Most were negative, virtually all were infected with hearsay. Case law instructs this was improper.

Federal Rule of Evidence 803(8) does provide an exception to the hearsay rule for "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." FRE 803(8). The Sheriff objected to the CRIPA letter due to its untrustworthiness. To show a public record is untrustworthy, a litigant must show "a particular and serious risk that the record is

inaccurate in an important way." *Evidence: Practice Under the Rules*, Mueller & Kirkpatrick, (1999) at 1243.

Instances where courts found an investigatory report to be untrustworthy include *Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300 (5th Cir. 1991). In *Moss*, the court excluded a report because an investigator failed to interview a key individual. *Moss* stands for the proposition that an investigator's failure to talk with appropriate witnesses indicates untrustworthiness. Similarly, poorly prepared investigative findings signify untrustworthiness, as held in *Meder v. Everest*, 637 F.2d 1182, 1185 (8th Cir. 1981). *Meder* was a products liability suit. The Eighth Circuit held the report was untrustworthy because an individual cited in the report could not recall who he spoke to about the product. *See also Wilson v. Attaway*, 757 F.2d 1227, 1245 (11th Cir. 1985) (report excluded for failure to afford possibility of cross-examination). This precedent provides the blueprint for finding the CRIPA letter untrustworthy.

An investigatory report that meets the requirements of the Rule 803(8)(C) hearsay exception and the test of relevance can be still excluded under Federal Rule of Evidence 403. Under FRE 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." The CRIPA letter is the epitome of prejudice. *See Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87 (2d Cir. 1980) (report excluded because of danger of unfair prejudice). Because the letter has the imprimatur of the DOJ, the jury likely gave it unwarranted weight.

The chief virtue of an objective investigatory report is the neutrality of its authors. On this point, the CRIPA letter fails. The letter is rife with inflammatory language and anecdotes. Many of the findings are steeped in inmate hearsay. The unflattering portrayal of the Jail is due to the one-sided nature of the letter. *Brown v. Sierra Nevada Memorial Miners Hosp.*, 849 F.2d 1186, 1190 (9th Cir. 1988) (assumption that agency's findings are trustworthy is substantially diminished when extended to the sources outside the investigative agency). The allegations have not been litigated and were categorically rejected by the Sheriff in a press release shortly after the DOJ's announcement. The letter ignored the corrective actions the Sheriff had already taken, rendering certain portions of the letter obsolete. Most importantly, the DOJ drafted the letter with an eye towards litigation. This should have precluded the letter from seeing the light of day. *See Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir. 1942), aff'd, 318 U.S. 109 (1943) (excluding

accident report because it was "dripping with motivations to misrepresent."). In highlighting only the negative aspects, the DOJ's findings against the Sheriff were a *fait accompli*. The above cited cases demonstrate that the DOJ's methodological shortcomings render its letter untrustworthy and prejudicial.

> B. **Forbidding Reference to the L3 Body Scan Machine After Plaintiffs Introduced It Constitutes Prejudicial Error.**

The Court precluded testimony from the Sheriff regarding the L3 body scan machine. The impact of this ruling was severe, warranting a new trial. To grasp the gravity of this ruling, a brief backdrop is provided.

> Plaintiffs raised the L3 issue in the opening statement:
>> The third thing that I think they're going to tell you about is a body scan machine. ... [A]nd it takes I think about a minute to scan one side and a minute to scan the other.
>>
>> There are machines that can do it in seconds, and, in fact, the jail has owned one of these machines for years. ... So, the timing on the body scan technology will be another piece of evidence to keep your eye on.

Tr. Vol. I at 270-71.

> Plaintiffs' second witness, Paul Beck, described his experience in the L3 machine:
>> Q. You mentioned the body scan machine in that area.
>> A. Yes.
>> Q. Did you get scanned?
>> A. Yes.
>> Q. Okay. And describe that process.
>> A. It took a couple of minutes. It was a big, round cylinder that we stepped into, they closed the door behind me, and I was being scanned all the way around my whole body while standing in the middle with my hands to the side.

Tr. Vol. III at 418.

> Beck's testimony on the L3 was so noteworthy that it prompted a query from the jury:
>> THE COURT: So, Mr. Beck, did you – were you both strip searched and body scanned?
>> THE WITNESS: Yes, I was.

Tr. Vol. III at 465.

