# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KIM YOUNG, RONALD JOHNSON, and WILLIAM JONES, on behalf of themselves and a class of others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 06 C 0552 |
| COUNTY OF COOK, et.al., | ) ) | JUDGE MATTHEW KENNELLY |
| Defendants. | ) | JURY TRIAL DEMANDED |

### DECLARATION OF MICHAEL KANOVITZ IN SUPPORT OF CLASS COUNSEL'S PETITION FOR ATTORNEYS' FEES AND COSTS

I, Michael Kanovitz, under penalty of perjury, declare and state that:

1. I am an attorney with the law firm of Loevy & Loevy ("L&L"), the firm the Court appointed as class counsel in this case. I have served as the lead attorney for the Plaintiffs in this case since its inception.

2. Litigating this case over the course of the last five years was a major effort for our firm. At the time that the case commenced, we were a small firm of only three partners and six associates. We have grown substantially since that time and now employ twenty-one attorneys (five of whom are partners).

3. Over the years, we have assigned a number of attorneys to handle portions of the case. Detailed statements of the work they performed are contained in the billing records attached as Exhibit 1 hereto. I would like to give the Court a very brief summary of each attorney's background and qualifications.[1]

```
                                                    EXHIBIT J
```

---

[1] We are providing these records *in camera* in order to preserve all applicable privileges.

1

**Partner-level Attorneys**

4.  <u>Arthur Loevy</u> graduated from University of Michigan Law School in 1963. He has been a member of the Illinois Bar in good standing for over four and one-half decades. He practiced labor law until 1970, at which time he became an elected officer of a trade union, the Amalgamated Clothing and Textile Workers Union ("ACTWU"). For the past twelve years, Arthur Loevy has practiced law full time with Loevy & Loevy ("L&L"). Over that time, he has appeared in more than 230 federal civil rights cases. Mr. Loevy is the most senior lawyer at L&L. Although our firm has not adopted the usual law firm titles, Mr. Loevy would be considered the managing partner at other firms.

5.  <u>Jon Loevy</u> graduated from Columbia Law School in 1993, where he was a senior editor on the Law Review and the recipient of various prizes for academic excellence. He has been lead trial counsel for more than a dozen successful federal civil rights trials, resulting in combined career jury verdicts exceeding $80 million. At one point, Jon Loevy won ten civil rights trials in a row, most involving very challenging fact patterns. Twelve times, he has won jury verdicts in excess of $1 million. In addition to trial skills, Jon Loevy is also an accomplished appellate lawyer, having won thirteen out of the last sixteen cases that he argued in the federal appellate courts. Mr. Loevy is a former associate attorney at Sidley & Austin LLP.

6.  <u>Mike Kanovitz</u> graduated with honors from the Cornell Law School in 1994. After graduation he returned to his home in Kentucky where he practiced in the litigation department of the large law firm, Stites & Harbison, for three years. After leaving Stites, he spent one year co-authoring a textbook on constitutional regulation of police procedures. He then relocated to Washington D.C., where he learned class action litigation practicing at Mehri, Malkin & Ross, a boutique class action law firm in Washington, D.C., which represents plaintiffs

in large employment discrimination class actions. He became a partner with L&L in 2001. Since joining L&L, Mr. Kanovitz has served as lead attorney for plaintiffs in 11 federal trials (with only one defense verdict) and eight federal appeals (in six of which his client prevailed, and one of which is still pending), and has been appointed as lead class counsel in four certified class actions. Together these class actions cover approximately one million clients. Mr. Kanovitz's cases have resulted in verdicts and settlements of over $40 million, exclusive of *Young*.

**Associate and Of Counsel Attorneys**

7. <u>Heather Lewis Donnell</u> graduated from Yale Law School in 2004. After law school, she clerked for the Honorable Diane P. Wood of the United States Court of Appeals for the Seventh Circuit. Prior to joining L&L in 2010, Ms. Donnell was a litigation associate at Mayer Brown LLP. During her tenure at Mayer Brown, she represented large corporations in insurance coverage, anti-trust, securities and white-collar criminal defense actions. She also represented numerous *pro bono* clients, including an individual in a four-day criminal trial and another in a successful grant of asylum. She is an experienced appellate lawyer, winning two successful appeals in the Illinois Appellate Court and submitting several amicus briefs to the United States Supreme Court on behalf of former federal judges, senior Department of Justice officials and retired military officers in litigation related to Guantanamo detainees. Before leaving Mayer Brown on a maternity leave in June 2009, Ms. Donnell's billing rate was $395. Based on information she has gathered from the current associates at Mayer Brown, it appears that her billing rate would be in excess of $425 were she still practicing there.

