### A. Early Stages of the Case

At the outset of the case, it was far from obvious that Plaintiffs would prevail, much less achieve the noteworthy victory that Class Counsel obtained. When we filed Plaintiffs' complaint in January of 2006 the law presented a number of hurdles to success. *See* Dkt. 1 (Complaint, filed January 30, 2006).

First, unlike most other jails that had faced court challenges to their strip search procedures, Cook County Jail ("CCJ") did not accept detainees into its facilities until after they had been arraigned by a judge and ordered into the custody of the Sheriff. The distinction was significant because after arraignment it is necessary for the detainee to be housed pending trial and, thus, to enter into the inner confines of the facility. The blanket security concerns in that scenario were quite different than with the typical circumstance of detainees kept in a holding cell overnight awaiting arraignment. There is no imminent need for such persons to enter the main confines of the jail and so strip searches are far less reasonable.

No Seventh Circuit case had addressed the issue of blanket strip searches of pre-trial detainees. The leading case, Mary Beth G. v. City of Chicago, 723 F.2d 1263, 272 (7th Cir. 1983), concerned police station strip searches of women in a municipal lock-up who were awaiting bond, a scenario that presented far fewer security and logistical concerns than those surrounding admission to the general population at CCJ. Indeed, the Mary Beth G. decision had noted that Bell v. Wolfish, 441 U.S. 520, 558 (1979), permits blanket strip searches under some circumstances, but distinguished it on the grounds that those searches involved people who (1) had been bound over for trial and had (2) been involved in recent contact visits. CCJ's intake strip search fit somewhere in between Mary Beth G and Bell. As a result, there was a constant risk during this litigation that the Seventh Circuit would reach a different conclusion for CCJ

than it had for police lock-up in Mary Beth G. The risk that Class Counsel feared has been gaining traction as numerous circuits have now found that blanket strip searches of misdemeanor detainees are reasonable upon eetry to the general population. See Florence v. Bd. of Chosen Freeholders of County of Burlington, 621 F.3d 296 (3d Cir. 2010); Bull v. City and County of San Francisco, 595 F.3d 964 (9th Cir. 2010) (en banc); Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008) (en banc).

In addition to the risk of bad appellate law, there were factual issues that could knock out the claims. Even under the most favorable expression of the law, blanket strip searches of persons charged with misdemeanors are still permissible so long as the facility using them has a sufficient history of contraband smuggling to make a blanket search reasonable. Mary Beth G., 723 F.2d at 1272-73. CCJ was notorious for problems with weapons and contraband. Thus, Class Counsel faced an uphill battle that with a significant risk of failure.

The law governing the methodology of the male strip search was no sure fire winner either. Bell had assumed, but not decided, that the Fourth Amendment would apply and, thus, require a reasonable methodology, but what counts as reasonable under a wide array of circumstances was not at all established. Class Counsel found the Jail's practices offensive and believed them to be unnecessary, but CCJ had its justifications, being the nation's largest jail and needing to process hundreds of pretrial detainees during a few hours each day. Moreover, the law was clear that courts could not require jail administrators to choose the least intrusive method for a strip search.

There was also the problem of proving that the widespread practices even existed, and were uniform throughout the class period. The Jail maintained that it was conducting the strip

searches in a professional manner and fronted guards, administrators, and even physicians employed by the County, to back it up.

Against this backdrop of difficult legal standards, uncertainty if the cause of action could withstand appeal, and the need to develop evidence for facts that were difficult to prove, undersigned counsel accepted the substantial risk to file and pursue the case.[1]

**B.     Class Certification**

Following the Court's rulings denying Defendants' motions to dismiss, Dkt. 37, 39, 56, Class Counsel geared up to take discovery with which to demonstrate the facts required for class certification under Rule 23(b)(3). This involved document discovery as well as depositions of policymakers, various jail guards and supervisors, and of the named plaintiffs themselves.