Thus, the jury was cognizant of the L3 machine. It was also curious why the L3 was being used in addition to strip searching. It was also made aware the Sheriff had used the machine on class members during the relevant class period.

Once Plaintiffs had broached the issue, the Sheriff had the right, indeed duty, to explain the parameters of the L3 machine. Through Dan Brown, the Sheriff attempted to explain why the L3 was being used. The Court refused. (Tr. Vol. V at 1169-83). This ruling prevented a number of issues from being discussed. That the L3 was used in conjunction with the strip searches because it was a new technology. That the Sheriff did not have the luxury of assuming the technology was effective. That the dangers of contraband mandated the Sheriff double check detainees via strip searching after the L3 scan. Precluding these points harmed the Sheriff by suggesting they did not have a legitimate reason for not using the L3. This harm was pervasive.

  C. **Summation.**

The Court's evidentiary rulings deprived the Sheriff of a fair trial. A new trial is warranted if the trial court erred in its evidentiary rulings and the error has a substantial and injurious effect or influence on the outcome of the trial. *Bintz v. Bertrand*, 403 F.3d 859, 869 (7th Cir. 2005). The CRIPA letter allowed the jury to hear evidence that could not be cross-examined by the Sheriff. The effect of these errors warrants a new trial.

**III.** **The Court Erred in Denying Certain Sheriff's Instructions.**

The Sheriff adopts and incorporates by reference all objections made to Plaintiffs' tendered instructions as stated in the jury instruction conference. *See, e.g.,* Sheriff's Objections attached hereto as Exhibit A.

**IV.** **The Jury's Finding That Plaintiffs' Fourth Amendment Rights Were Violated Was Against The Manifest Weight of the Evidence.**

  A. **The Malleable Nature of Plaintiffs' Case.**

From the outset, Plaintiffs' case has been a moving target. It began as a challenge to the blanket nature of the search policy. It then morphed into a suit about the presence of canine units, female correctional officers, and bodily fluids. Plaintiffs emphasized the distinction between the bend and spread and squat and cough techniques, but mid-way through trial announced they were not contesting the constitutionality of either procedure. In the end, Plaintiffs' case became

mainly about the mockery by correctional officers. Plaintiffs' ever shifting theories flummoxed the jury and precipitated otherwise unnecessary jury instructions.

### B. Fourth Amendment Rights are at a Nadir in Jail.

Plaintiffs repeated the mantra that they were not challenging the constitutionality of the search itself, but rather the manner. (Tr. Vol. I at 265, 272). This is belied by the existence of their Fourth Amendment claim. The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. Amend. IV. But Fourth Amendment protections are diminished in a correctional setting. *Hudson v. Palmer*, 468 U.S. 517 (1984). Moreover, "courts prudently are deferential to the experienced judgment of prison administrators." *Fernandez v. Rapone*, 926 F.Supp. 255, 260-61 (D. Mass. 1996). Plaintiffs' Fourth Amendment claim proves the search itself was challenged.

The seminal case on visual search policies is *Bell v. Wolfish*, 441 U.S. 520 (1979). The Court found the reasonableness of a search is determined by "balancing . . . the need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559. In doing so, the Court considered "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* The justification for the searches and their location motivated the Court. "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell*, 441 U.S. at 559.

The jury's finding against the Sheriff on the Fourth Amendment was against the manifest weight of the evidence. It also defies binding precedent. "The prisoner's expectation of privacy always [must] yield to what must be considered the paramount interest in institutional security." *Hudson*, 468 U.S. at 528. The Sheriff's interest is indisputable: "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier*, 417 U.S. 817, 823 (1974).

### C. The Court's Evidentiary Rulings Blurred the Fourth Amendment Issue.

A new trial is warranted on Plaintiffs' Fourth Amendment claim due to the limited evidence the jury received on the issue. The Sheriff could not present evidence of the reasonableness of the search. This deprivation manifested itself in numerous ways. The Sheriff

could not elicit evidence that the detainees had attended a bond hearing, that there was a finding of probable cause, and an order remanding the detainees to the custody of the Sheriff. The Sheriff was also barred from presenting evidence of specific instances of contraband found during the intake strip search. Such evidence supports the arguments that the searches were reasonable and conducted in a reasonable manner. This evidence would have demonstrated the need for the search trumped Plaintiffs' privacy rights. *See Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (privacy expectations of detainees can not overcome security interests). The Court's refusal to permit this evidence is incompatible with *Bell v. Wolfish* and warrants a new trial.