8. <u>Joel Feldman</u> graduated magna cum laude from the University of Illinois College of Law in May 1993 and was admitted to practice in Illinois that year. He has also been admitted

3

to the Northern District of Illinois. Following law school, Mr. Feldman practiced with three prominent Chicago law firms: Katten Muchin & Zavis, Hopkins & Sutter (later called Foley & Larder) and Schwartz Cooper (later called Dykema). In 2002, Mr. Feldman began representing plaintiffs in consumer class action and "lemon law" litigation with the national class action law firm of Macey, Chern & Diab. Since becoming Of Counsel to L&L in 2009, Mr. Feldman has assisted L&L in pursuing class actions and individual litigation.

9. <u>Matthew Jenkins</u> graduated from Chicago-Kent College of Law in 2007. During law school, he was named a Public Interest Law Initiative Scholar. In 2007, he was admitted to practice law in Illinois. He has also been admitted to the U.S. District Court for the Northern District of Illinois and the U.S. District Court for the Southern Districts of Illinois. Currently, he is an associate with the Chicago law firm of Corboy & Demetrio.

10. <u>Roshna Bala Keen</u> graduated from Northwestern University Law School in 2004. She served on the Law Review and was awarded the Arlin Miner Prize for Outstanding Brief Writing. After law school, Ms. Keen worked for four years at Sidley Austin LLP, where she handled federal and state litigation, white collar matters, and False Claims Act suits, in addition to working extensively on *pro bono* matters. At L&L, Ms. Keen has been trial counsel on eight trials. She has also worked on three class action lawsuits. Ms. Keen's billing rate when she left Sidley Austin LLP was approximately $425. Based on information she has gathered from fellow associates who still work at Sidley Austin, the firm would bill for Ms. Keen's work at a rate in excess of $465 per hour were she still practicing there.

11. <u>Samantha Liskow</u> graduated from Columbia Law School in 2005. During law school, she worked for a number of civil rights organizations, including the national office of the American Civil Liberties Union, and represented prisoners in connection with the Columbia's

4

prisoner clinic. In her five years with the L&L, Ms. Liskow has gained litigation experience that is far richer than many fellow 2005 law school graduates from Columbia Law School. She has served as the primary litigator on dozens of civil rights cases. Ms. Liskow has served as trial attorney on five cases; in all of those cases, the plaintiffs were victorious. She has helped draft appeal briefs, and has argued an appeal in the Seventh Circuit. Ms. Liskow also served as the lead counsel in a high-profile suit for the release of documents related to police misconduct.

12. Aaron Mandel graduated from the University of Chicago Law School in 2004 and was an Olin Fellow. After graduating, Mr. Mandel completed a clerkship for the Staff Attorney of the United States Court of Appeal for the Seventh Circuit in 2006. Thereafter, he worked as an associate in the general litigation department at Sidley Austin LLP in Chicago for two and one-half years. Mr. Mandel joined L&L in April, 2009, after leaving Sidley Austin. Mr. Mandel's billing rate when he left Sidley Austin LLP was $425. Based on information he has gathered from fellow associates who still work at Sidley Austin, the firm would bill for Mr. Mandel's work at a rate in excess of $465 per hour were he still practicing there.

13. Gregory Swygert graduated with honors from the Northwestern University School of Law in 2003. During his time at law school, he worked in the Legal Clinic's Center on Wrongful Convictions. Following law school, Mr. Swygert worked for the Capital Post-Conviction Project of Louisiana, where he represented death row inmates at the state post-conviction and federal habeas corpus litigation stages. He then became a two-year law clerk for the Honorable Arthur J. Tarnow of the United States District Court for the Eastern District of Michigan. Mr. Swygert joined L&L in 2007 and has since gone on to a position with the Illinois Appellate Defender's Office in the Capital Post Conviction Unit.