The difficulty of obtaining class certification was compounded in several ways. First, Defendants claimed repeatedly, and incorrectly, that the Jail's database was so antiquated that they could not produce to us a list of persons admitted during the class period. Following certification they produced the database multiple times. However, the failure to produce it for class certification prevented Plaintiffs from adducing witness evidence from the class members with which to prove of the commonality of the widespread abuses by guards during the male strip search. It also hampered Plaintiffs' ability to establish numerosity for the misdemeanor

---

[1] Counsel originally filed the Complaint on behalf of four classes, three concerning the strip search and one concerning women who had been tested for sexually transmitted diseases during intake to the Jail. Complaint at ¶¶ 39-44; Dkt. 1. After conducting substantial discovery, Class Counsel determined that the STD testing claim would not be viable as a class and chose not to seek certification. Before dropping that claim, Class Counsel obtained an agreement from the Jail to provide important notices in connection with the STD procedures in the future. The agreement was without prejudice to the rights of the putative class members to pursue any claims arising out of the testing, and no money was paid to Plaintiff or Class Counsel for making this agreement. *See* Dkt. 93. The additional strip search class was essentially a sub-class of Class I and Class Counsel determined to simplify the case by pursuing only one such class.

3

class. Defendants were claiming that persons charged with non-drug/non-weapons misdemeanors rarely entered the jail due to the i-bond system and Plaintiffs had no database with which to disprove it. Accordingly, Plaintiffs monitored the publically admissible records of admissions to the Jail for a period of time and then looked up the criminal file of each new detainee to locate those who were charged with Class II charges so as to prove that a misdemeanor class actually existed.

Second, Class I's claim about the strip search methodology turned, in part, on abuses that were *ad hoc*: terrorizing detainees, using violence and profanity, bodily fluids spilling during the search. Those sorts of conditions were likely unconstitutional, but establishing that they were universal, so as to justify class treatment for them was a difficult and risky task.

The Court found that any differences were not likely to predominate, but that ruling was interlocutory, and could be revisited as more information became available. Accordingly, building the case in discovery and trying it before a jury required special care so as not to allow the Fourteenth Amendment claims to devolve into disparate claims for different experiences.

Third, Defendants inundated Plaintiffs with irrelevant but voluminous documents. One was an exhibit of 400 "contraband reports" that were apropos of nothing at issue at the certification stage, but still required laborious analysis and tabulation so that Plaintiffs could respond to Defendants' representations about it. Another was Defendants' reliance on documents and consent decrees in *Duran* and the *Lewis v. O'Grady* case which required Plaintiffs to study those records.

Following the Court's grant of class certification, Defendants petitioned the Seventh Circuit for leave to appeal under Rule 23(f). Class counsel took the appeal very seriously and

4

briefed it thoroughly given that a grant of the petition would, at a minimum, delay the case and could undo the certification that was vital to success in the case.

### C. Class Notice

Once the Classes were certified, Class Counsel directed mailed notice (at our expense) to over 180,000 Class Members.

Many class members took a keen interest in the case, calling and writing with questions. We received over 2,000 phone calls and almost 1,800 letters between the time when we sent notice and when the case went to trial. Counsel made sure to respond to all of these contacts. We set up protocols so that class members with questions could speak to an attorney and we made sure that written questions that were appropriate for an attorney were answered by an attorney.

News of the case also spread as a result of media coverage of the Court's summary judgment decision and of the liability trial. Between the liability trial and the time when we sent notice of the proposed settlement, counsel received another 1,600 phone calls and another almost 7,000 letters, most requesting an update on the case and asking for an explanation of what the case developments meant. Again, we responded to each and every communication, providing the class members with access to an attorney whenever requested. Since sending out the notice of settlement, we have responded to over 3,200 phone calls and almost 1,800 letters from class members making direct inquiries to Class Counsel.

### D. Building the Case

This was far from a single-issue case. To prevail, Plaintiffs had to develop evidence to prove a vast array of facts and some of which changed over time as the Jail modified its policies in response to this case. Moreover, some of the issues Plaintiffs needed to prove were in tension

with one another under applicable law, meaning that Counsel not only had to invest extraordinary resources to build the case but also had to perform a careful balancing act between marshaling evidence and staying away from potential danger spots. A non-exhaustive list of these issues is attached to the Petition.

On the investigation side, we undertook a massive project to gather over 500 declarations from randomly selected class members representing a cross section of the class period. The attorneys interviewed each declarant personally to produce the declaration.

Also, given the state of the Jail's charging data on the class members, we conducted a random sample of 2,000 class members and looked up every single file on them. We used this data to estimate the number of Class II class members and also to analyze issues of length of stay for misdemeanor detainees (generally, a short length of stay would further support the class's position that post-arraignment misdemeanor detainees should be treated similarly to pre-arraignment misdemeanor detainees) with the assistance of database experts. We also surveyed procedures in other police departments and facilities and conducted a great deal of internet research to marshal evidence for the case.