Limiting the Sheriff's avenues was problematic enough. But the damage of these rulings was exacerbated by permitting the Plaintiffs to touch upon these taboo topics. Plaintiffs adduced testimony regarding the Sheriff's custody of the detainees in the early morning hours without allowing explanation that this was at bond court proceedings-before detainees entered the Jail. This testimony allowed the jury to infer that the Department of Corrections had custody of the detainees as early as 5 a.m., and the possibility of performing an earlier search. This misrepresentation ignores the fact that a judge would not have remanded the detainee to the Department of Corrections at that point. The bond hearing would have been further evidence used to impeach many of the Plaintiffs' witnesses who stated they were searched in the early morning hours (an impossibility). The Sheriff was denied the ability to attack the Plaintiffs' credibility and was denied the factual basis to argue why the Department of Corrections did not have custody of the detainees.

The Court denied the Sheriff the opportunity to present evidence that no inmate is remanded to the custody of the Sheriff until after a bond hearing. Yet, Plaintiffs presented a plethora of evidence which had no bearing on the constitutionality of the intake strip-search procedures from February of 2007 until March of 2009. Plaintiffs presented evidence regarding the conditions of the RCDC, searches predating the class period, and the proposed viability of performing the strip searches in the clothing room of Division V. Further, Plaintiffs routinely used excerpts from the DOJ and published specific instances of violence occurring in the RCDC which had no relevance to the intake searches.

Despite allowing Plaintiffs to veer into these irrelevant topics, the Sheriff was barred from presenting any evidence of bond hearings or specific contraband reports from searches

which predated the class period. Additionally, The Sheriff could not utter the individual criminal charge of any class member, let alone the nature of said charges, which form an additional basis for the strip search policy. In essence, Plaintiffs were allowed to present irrelevant and prejudicial evidence far removed from the time frame in which the intake searches were conducted while the Sheriff's evidence was confined to the moments before the intake searches from February 2007 until March of 2009.

Plaintiffs also filed a Motion in *Limine* to bar evidence or argument about damages, which the Court granted. (Dkt. 364 at 23). Plaintiffs then proceeded to trample over their own Motion. This was not an isolated event – it occurred with virtually every class member they called. "How the detainee was injured" was supposed to be *verboten*. The following demonstrates it was not. Mr. Hytrek stated, "I've had since then in times of stress nightmares of that experience, not anything before that or after that, but that experience. And that will – I'll never forget that." (Tr. Vol. II at 359). The following colloquy involving Mr. Beck also shows how he was injured by the searches:

    Q.    Have you been able to put the strip search behind you?
    A.    No.
    Q.    Why not?
    A.    Well, I felt embarrassed. You know, I mean, it's just not something that happens to me every day. So it's not like something that's easy to forget.

(Tr. Vol. II at 426).

Mr. Winfield felt "humiliation and powerlessness." (Tr. Vol. IV at 952). Mr. Santiago (charged with exposing himself to a minor) testified that he was "ashamed." (Tr. Vol. IV at 899). This testimony contravenes Plaintiffs' own Motion. It also fostered the "humiliation" argument repeated by Plaintiffs. The prejudice emanating from this development is transparent as the feelings of humiliation were the fulcrum of Plaintiffs' case. However, The Sheriff was precluded from questioning Plaintiffs about the specifics of their arrest and how their trek through the criminal justice system affected them. The Sheriff was precluded from attacking Plaintiffs' credibility on these points. This inconsistency cannot be reconciled.

Finally, Plaintiffs' blending of Constitutional claims led to substantial juror confusion. This was evinced by a juror question during deliberations which essentially asked whether the Sheriff had probable cause under the Fourth Amendment to search the detainees. *See* Jury Questions attached hereto as Exhibit B. The jurors were not satisfied with the Court's direction

and Plaintiffs' stipulation that they were not challenging the search itself rather only the manner. The jurors cannot be faulted. Each of Plaintiffs' witnesses described procedures such as the bend and spread and squat and cough, but the Sheriff was barred from introducing evidence as to why these procedures were used. The Court's instruction regarding the use of one technique not having any constitutional significance over the other was inadequate. The jury heard evidence of the Jail using invasive search procedures, but the Sheriff was barred from presenting reports of specific instances of contraband showing why they were imperative. A Fourth Amendment claim requires a balancing of the privacy invasion and the rational for that invasion. The Sheriff was deprived of the opportunity to present specific evidence which would have explained the need for the Jail to use the bend and spread or squat and cough procedures.