14. <u>Julie Thompson</u> graduated from The John Marshall Law School in 2008 and was admitted to the Illinois bar that year. While in law school, Ms. Thompson received recognition for her achievements in public interest law, including: the Lawton Memorial Scholarship, the Louis L. Biro Scholarship, and the Student Bar Association Public Interest Scholarship. Since 2008, Ms. Thompson has been working with L&L, focusing on civil rights litigation. She has as trial counsel at four federal civil rights trials, all of which resulted in verdicts in favor of the plaintiffs.

15. <u>Cindy Tsai</u> graduated from Loyola University Chicago School of Law in 2007 and was admitted to the Illinois bar that year. Ms. Tsai also obtained a Masters in Business Administration from Loyola University School of Business in 2007. During law school, she was executive editor of the law review and placed second in the Thomas Tang moot court. Since 2008, her practice with L&L has focused on civil rights litigation and she has worked on four civil rights class actions.

**Project Group Attorneys**

16. <u>O. Nathaniel Banks</u> was admitted to practice law in the state of Illinois in 1999. He graduated from DePaul University College of Law in 1999.

17. <u>Jonathan Bell</u> was admitted to practice law in the state of Illinois in 2007. He graduated from Loyola University Chicago School of Law in 2007.

18. <u>Neil Berkowitz</u> was admitted to practice law in the state of Illinois in 2010. He graduated from Chicago-Kent College of Law in 2010.

19. <u>Elizabeth Butler</u> was admitted to practice law in the state of Illinois in 1993.

20. <u>Alexandra Corrigan</u> was admitted to practice law in the state of Illinois in 2008. She graduated from DePaul University College of Law in 2008.

21. <u>Susan DeConstanza</u> was admitted to practice law in Illinois in 2008. She graduated from DePaul University College of Law in 2008.

22. <u>Timothy Eavenson</u> was admitted to practice law in the state of Illinois in 2008. He graduated from the John Marshall Law School in 2008.

23. <u>Daniel Edelstein</u> was admitted to practice law in the state of Illinois in 2005. He graduated from the John Marshall Law School in 2005.

24. <u>Jennifer Hartung</u> was admitted to practice law in the state of Illinois in 2009. She graduated from the University of Wisconsin Law School.

25. <u>Stacy Hronopoulos</u> was admitted to practice law in the state of Illinois in 2007. She graduated from The John Marshall Law School in 2007.

26. <u>Emily Meehan</u> was admitted to practice law in Illinois in 2007. She graduated from DePaul University College of Law in 2007.

27. <u>Rachel Mercer</u> was admitted to practice law in the state of Illinois in 2010. She graduated in the top 5% of her class and was Order of the Coif from the University of Washington School of Law in 2010.

28. <u>Michael Moskovich</u> graduated from The John Marshall Law School in 2007.

29. <u>Samira Nazem</u> was admitted to practice law in Illinois in 2010. She graduated from the University of Chicago Law School in 2010.

30. <u>Dina Ninfo</u> was admitted to practice law in Illinois in 2006, and was admitted to the Northern District of Illinois in August 2007. She graduated from the John Marshall Law School in 2006.

31. <u>Kenneth Overwater</u> was admitted to practice law in the state of Illinois in 2007. He graduated from Loyola University Chicago Law School in 2007.

7

32. <u>Michael Phelps</u> was admitted to practice law in Illinois in 2008. He graduated from DePaul University College of Law in 2008.

33. <u>Emma Scott</u> was admitted to practice law in Illinois in 2006. She graduated from the John Marshall Law School in 2006.

34. <u>Owens Shelby</u> was admitted to practice law in Illinois in 2007. He graduated from Chicago-Kent College of Law in 2007.

35. <u>Drake Shunneson</u> was admitted to practice law in Colorado in 2007 and in Illinois in 2008. He graduated from the University of Colorado Law School in 2007.

36. <u>Michael Soukop</u> was admitted to practice law in Illinois in 2007. He graduated *cum laude* from Loyola University Chicago School of Law in 2007.

37. <u>Jasmine Vasavada</u> graduated from the University of Chicago Law School in 2009.

38. In addition to the submitted time records, in 2008 L&L had two law students clerking as summer associates: Franklin Wolf and Jackie Large. The two of them were tasked with reading all of the more than 500 declarations to find good quotes and stories and create categories and lists of declarations. We do not have billing records for their work. My recollection is that they split the project fairly evenly and they worked on it for approximately two weeks. Accordingly, I estimate that they would have spent approximately 60 hours each.