Perhaps the most intensive investigation effort was in locating and vetting class members for the trials. Class Counsel faced the challenge of finding good witnesses out of a pool of hundreds of thousands of persons in a population that jurors typically find to be less than credible. Moreover, we had to prove a continuity of conduct over the course of years, which meant that we needed good witnesses from throughout the relevant timeframe. With a constant eye on preparing cases for jury trial, our firm invested heavily in locating the best witnesses available to support the Class's claims.

Formal discovery in the case was searching as well. We served multiple rounds of written discovery, took or defended 84 depositions, and reviewed some 5,000 pages of documents produced in discovery. This included intensive study of over 2,000 pages of "contraband reports" produced and relied upon by the Jail and researching court records of the persons identified to determine Class II membership.

Class counsel also had to retain experts to assist in the case, both as consultants and as testifying experts. We vetted approximately a dozen potential experts and ended up using a jail practice expert, a statistician, two database experts, and a damages expert.

### E. Summary Judgment

From the outset of the case, our attorneys' assessment was that we needed to win Class II's claims at summary judgment because they were not viable if tried to a jury. Our firm's significant experience with wins and losses in a wide array of civil rights jury trials gave us serious concern about juror antipathy towards cases that challenge blanket strip searches. Because the Jail's history of contraband problems was relevant under the law to the jury's consideration of the reasonableness of blanket strip searches, if we left a jury question open then the Jail was going to be able to put on a host of incendiary evidence about drugs and shanks and violence towards officers and the detainees themselves. This would have not only destroyed Class II's chances for success, it would also have created the appearance that the Plaintiffs' and Class Counsel's case was at odds with jail security and have had an unacceptable spillover effect on the Class I methodology claims.

Thus, merely surviving summary judgment so that we could present the case to a jury, which is the most that civil rights plaintiffs usually can hope for in discovery, was not enough. Because there was an undeniable history of contraband entering the Jail, Class Counsel needed to

so thoroughly undermine the foundation for any conclusion that the evidence was relevant to Class II's claims as to leave no jury question at all regarding the weight of the evidence. This was no easy task. There were 2,000 pages of contraband reports as well as anecdotal evidence from every Jail policymaker and employee who sat for a deposition.

 We also marshalled evidence to establish that it was feasible for the Jail to treat post-arraignment misdemeanor detainees in the same manner as other jails handle the pre-arraignment detainees who were the focus of most of the case law prohibiting blanket strip searches. This included not only issues of processing but, also, housing persons whom the court had ordered to be detained pending trial or making bond.

 We also managed to develop sufficient evidence to obtain summary judgment in the Class' favor on the methodology claims even though the Jail initially presented numerous justifications for using a group strip search procedure.

 We were able to accomplish this, mainly, because we elicited admission from Jail administrators during deposition showing that the use of privacy dividers in the hallway was a practical alternative to shoulder-to-shoulder group strip searches. However, that admission was in tension with another fact that we needed to prove: that the Jail was not in fact using the dividers as it claimed to be. We also were able to move the Defendants' own expert to admit facts that supported Plaintiffs' position by cross-examining him at his deposition. Separately, we created summaries of the declarations we had gathered in order to present evidence of repeated abuses occurring on over 500 different days of the class period. The summaries presented a powerful picture of routine abuse as a policy at work in the Jail.

### E. Liability Trial and Defendants' Interlocutory Appeal

Following the Court's rulings on summary judgment, we briefed Defendants' motions for reconsideration and its request for an interlocutory appeal. Simultaneously, we began preparing from the liability trial. L&L allocated five attorneys to get the case ready for trial on a relatively-tight schedule. We took the trial very seriously, not only for the sake of the post-February 2007 class members, but also to protect those who had prevailed via the Court's summary judgment ruling. Defendants clearly contemplated appealing that ruling and we feared that a jury verdict for the defense would have given them substantial fodder to undermine the summary judgment opinion in the eyes of the Seventh Circuit, even if it was not technically relevant. Moreover, the trial presented Defendants three bites at the apple because there were three Class I claims on which we had prevailed at summary judgment and which we needed to prove anew to the jury.