The Seventh Circuit has observed, "it is difficult to conjure up too many real-life scenarios where prison strip searches of inmates could be said to be unreasonable." *Id.* at 697. The jury's verdict is an unwarranted departure from this principle. A new trial is thus needed.

**V.     The Jury's Finding That Plaintiffs' Eighth Amendment and Due Process Rights Were Violated Was Against the Manifest Weight of the Evidence.**

**A.     The Jury Instruction on the Due Process Claim Obscured the Law.**

A jury instruction must accurately reflect the law. On this, the instruction given on Plaintiffs' Fourteenth Amendment Due Process Claim fails. The Sheriff tendered an instruction delineating the factors a jury should consider. They include the nature of the intrusion, the duration, location, penological interest behind the search, and whether the search promotes jail security. *See* Sheriff's Instruction No. 21, attached hereto as Exhibit C.

These factors were not only salient, they were integral. More importantly, they were lifted directly from the seminal correctional strip search case, *Bell v. Wolfish*, 441, U.S. 520, 558-59 (1979). But the Court stymied Sheriff's efforts to introduce these important factors. This ruling was debilitating. Without references to the penological interests and jail security, the Sheriff's position was imperiled. Moreover, the jury struggled with the punitive nature of the due process claim as evidenced by their questions during their deliberations. (See Exhibit B).

Plaintiffs objected to the instruction because it was "improperly directed [and] misstates the law." (*See* Dkt. 365 at 88). This logic is a sharp blow to the established principles of Supreme Court precedent. To judge officers' actions without providing the context for them

10

fundamentally skews the decision-making process. Not providing the "governmental purpose" for the searches maintained the fiction that Plaintiffs were not challenging the search itself. Keeping the interests of safety and security out of the instruction distorted the due process debate.

### B.  Group Searches Are Permissible.

Courts hold that visual searches in the presence of other inmates and staff are not constitutionally defective. A district court entertained the question in *Zunker v. Bertrand*, 798 F.Supp. 1365 (E.D. Wis. 1992). "Visual body cavity searches conducted after contact visits as a means of preventing inmates' possession of weapons and contraband, even absent probable cause, have been found reasonable by the Supreme Court." *Id.* at 1369. The court held, "plaintiff's privacy interest in not having other inmates view the strip searches [did not] outweigh[] the security interests of the prison in this case." *Id.* at 1370. The presence of other inmates during a strip search was found reasonable in *Difilippo v. Vaughn*, 1996 U.S. Dist. LEXIS 8823 at *6 (E.D. Pa. 1996). The district court in *Fernandez v. Rapone*, 926 F.Supp. 255 (D. Mass. 1996), held similarly. Strip searching inmates in front of others "does not render the searches unreasonable [because a] person's expectation of privacy is unquestionably diminished when he is incarcerated." *Id.* at 262. The finding of liability against the Sheriff contravenes this precedent.

"Privacy is the thing most surely extinguished by a judgment committing someone to prison." *Johnson v. Phelan*, 69 F.3d 144, 146 (7th Cir. 1995). Yet, Plaintiffs' case and the jury's verdict are the antithesis of this principle. Because the jury's verdict is against the manifest weight of the evidence and violates the law, a new trial is needed.

### C.  Verbal Threats Do Not State a Case Under § 1983.

Insults are an unfortunate but inherent part of the correctional experience. The Ninth Circuit's assessment is noteworthy: "[w]e are mindful of the realities of prison life, and while we do not approve, we are fully aware that the exchange of verbal insults between inmates and guards is a constant, daily ritual observed in this nation's prisons." *Somers v. Thurman*, 1997 U.S. App. LEXIS 12272 at *26 (9th Cir. 1997).

Although unprofessional, verbal abuse is insufficient to state a constitutional violation cognizable under § 1983. *McDowell v. Jones*, 990 F.2d 433 (8th Cir. 1993); *Emmons v.*

*McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989). Thus, a threat only violates the Fourteenth Amendment if accompanied by physical force or the present ability to effectuate the threat. *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987). Because Plaintiffs fail to allege any actual injury, the officers' derogatory comments were a red herring. The jury should not have been able to hear about claims that did not rise to a constitutional level. As the comments were a mainstay of Plaintiffs' case, the jury's verdict cannot stand.