### L&L's work on this case

39. Broadly speaking, the work that L&L did in the course of representing the Plaintiffs in this case consisted of the following:

    (1) Formulating the classes' claims and drafting the complaint;

    (2) Resisting the multiple bases for the Defendants' motions to dismiss;

    (3) Conducting discovery in support of the class certification motion;

(4) Briefing class certification;

(5) Opposing defendants' petition for leave to appeal under Rule 23(f);

(6) Mailing notice to 180,422 class members;

(7) Conducting oral and written discovery on the substantive claims, related motion practice, and document review and analysis;

(8) Investigating facts relating to national practices of other jails, including the Federal Bureau of Prisons;

(9) Analyzing the pre-existing databases to identify class members, including working with database experts;

(10) Locating class members and investigating and documenting the defendants' widespread misconduct over the class period by collecting 513 declarations from class members documenting their experiences of being strip searched at the Jail;

(11) Responding to approximately over 6,800 phone calls and 10,600 letters from class members regarding questions throughout the course of the litigation;

(12) Conducting expert discovery;

(13) Briefing cross motions for summary judgment and associated motions to strike;

(14) Preparing for and conducting an eight-day liability trial in August 2009 involving 29 witnesses, preparation of which included investigating and conducting pre-trial discovery for 34 class members revealed before trial, filing eighteen motions *in limine*, and opposing defendants' motions *in limine*;

(15) Opposing defendants' interlocutory appeal, including filing a 53-page brief on behalf of the Plaintiffs;

(16) Conducting eight days of bellweather damages trials for eight plaintiffs in March and April 2010;

(17) Negotiating settlement, including representing the class at approximately six court-mediated settlement conferences; database analysis and working with experts to identify class sizes; factual research and working with experts to establish claims rates;

(18) Drafting and negotiating the settlement documents and claims handling practices, including researching insurance claims and engaging coverage counsel to advise on the same;

(19) Preparing preliminary and final motions for approval of the settlement and researching objections;

(20) Working with claims administrators on class notice, both initial notice and ongoing additions;

(21) Fielding hundreds of class member contacts and providing substantive answers to their questions;

(22) Researching class member claims to validate the claims. This is an ongoing process. Class Counsel has agreed to supply all the labor necessary to complete this process.

40. I have presented the foregoing categories in a very summary fashion. The brevity with which I have described them should not be taken as a barometer of the actual work L&L invested in each of those tasks. To the contrary, the foregoing list encompasses over 16,000 hours of work, all of which is described in far more detail in the billing records which accompany the fee petition.

41. Also, attached hereto as Exhibit 2, and incorporated by reference, is a true and accurate narrative description of many of the more challenging aspects of the work within these categories, should the Court wish to review it. By and large it attests to the description already set out in the fee petition.

42. Attached hereto as Exhibit 3 is a summary of the lodestar value of the firm's work on the case. The total value of our firm's lodestar time expended on behalf of the class comes to approximately $5,994,894.75.

**L&L's contingency fee**

43. As a law firm that specializes in pursing cases involving civil rights violations by police and municipalities, L&L must take almost all of its cases on contingency. The economics

of running such a firm are challenging, to say the least. The firm advances the costs for litigating each case and pays salaries, healthcare, and all of the other costs of doing business without any regular cash flow. It costs our firm literally millions of dollars every year just to operate.

44. Moreover, unlike many other law firms, ours is not committed solely to maximizing profits. Because we are a civil rights firm, devoted largely to protecting the rights of people who lack power in our society, we take numerous cases where the interests of justice so dictate, even if representation is not technically "economically rational," including small damages cases and *pro bono* matters.[2] Nevertheless, we still must confront the same economic realities as any other business. The firm employs and pays the salaries and benefits of twenty-one full-time lawyers, several part-time lawyers, and an associated support staff. We also pay the costs to staff and run a wrongful conviction clinic at the University of Chicago Law School (with attorneys, a paralegal and an investigator) that provides representation to dozens of prisoners needing *pro bono* representation for post-conviction challenges. The overhead associated with an operation of our size is quite substantial.