There was extensive additional investigation, discovery and motion practice prior to trial. We vetted over one-hundred class members, and then participated in both written and deposition discovery regarding 34 that were selected as witnesses. Between the Court's February 23, 2009 order on summary judgment and the commencement of trial on August 13, 2009, the parties litigated 55 written motions, 32 of which were motions *in limine*. The trial covered eight days.

Both from a standpoint of preparing the case and of presenting it to a jury, the trial of this class action was largely unchartered territory. We had little guidance. There are precious few examples of class action trials at all, much less in the context of a case like this one where there were multifarious issues and questions for the jury to consider and where the evidence consisted largely of anecdotal accounts over a long period of time.

Following a Plaintiffs' verdict on all three claims, the Defendants filed an interlocutory appeal on immunity grounds, as well as a motion to certify a far broader interlocutory appeal that

9

would cover the merits of the summary judgment decision and jury verdict, a motion to stay the case, and a motion for new trial and judgment as a matter of law. Class Counsel successfully briefed each of the motions before this Court. We also filed a motion to dismiss the interlocutory appeal in the Seventh Circuit as well as a court-ordered brief on the finality of the judgment. Those issues were sent to the merits panel and briefing was ordered on the appeal.

Despite the fact that this Court denied the Sheriff's motion to certify an interlocutory appeal on the merits of summary judgment and the trial, he argued the merits in his immunity appeal anyway, claiming that the merits of the case were sufficiently intertwined with the immunity issues to give the Seventh Circuit jurisdiction over the whole case. Accordingly, Class Counsel was called upon to defend the entire case on appeal, and we prepared an exhaustive 53-page response addressing every aspect of the merits of summary judgment and the jury's verdict. In the end, our motion to dismiss was dispositive. The merits panel found that the Defendant's immunity argument was too insubstantial to create a non-frivolous basis for jurisdiction. The appeal was dismissed without the court reaching any of the substantive issues on appeal following final judgment.

### F. Damages Trials

After the liability trial verdict and after handling briefing on the slew of Defendants' motions, Class Counsel initiated damages discovery, consulted with experts about proving damages on class-wide basis, and researched procedures for using special masters. This process culminated in Plaintiffs' motion for a jury trial on class-wide damages. Dkt. 493 (Plaintiffs' Motion to Appoint a Special Master for the Damages Phase of the Case). After responsive briefing and argument, the Court denied the motion without prejudice and stated that it would hold jury trials so that the parties could see what the claims were worth. Dkt. 503.

Prior to the damages trials, the Plaintiffs had attempted settlement at numerous junctures throughout the case: in conjunction with the Rule 26(f) conference, following class certification near the close of fact discovery, after summary judgment, and after the liability trial. Each of our attempts failed to elicit a formal counter-offer from the Defendants until after summary judgment. The Court separately held settlement discussions in the weeks leading up to the damages trials. Defendants would not go over a $20 million common fund (with a 40% contingency fee). Plaintiffs rejected the offer.

Accordingly, our five attorneys once again geared up for trial on a relatively short time frame, locating witnesses, participating in written and oral discovery, working with an expert, engaging in motion practice, and preparing ten plaintiffs for trial. In addition to the Class Members, Counsel prepared damages witnesses for each Class Member, who were deposed but did not ultimately testify. We also deposed 13 Cermak Health Services employees and Jail employees, disclosed by the Defendants to rebut the damages plaintiffs, but who never testified. Three separate jury trials were held back-to-back over the course of nine days. At the end of each trial, the juries returned verdicts in favor of Plaintiffs and awarded substantial damages to compensate for them for their injuries.

### G. Settlement Process

Even after Plaintiffs prevailed at each stage, including motions to dismiss, class certification, summary judgment, two interlocutory appeals to the Seventh Circuit, a liability trial, and three individual damage trials, negotiating a favorable settlement for the Class was not easy. In addition to the complexity of modeling claims rates and analyzing class sizes, the Parties were far apart on money, and the Parties' willingness to settle was being thwarted by several insurers' refusals to pay under the County's policies.

The Court is all too familiar with the fact that it required over 6 mediation sessions as well as much additional work among the Parties to finally reach a settlement agreement. To make the settlement work, Class Counsel had to analyze numerous issues of insurance coverage and assignments as well as the practical amount which could be obtained from the County given the political dimensions of the settlement. This required a great deal of research regarding relatively esoteric issues of insurance coverage, bad faith litigation, and municipal liability insurance policies. One measure of how complicated the negotiation became is that the lawyers for both sides had to hire coverage counsel to advise them.