In permitting this evidence, the Court cited the recent decision of *Mays v. Springborn*, 2009 WL 2046484 (7th Cir. 2009). But that case is inapplicable. First, the case was disposed of at the summary judgment stage. Second, the court's analysis was largely limited to whether there was an issue for the jury. Third, two of the three objections concerned elements not at play here – dirty gloves and a cold room. Fourth, the discomfort of being naked with other inmates was never broached by the *Mays* Court. These distinctions render *Mays* inapt.

### 1. Circuit Precedent Foreclosed the Jury's Finding.

The Seventh Circuit addressed this issue in *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987). An officer made offensive remarks to an arrestee. The court held, "defamation is not a deprivation of liberty within the meaning of the due process clause. No more is a derogatory racial epithet." In *Pride v. Holden*, 1993 U.S. App. LEXIS 20048 (7th Cir. 1993), the Seventh Circuit held intimidation by correctional officers did not entitle an inmate to relief because he alleged no actual injury. Plaintiffs' contentions cannot overcome Seventh Circuit precedent.

### 2. District Court Case Law Also Rejected Plaintiffs' Position.

Many Northern District Court cases hold threats and derogatory remarks are not enough under § 1983. In *Duncan v. Baird*, 2004 U.S. Dist. LEXIS 20842 (N.D. Ill. 2004), officers threatened to pay other detainees to kill plaintiff. The court held these gestures were insufficient grounds for § 1983 relief. Similarly, an officer's threat to hurt an inmate and his family did not state a claim for relief in *Bourbeau v. Franzen*, 1998 U.S. Dist. LEXIS 13778 (N.D. Ill. 1998). In *Spivey v. Godinez*, 1995 U.S. Dist. LEXIS 13640 (N.D. Ill. 1995), the court held "threats and name calling, in the absence of any physical injury to [the inmate], do not rise to the level of constitutional violation cognizable under § 1983."

The case at bar involves insults. This is insufficient to state a claim, for courts have rejected far more serious threats of physical harm. For example, in *Brown v. Walker*, 2007 U.S.

12

Dist. LEXIS 58534 (S.D. Ill. 2007), threats by guards to inflict violence and kill an inmate were insufficient to state a claim. Similarly, a guard's threat to kill an inmate was found not to be a constitutional deprivation in *Strickland v. Dunigan*, 1987 U.S. Dist. LEXIS 11126 (N.D. Ill. 1987). Thus, this Court's case law defies Plaintiffs' position.

The collective experience of the Plaintiffs highlights why their claims do not pass constitutional muster. Male detainees are searched in groups of between 30 and 80 men. They are typically monitored by 3 to 4 officers. Given this disparity, maintaining order and discipline is imperative: more so because the officers are defenseless. They carry no gun, baton, taser, or pepper spray. On the other hand, detainees are not handcuffed or shackled. (Tr. Vol. III at 580). Some are violent offenders harboring animus towards law enforcement. In this milieu, the safety of correctional staff demands detainees follow instructions.

Preserving order and discipline are essential in a correctional setting. Prison administrators "should be accorded wide-ranging deference" in facilitating these ends. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). In assessing whether excessive force is warranted, courts consider whether it was done to maintain discipline. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). These tenets reflect that officers must be able to establish authority. If not, chaos is the result. Inmates outnumber officers significantly. Some are violently inclined. This toxic mix necessitates maintaining authority, which "may require and justify the occasional use of force." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). "A single instance of physical contact motivated by a legitimate concern for institutional safety or use of abusive language by a prison guard may constitute a *de minimis* or excusable infringement of a detainee's constitutional rights." *Strickland v. Dunigan*, 1987 U.S. Dist. LEXIS 11126 at *9 (N.D. Ill. 1987). Forbidding the Sheriff from broaching the issues of specific contraband and the underlying charges of class members left this avenue blocked. Indeed, it left the impression that Plaintiffs just appeared at the Jail. Omitting the back story hindered the jury's understanding of the searches' context.

Plaintiffs allege the stench from detainees' vomit and feces coupled with the close proximity of the detainees resulted in unconstitutional conditions. While the environment was less than pristine, "some degree of unpleasant odor is the natural by-product of housing many people in a small and confined area, and the Eighth Amendment does not prohibit unpleasantness and discomfort." *Marshall v. Salter*, 2008 U.S. Dist. LEXIS 50082 (W.D. Wis. 2008). Moreover,

"inmates cannot expect the amenities, conveniences and services of a good hotel...." *Lunsford*, 17 F.3d at 1579. The critical inquiry is whether physical harm was sustained: "although [the inmate] experienced considerable unpleasantness, he suffered no physical harm." *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988). Seventh Circuit precedent precludes Plaintiffs' claim regarding the conditions.