45. Moreover, when the cases that we have taken fail, we lose the monies we have advanced and receive nothing for our work. Our firm has lost multiple cases where we had invested more than $100,000 in cash, to say nothing of thousands of hours of attorney time. See, e.g., Manning v. United States, 546 F.3d 430 (7th Cir. 2008) ($6.6 million Bivens claim jury verdict vacated); Evans v. City of Chicago, 513 F.3d 735 (7th Cir. 2008) (unsuccessful jury trial from man who was incarcerated for 27 years following a wrongful conviction; split decision in the Seventh Circuit, split decision *en banc*). See also White v McKinley, 4:05-cv-00203-NKL,

---

[2] That is not meant to imply that our firm is not economically successful. Because we hire outstanding lawyers who are extremely committed to the firm's mission, we have been fortunate to win enough of our cases to ensure that the firm is viable from a business perspective.

11

Dkts. 447-450 (W.D. Mo.) (following two-week jury trial and successful appeal, municipality refused to indemnify judgment of $16 million in wrongful conviction case on which L&L was the lead firm).

46. For a contingency practice to survive it must cover the risk it takes in every case by balancing the losers with recoveries in the winners. On this point, it has been our consistent experience that civil rights cases are extremely difficult to win, a constraint which limits the number of attorneys who have devoted their practice to these kinds of cases to a tiny fraction of the bar. Even if we are aggressive and diligent enough to get cases over summary judgment, often no easy feat, the specter of a negative outcome is ever-present, given, for example, the difficulty of persuading juries with sometimes-unsympathetic clients, or persuading a sometimes-skeptical Seventh Circuit. Thus, when we do prevail, those successes keep our firm operating.

47. Our fee structure reflects these economic realities of the civil rights contingency practice. We take many "small" cases -- where the damages are modest although the principles at stake are great, and we also take much "larger" cases, for example shooting deaths and wrongful convictions, where the damages can range well into the seven figures. Across the board, our usual contingency fee is 40% of the recovery.

48. This fee is based upon the risks we incur to pursue civil rights litigation, the difficulty of the cases -- which usually increases with the size of the damages -- and our understanding of the market for contingency representation in civil rights litigation. Moreover, L&L has built a reputation as one of the premier firms for civil rights litigation. We have assembled a team of highly qualified attorneys, many of whom once practiced in the City's

largest and most prestigious firms before making the decision to spend their careers working for plaintiffs on civil rights matters.

49. Most of the firms we know of in the civil rights bar charge a 40% contingency fee. We have confirmed this with affidavits from some of those practitioners which are included with the petition. We also know this anecdotally from times when prospective clients have "shopped around" with other civil rights practitioners.

50. I am also familiar with the firm's practices for pursuing Monell-type litigation directly against municipalities. We pursue such claims in more than half of the cases we handle, and I am comfortable estimating that our firm has actively litigated dozens of such claims, by pursuing them in discovery and, often times, at summary judgment. In addition, we have pursued several such claims all the way through jury trial. See, e.g., Garcia v. City of Chicago, 01 C 8945 (Holderman, J.) (favorable jury verdict on Plaintiff's Monell claim alleging Chicago's O.P.S. system was so dysfunctional that it encouraged abuses); Robinson v. City of Harvey, 99 C 3696 (Lefkow, J.) (prevailing at jury trial on the same sort of Monell claim); Smith v. City of Urbana, 01 C 2209 (Baker, J.) (favorable jury verdict on Plaintiff's Monell claim alleging failure to train and policy maker indifference to faulty take-down techniques); Parish v. City of Elkhart, 07 C 0452 (Lozano, J.) (successful jury verdict on Plaintiff's Monell claim alleging failure to train and policy maker indifference to abuses during murder investigations).

51. Under the Settlement Agreement, L&L is entitled to petition the Court for a contingency fee of one-third of the Settlement Fund. For all of the reasons stated in our Petition, 33.33% is a reasonable contingency fee percentage given the risk/benefit profile for the case. Based on our usual practices and our experience with prospective clients for over the last decade, I believe that the firm would not have agreed, and would not have needed to agree, to a lesser

rate at the outset of the case.  Given the difficulties that the classes confronted to prevail and the likely amount of a future settlement when we chose to accept the case, I believe one-third is the minimum contingency percentage that our firm would have insisted upon in an arm's length negotiation.

      I declare under penalty of perjury that the foregoing is true and correct.

                                                                             _____
                                                                               Michael Kanovitz

                                                                      Dated:   February 15, 2011