## VI. The Jury's Findings Concerning the Equal Protection Clause Cannot Stand.

The Sheriff maintained the burden on the issue of equal protection. To prohibit the Sheriff from demonstrating why he searched in the fashion he did rendered his ability to carry the burden impossible. This alone necessitates a new trial.

The Equal Protection Clause does not prevent gender as a basis for classification when the situations of men and women differ. *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464 (1981). Detainees must be treated equally, unless unequal treatment bears a rational relation to a legitimate penal interest. *May v. Sheahan*, 226 F.3d 876, 882 (7th Cir. 2000). Institutional security was the basis for the Jail's different policies. Institutional security epitomizes "important purpose." Moreover, disparate treatment is indeed permissible if the differences in number or qualities of men versus women is shown to be a valid premise. Thus, gender based characteristics dictate divergent policies.

The contrast between men and women at the Cook County Jail is stark. Men outnumber women by almost 10 to 1. (Tr. Vol. IV at 813). In contrast, female inmates tend to have more medical problems and more complex hygiene issues. (Tr. Vol. III at 669). There are two maximum security classification divisions for the men, and none for the women. (Tr. Vol. V at 1137-38). This factor demonstrates the different security risks posed by each group. *Id.* Thus, the search process differed not due to gender but different security concerns.

The linchpin of Plaintiffs' equal protection claim is the delay between the uses of partitions for females versus males. They argue this evinces discriminatory treatment. But this assertion ignores three facts. First, there were less female detainees. Second, females' monthly bodily processes necessitated added privacy. Third, female searches were in an open gymnasium, while men were searched in a hallway, making partitions more conducive for females.

Plaintiffs have emphasized the older technology body scan machine used for females but not males evinces discrimination. While the machine does demonstrate a difference in the

process for men versus women, it shows little else. Plaintiffs have failed to show how the machine would be feasible for males. Testimony established the smaller number of women "on the new" (30-60) enabled the body scan machine process. (*See* Tr. Vol. IV at 813). Further, the older technology took several minutes to complete a single scan. In contrast, with approximately 300 men coming in daily, time constraints would make the body scan machine an impossibility. Additionally, the distance to the men versus the women's divisions provides that searching men in the RCDC is more logical. In addition, the court precluded reference to the newer L3 machine used during the class period at issue. This denied the Sheriff the ability to show that there was no unequal treatment. Both men and women underwent both a body scan and a strip search in groups.

The other facets of Plaintiffs' equal protection argument are also unavailing. First, there is a perfectly legitimate penological interest for searching the men twice. The men are searched a second time because after they are transferred to the housing division, they have commingled with detainees who are returning from court or who otherwise had contact with the outside. Plaintiffs argued the newer technology L3 body scan machine negates the need for a second strip search of males. Lt. Queen confirmed the L3 is not entirely reliable.

The differences in treatment here stem from an undeniable, immutable fact: a significant imbalance between men and women. Equal protection is not synonymous with identical treatment. *Glover v. Johnson*, 855 F.2d 277, 289 (6th Cir. 1988) (Engel, concurring). Jail security is a significant justification for the disparate treatment.

## CONCLUSION

WHEREFORE, The Sheriff respectfully requests judgment be entered as a matter of law, or a new trial be granted, and any other relief the Court deems just.

Respectfully submitted this 3rd day
of September, 2009.

SHERIFF OF COOK COUNTY


By: /s/ Daniel F. Gallagher            By: /s/ Francis J. Catania
    One of his attorneys                   Attorney for Defendant

15

Daniel F. Gallagher, Esq.
Paul O'Grady, Esq.
Larry S. Kowalczyk, Esq.
QUERREY & HARROW, LTD.
175 West Jackson, Suit 1600
Chicago, IL  60604
Tel:     (312) 540-7000
Fax:    (312) 540-0578

Francis J. Catania
Cook County State's Attorney's Office
Richard J. Daley Center
50 W. Washington Street, Room 500
Chicago, IL 60602
Tel: (312) 603-6772
I.D. #6203188