**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| KIM YOUNG, RONALD JOHNSON, | ) | |
| WILLIAM JONES, ALLEN GORMAN, | ) | |
| GERRAD LAMOUR, LEE MERCADO, | ) | |
| BRADLEY HYTREK, CARL GRAY, and | ) | No: 06-CV-552 |
| MATTHEW LIPTAK, on behalf of themselves | ) | |
| and a class of others similarly situated, | ) | |
| | ) | JUDGE KENNELLY |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| COUNTY OF COOK and SHERIFF TOM | ) | |
| DART, Sheriff of Cook County | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THE PARTIES' JOINT MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Table of Contents

Table of Authorities .................................................................................................................. ii

Introduction ............................................................................................................................... 1

Facts .......................................................................................................................................... 3

    A. Overview of the Litigation .......................................................................................... 3

    B. The Settlement Process and the Settlement Agreement ............................................ 3

    C. Notice and Claims Administration .............................................................................. 5

    D. Per-Class Member Distribution ................................................................................. 9

Discussion ............................................................................................................................... 12

    A. The Proposed Settlement is Fair, Reasonable and Adequate, and Should
       Be Finally Approved ................................................................................................. 12

         1. The Strength of Plaintiffs' Case Is Appropriately Balanced with
            Defendant's Settlement Offer ..................................................................... 13

         2. Continued Litigation Would Be Lengthy, Complex And Costly ................. 15

         3. There Is Virtually No Genuine Opposition To The Settlement
            Agreement ................................................................................................... 15

         4. Class Counsel Supports This Settlement Agreement ................................... 19

         5. This Settlement Was Negotiated Only After Significant Discovery
            And Litigation ............................................................................................ 19

    B. The Notice Provided To Class Members Meets Due Process ................................... 20

    C. The Court Should Grant Final Certification of the Two Settlement Classes ............. 22

Conclusion .............................................................................................................................. 23

Table of Authorities

Armstrong v. Bd. of Sch. Dirs. of Milwaukee, 616 F.2d 305 (7th Cir. 1980) ........................12, 13

Boone v. City of Philadelphia, No.05 CV 0185 (E.D. Pa. June 1, 2009) ...............................11, 12

Bull v. City and County of San Francisco, 595 F.3d 964 (9th Cir. 2010) (en banc) ...................15

Bullock v. Dart, No. 04 CV 01051 (N.D. Ill.) (Filed Nov. 17, 2010) ...........................................1

Calvin v. Sheriff of Will County, 03 CV 3086 (N.D. Ill. Nov. 11, 2006) ..............................11, 12

E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884 (7th Cir. 1985) ..........................12, 13, 17

Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998) ......................................................................12

Florence v. Bd. of Chosen Freeholders of County of Burlington, 621 F.3d 296
    (3rd Cir. 2010) ....................................................................................................................15

Gautreaux v. Pierce, 690 F.2d 616 (7th Cir. 1982)....................................................................12

Isby v. Bayh, 75 F.3d 1191 (7th Cir.1996) .....................................................................12, 13, 15

Jackson v. Sheriff of Cook County, No. 06 cv 493 (N.D. Ill. Nov. 2, 2007) ...................1, 8, 9, 11

McBean v. City of New York, 233 F.R.D. 377 (S.D.N.Y. 2006)...................................................9

Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985) ........................................................20, 21

Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008) (en banc) .....................................................15

Reynolds v. Beneficial Nat. Bank, 288 F.3d 277 (7th Cir. 2002)................................................14

Synfuel Technologies, Inc. v. DHL Express (USA), Inc., 463 F.3d 646
    (7th Cir. 2006)...............................................................................................................13, 14

Tyson v. City of New York, Case No. 97 cv 3762 (S.D.N.Y)........................................................9

Williams v. County of Los Angeles, 2:97 cv 03826-CW (C.D. Cal.) ...........................................9

Plaintiffs, by and through undersigned class counsel, Loevy & Loevy, respectfully submit this Memorandum in Support of the Parties' Joint Motion for Final Approval of the Settlement Agreement. The Motion should be granted for the reasons that follow.

## Introduction

Plaintiffs and their counsel overcame numerous obstacles to reach the point of a satisfactory settlement. They aggressively litigated for over four years, pushing the case much further than most class actions ever go. As a result, the Class was able to achieve a record-breaking settlement of $55 million in cash, plus an assignment of claims. All parties to the case now seek to have the Court finally approve the Settlement and bring this litigation to an end.

Courts consider several factors at this stage of the settlement process, and here they all point unanimously to final approval. For starters, Counsel respectfully submits that the negotiations yielded the maximum amounts that the Class could have hoped to attain in settlement, and the resulting fund is clearly fair and adequate for the Class. Other cases raising comparable issues for comparable classes achieved far less. See, e.g., Motion for Preliminary Approval and Settlement Agreement, Bullock v. Dart, No. 04 CV 01051 (N.D. Ill. Nov. 17, 2010) ($1.4 million dollar fund for class of 16,000 individuals with payment awards between $100 and $200 per valid claim) (attached as Group Exhibit A at pp. 1, 10-11); Order Granting Final Approval and Memorandum in Support of Proposed Settlement, Jackson v. Sheriff of Cook County, No. 06 CV 493 (N.D. Ill. Nov. 2, 2007) ($4.575 million dollar fund for class of approximately 100,000 individuals with payment awards between $100 and $200) (attached as Group Exhibit B at pp. 1, 3).

Moreover, settlement was the only good litigation option at the time that the Class chose to settle. Not only did the Class avoid the risk of appeal from the forthcoming final judgment -- which in this case was a serious concern in light of changing law and the fear of sympathy for Defendants' financial position -- it also avoided the untenable deluge of individual damages trials. Put simply, even if the Class won the appeal, most Class Members would have been losers in practical effect because of the impossibility of trying so many damages claims. There can be little doubt that the Settlement is fair and in the best interests of the Class.

Likewise, the notice sent to the Class was extremely effective. Class Counsel worked very hard to increase Class Member participation, and as a result of all of those diligent efforts (explained below), the Class Members have submitted claims at a high rate of at least 25%. By comparison, class actions involving strip search claims in New York and Los Angeles achieved claims rates of only 10% or less.

Finally, there have been very few objections to the settlement, particularly for a class of this size. Of the seven total objections, one was filed by an individual who apparently believes he should receive over $1.3 million from the fund, one seeks to have an award of clemency instead of money damages, and the remaining objections do not demonstrate any substantial grounds to doubt the adequacy and fairness of the Settlement.

Accordingly, and for the reasons that follow, the Court should finally approve the Settlement, finally certify the Settlement Classes, and order the Claims Administrator to make payments from the Settlement Fund to Class Members who have submitted timely and valid claims.

<u>Facts</u>

**A.      Overview Of The Litigation**

As the Court has had the opportunity to observe over the last four and one-half years, the parties actively and aggressively litigated this case before reaching a settlement. The case proceeded all the way through summary judgment, a liability trial, an interlocutory appeal, and several damages trials – the later three stages going well beyond the amount of process that most classes receive. In other words, the claims here were thoroughly litigated; there is no sense in which the Settlement was reached prematurely or without an ample exploration of the merits of the Class' prospects and pitfalls.

Class Counsel's previously-filed Petition for attorneys' fees, costs, and class member incentive bonuses (Dkt. 637) contains an extensive summary of the litigation activities during each stage of the litigation, as well as the associated risks faced by the Class. Rather than set forth the same lengthy and detailed background here, Plaintiffs respectfully refer the Court to pages 20-28 of that pleading, which is incorporated herein.

**B.      The Settlement Process And The Settlement Agreement**

The Settlement Fund that was eventually accepted by the Class was not only the result of not only hard litigating, but also hard bargaining. As the Court is aware, the parties spent months in negotiations, both in six mediation sessions involving this Court, as well as additional outside conversations. Both sides also hired insurance coverage attorneys to advise them about the various applicable insurance policies that covered Cook County during the class period. Plaintiffs also analyzed the Defendants' database, reviewed claims rates from other class actions with similar populations of claimants, and

3

conducted a 2,000 person random sample audit to gain a better understanding of the percentage of detainees who fit the Class II definition. Based on all of these efforts, Class Counsel was able to negotiate a Settlement Fund that maximized the total consideration that the County was able to pay to the Class.

The proposed Settlement Agreement provides the Class with both a $55 million dollar cash fund and an assignment of claims against certain of the County's insurers (the "Settlement Fund"). See Exhibit C (Settlement Agreement at ¶¶ 27-28). The cash portion pays for compensation to Class Members, as well as the costs of notice and settlement administration, incentive bonuses to class members who assisted the class, and the attorneys' fees and costs for Class Counsel. Id. at ¶¶ 29-33. The cash available for payment to the Class will be distributed in shares which vary based upon three categories of class membership: men in Class II, men in Class I, and women in Class II. Id. at ¶ 34. A reversion of up to $5 million was also built into the Settlement to protect Cook County in the event that the class claims rate was not sufficient to consume the funds available for payment, net of fees and costs, using an expected payment of $1,000 for Class II men, $700 for Class I men, and $500 for Class II women. Id. at ¶ 37. However, as explained below, the claims rate in this case should be more than sufficient to moot any reversion. See Exhibit D (Declaration of Michael Kanovitz at ¶ 10). The Settlement Agreement provides that Settlement Class members will receive their payment from the cash portion of the Fund within 91 days after the entry of a final order approving the settlement (and assuming there are no appeals). See Exhibit C (Settlement Agreement at ¶ 44).

The Settlement Agreement also proposes that this Court retain jurisdiction until the litigation on the assigned claims is finally resolved so that the Court can determine

the fairness of any settlement on the insurance claims and apportion fees and costs, though it does not require that such claims be pursued in federal court. See Exhibit C (Settlement Agreement at ¶ 47(f)). Any additional recovery on the assigned claims will be distributed to the claimants in a manner like the cash portion will be distributed. Id. at ¶ 44.

> **C.** **Notice and Claims Administration**

On November 24, 2010, the Court granted Plaintiffs' motion for preliminary approval of the Settlement Agreement, and ordered the Claims Administrator to mail individual notice to potential Class Members. Dkt. 628; 624. The Court also approved the parties' Notice Plan, Published Notice and Claim Form. Id.

On December 13, 2010, pursuant to the Notice Plan, individual notices were mailed to 249,589 persons who appeared to be Class Members based on the data provided by Cook County Jail. See Exhibit E (Affidavit of Robin Niemiec at ¶ 12). The Notice was sent after the Claims Administrator first researched the last known address for Class Members in LexisNexis (which resulted in 155,555 updated addresses for individuals), and ran the class mailing list through the United States National Change of Address database. Id. at ¶ 7. In addition, Class Counsel provided the Claims Administrator the current population of individuals held at Illinois Department of Correction Facilities ("IDOC") that Counsel had obtained via the Illinois Freedom of Information Act ("FOIA"). Id. at ¶¶ 8-10; Exhibit F (Affidavit of Roshna Bala Keen at ¶ 8). Counsel directed the Claims Administrator to compare the Class mailing list with IDOC's population, which resulted in sending 29,019 individual Notice packets to Class

Members within IDOC facilities, who likely would not otherwise have received notice. See Exhibit E (Niemiec Aff. at ¶ 9); Exhibit F (Bala Keen Aff. at ¶ 8).

To ensure that these Class Members received timely notices, Counsel also researched IDOC's mail rules for each facility and instructed the Claims Administrator to print special envelopes complying with the particulars required by each facility. See Exhibit E (Niemiec Aff. at ¶ 10); Exhibit F (Bala Keen Aff. at ¶ 11). Counsel also worked with IDOC's parole division to obtain the current address for anyone on parole, which resulted in sending 24,769 Notices to updated addresses for Class Members. See Exhibit E (Niemiec Aff. at ¶ 11); Exhibit F (Bala Keen Aff. at ¶ 9). The Claims Administrator mailed an additional 14,730 Notice Packets based on individuals' requests. Exhibit E (Niemiec Aff. at ¶ 13).

Despite these efforts, approximately 87,050 Notice Packets were returned as undeliverable without forwarding address and 1,086 were returned with forwarding addresses, which the Claims Administrator then mailed to the new addresses. Id. at ¶ 14. For any Notice Packets returned from IDOC facilities, the Claims Administrator went to IDOC's inmate locator on the IDOC website to find the current facility at which the individual was held, and then re-mailed the Notice Packet, which resulted in 1,933 Notice Packets being sent to a second IDOC facility. Id. All told, 266,252 Notice Packets were mailed to potential class members. Id. at ¶ 16.

In addition to the individual mailed Notice, published Notice was provided in two print cycles in: (1) La Raza, a Spanish-language weekly publication, published on December 17, 2010 and January 14, 2011; (2) the Chicago Sun Times, published on December 15, 2010 and January 15, 2011; (3) the Chicago Defender, published on

December 15, 2010 and January 12, 2011; and (4) Prison Legal News, a monthly

publication for incarcerated individuals, published on December 1, 2010 and January 1,

2011. See Exhibit E (Niemiec Aff. at ¶ 18). Published Notice ran in each of the

publications as a quarter-page advertisement located in the main body of the paper (not

the classified section). Additionally, a blank claim form was published in Prison Legal

News in both print cycles, allowing incarcerated individuals to directly submit a claim

form without needing to request one, which often requires extra time for these

individuals.

The Notice Plan provided that the Jail would post "the Published Notice inside the

Cook County Jail Receiving Classification and Diagnostic Center [RCDC] in a location

that is accessible and visible to detainees." See Exhibit C (Settlement Agreement at ¶

14(h)). No date was specified for when the posting would occur, though the parties had

contemplated that the posting would be placed in RCDC beginning on December 13,

2010, the date of the initial mailing.

The Cook County Department of Corrections ("CCDOC") posted the Published

Notice on January 3, 2011. See Exhibit F (Bala Keen Aff. at ¶ 13). The Published

Notice was placed not only in the RCDC but in every division of the Jail and, in addition,

it was posted in the law library and in several common areas of the Jail. Id. at ¶ 12-13.

To accommodate Class Members who were processed into the Jail between December

13, 2010, and January 2, 2011, prior to the Jail posting, the parties agreed to accept late

claims from these individuals, provided their claim is postmarked on or before February

17, 2011. Id. at ¶ 14. CCDOC has provided the Claims Administrator with a list of all

admittees to the Jail during this time period.  <u>Id</u>. at ¶ 15; <u>see also</u> Exhibit E (Niemiec Aff. at ¶ 17).

In addition to the published notice, Class Counsel held four clinics at the Chicago Harold Washington Public Library to assist class members in submitting claim forms, and also accepted a number of "walk-ins" at our law office.  <u>See</u> Exhibit F (Bala Keen Aff. at ¶ 16).  Thousands of class members also chose to contact Counsel by telephone, letter, and email. <u>Id</u>. at ¶ 4. Counsel received approximately 3,200 telephone calls and 1,800 inmate letters since sending the Notice, all of which were responded to individually.  <u>Id</u>. at ¶ 4.

The Notice campaign was extraordinarily effective, and resulted in a claims rate for this case that is well above average.  <u>See</u> Exhibit E (Niemiec Aff. at ¶ 41).  To date, the Claims Administrator has received 78,314 claim forms of which 62,037 have been found to be valid and timely. <u>Id</u>. at ¶ 39.  There are an additional 132 timely claims which the Claims Administrator still must process to determine if they are valid.  <u>Id</u>. at ¶ 38. Thus, the claims rate for this settlement is at least 25% and could be as high as 28%. This is a much higher claims rate than average for this size class.  <u>See</u> Exhibit E (Niemiec Aff. at ¶ 41) (Based on Rust's experience as the claims administrator in other civil rights settlement class actions, the 25% eligible claim rate in this case is above-average and higher than similar settlements ).  For example, the <u>Jackson</u> settlement achieved a claims rate of only 11% for the same class of Cook County Jail detainees represented here (the <u>Jackson</u> class was limited to men and the class period ended in 2007, so it covered approximately 100,000 members).  <u>See</u> Group Exhibit G at p. 1 (Plaintiff's Memorandum in Support of Approval of Proposed Settlement and Order Granting Final Approval,

Jackson v. Sheriff of Cook County, No. 06 cv 493 (N.D. Ill. Nov. 2, 2007)). Likewise,
strip search class actions in New York and Los Angeles also produced far lower claims
rates. See Exhibit D (Kanovitz Decl. at Exhibit 6) (McBean v. City of New York, 02 CV
5426 (S.D.N.Y. 2006) (11% claims rate with 3,402 claims returned out of 40,352 class
members)); id. at Exhibit 8 (Tyson v. City of New York, Case No. 97 CV 3762
(S.D.N.Y) (less than 10% claims rate with 6,000 claims returned in a class of 67,000));
id. at Exhibit 4 (Williams v. County of Los Angeles, 97 CV 03826 (C.D. Cal.) (13.3%
claims rate with 36,730 claims returned in a class of 276,717)).

Thus, as a result of the high claims rate, far more class members will receive a
payment through the Settlement Agreement than in the average case of this kind. Also,
as a result of the high claims rate, there should be no reversion to Cook County, meaning
that the Class will receive the benefit of the entire $55 million fund.

### D.    Per-Class Member Distribution

As stated, Class Counsel has previously filed a Petition for attorneys' fees and
costs, as well as class representative and class member incentive bonuses allowed under
the Settlement Agreement. Assuming the Court grants the Petition, the Class will receive
$35,335,000, or 64.2% of the cash portion of the fund. This amount will be distributed
entirely to the claimants, but, due to the high claim rates for this settlement, the estimated
distribution per-class member will be prorated in accordance with the Settlement

Agreement.[1] The estimated per-class member payment amounts in the Settlement Agreement and Notice are up to $1,000 for Class II men, $700 for Class I men, and $500 for Class II women. See Exhibit D (Kanovitz Decl. at ¶ 7). Both the Settlement Agreement and the Class Notice state that the payment each class member receives would be less than the expected amount in the event that more than the anticipated number of Class Members submitted claims. See Exhibit C (Settlement Agreement at ¶ 26); Exhibit H (Notice at Question 8) ("If more than the expected number of class members submit claims, then the actual payments from the $55 million fund will be less than the expected payments, and there will be no reimbursement to the County").

The *pro rata* adjustment amount should be approximately proportional to the amount by which the actual claims rate exceeds 20%. The final proration will also depend, to a lesser extent, upon the percentage mix of Class II to Class I claimants, because Class I men receive only 70% of the payment to Class II men, and women are only covered by the Settlement if they are in Class II.

At present, about 21% of claimants are confirmed to meet the definition of Class II based on the information for each claimant reflected in the Jail's database. See Exhibit F (Bala Keen Aff. at ¶ 20). That percentage is expected to increase to as high as 26% as

---

[1] As the parties closed the gap in their negotiations over the cash portion of the Settlement Fund and the County's reversion rights, Class Counsel tried to arrive at as accurate an estimate of the claims rate as possible. Information Counsel had on other large strip search class actions (classes of 40,000 or greater) revealed an average claims rate of approximately 13%, with a high claims rate of approximately 20%. See Exhibit D (Kanovitz Decl. at ¶ 6), and id. at Exhibit 4 (summary chart). Rust Consulting, the Claims Administrator, confirmed that these figures fairly reflect the likely claims rate range for the Young class. See Exhibit F (Bala Keen Aff. at ¶ 19). Counsel calculated the anticipate a per-class member payments based on an assumption that Plaintiffs would achieve a claims rate towards the higher end of this range.

the claims are processed, due to adjustments for ambiguities in the Jail's database.[2] If the rate of Class II membership reaches 26%, then the per-class member payments would be $770 for Class II men, $539 for Class I men, and $385 for Class II women at a 25% claims rate. Lower Class II rates would mean higher per-class member payments. Id. at ¶ 21.

Even with the above-average claims rate here, the cash portion of the fund remains so large that the prorated figures still compare favorably with the amounts paid in other strip search class actions approved as fair. See, e.g., Plaintiff's Memorandum in Support of Approval of Proposed Settlement, Jackson, 06 CV 593 (N.D. Ill. Oct. 26, 2007) (awards of between $100-$200 for strip search and invasive penile swab, subject to reduction in the event that the claims rate exceeded 16%) (attached as Group Exhibit G at p. 3); Plaintiff's Memorandum in Support of Approval of Proposed Settlement, Notice of Class Proposed Settlement and Hearing and Order Granting Final Approval, Calvin v. Sheriff of Will County, 03 CV 3086 (N.D. Ill. Nov. 11, 2006) (approving estimated payments of between $450 and $1,000 per class member, subject to reduction if the claims rate exceeded 15%) (attached as Group Exhibit I at pp., 7-8, 13, 15); Notice of Proposed Settlement and Hearing, Boone v. City of Philadelphia, No.05 CV 0185 (E.D.

---

[2] The Jail's database tracks the statute under which each class member was charged; however, that information alone is not sufficient to determine Class I/Class II membership for those statutes, which can be charged as either a felony or a misdemeanor (unless the statute involves a weapons or drug offense). See Exhibit D (Settlement Agreement at ¶ 29); Exhibit F (Bala Keen Aff. at ¶ 21). To address this deficiency the parties have agreed to send a letter to claimants with such charges, inviting them to submit proof that their charges were for a misdemeanor and not a felony. Id. at ¶ 22. The charges for claimants in this category who are known to be incarcerated (and who therefore may not have been able to obtain the necessary proof) will be researched by Class Counsel manually using Cook County Circuit Court records, a laborious process. Id. at ¶ 23. The final Class II rate is expected to be at or below 26% based on a random sample of 2,000 class members that Class Counsel researched during discovery. See Exhibit D (Kanovitz Decl. at ¶¶ 3-4).

Pa. June 1, 2009) (misdemeanants would receive between $600 and $900 each while

individuals who were arrested for more serious crimes would recover about $100 each

out of the total settlement fund) (attached as Group Exhibit J at p. 4).[3]

**Discussion**

The Court should finally approve the proposed settlement because it is fair,

reasonable and adequate. Movants explain as follows.

**A.      The Proposed Settlement Is Fair, Reasonable And Adequate, And
         Should Be Finally Approved**

 "Federal courts naturally favor the settlement of class action litigation."   Isby v.

Bayh, 75 F.3d 1191, 1196 (7th Cir.1996); see also Armstrong v. Bd. of Sch. Dirs. of

Milwaukee, 616 F.2d 305, 313 (7th Cir. 1980), *overruled on other grounds,* Felzen v.

Andreas, 134 F.3d 873 (7th Cir. 1998) ("Settlement of the complex disputes often

involved in class actions minimizes the litigation expenses of both parties and also

reduces the strain such litigation imposes upon already scarce judicial resources.").  To

finally approve a class action settlement, the Court "must determine whether a proposed

decree is lawful, fair, reasonable, and adequate." E.E.O.C. v. Hiram Walker & Sons,

Inc., 768 F.2d 884, 889 (7th Cir. 1985) (citing Gautreaux v. Pierce, 690 F.2d 616, 631

(7th Cir. 1982)).  In its review, the Court considers the facts "in the light most favorable

to the settlement" and evaluates the fairness of the settlement viewing it in its entirety,

rather than its component parts. Isby, 75 F.3d at 1199 (quoting Armstrong, 616 F.2d at

---

[3]  None of these cases achieved the high claims rates achieved here. See, e.g. Plaintiffs'
Memorandum in Support of Approval of Proposed Settlement, Calvin, No. 06 CV 03086 (N.D.
Ill.) (filed Nov. 16, 2006) (as of date of filing for final approval, the claims rate was 15%)
(attached as Group Exhibit I at p. 7); Memorandum of Law in Support of Plaintiffs' and
Defendant's Motion for Final Approval of Settlement and Class Certification, Boone, No. 05 CV
1851 (E.D. Pa. Sept. 23, 2009) (as of date of filing, claims rate was 15%) (attached as Group
Exhibit J at p. 16).

12

315 (7th Cir. 1980)). The Seventh Circuit has "admonished [the district courts] 'to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights . . . .'" Id. at 1196-97 (quoting in part E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir.1985), cert. denied, 478 U.S. 1004).

To make its fairness determination, the Court considers the following factors: (1) the strength of plaintiffs' case compared to the amount of defendants' settlement offer; (2) an assessment of the likely complexity, length and expense of the litigation; (3) an evaluation of the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel, and; (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. Synfuel Technologies, Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 653 (7th Cir. 2006), quoting Isby, 75 F.3d at 1199.

Applying the foregoing factors here strongly supports approval of the settlement as fair, reasonable and adequate. Most significantly, the approximate expected value of continued litigation to Class Members is within range of the actual settlement, which demonstrates the fairness of the County's $55 million dollar settlement offer.

## 1. The Strength Of Plaintiffs' Case Is Appropriately Balanced with Defendant's Settlement Offer

Of the factors described above, the most important is the strength of Plaintiffs' case compared with the Defendant's settlement offer. Isby, at 75 F.3d at 1199 ("The district court properly recognized that the first factor, the relative strength of plaintiffs' case on the merits as compared to what the Defendants offer by way of settlement, is the most important consideration."); see also Armstrong, 616 F.2d at 314 (same). Under the Seventh Circuit's approach to this factor, the Court must "quantify the net expected value

13

of continued litigation to the class." Synfuel, 463 F.3d at 653, quoting Reynolds v. Beneficial Nat. Bank, 288 F.3d 277, 284 (7th Cir. 2002). To do so, the Court should "estimat[e] the range of possible outcomes and ascrib[e] a probability to each point on the range." Id. Although "[a] high degree of precision cannot be expected in valuing a litigation," the Court should determine a "ballpark valuation." Id.

After years of litigating their respective positions, the parties were well-equipped to assess the settlement value of Plaintiffs' claims. From Plaintiffs' perspective, it would have been a losing proposition to continue litigating. Without a settlement, the class members would have had to face the prospect of individual damages trials in order to obtain compensation. That would be a pipe dream for most class members. Somewhere between 60,000 and 70,000 class members have submitted valid claims. If each of those persons instead had to participate in a damages trial, and assuming the Court could try three plaintiffs' claims per day, we would need a minimum of 20,000 court days, of which there are approximately 252 per year. Assuming the Court had nothing to do but try these cases, it would take much of the rest of the century to complete the trials.[4] In other words, settlement was the sensible decision for the Class as a whole.

Moreover, as the Court observed first hand, the cash portion of the fund represents the most that the County could pay in settlement (certainly as a political and practical matter). Even so, the Class is also receiving an assignment of potentially valuable claims against the insurers that refused to provide coverage. The policies provided for $80 million in coverage and the assignment includes claims to damages in

---

[4]   Certainly a Court might fashion other solutions to get class members compensated, as by using special masters or entering a liability judgment classwide so that the individual class members could pursue damages actions in multiple courts. Nevertheless, the foregoing example illustrates why a settlement was prudent at this juncture.

excess of the coverage. Although no one can predict the future, the assignments are valuable and may well result in additional monies beyond the cash portion of the fund being paid to the Class.

Also militating in favor of settlement was the risk of appeal from the forthcoming final judgments. For the reasons set out more fully in Class Counsel Fee Petition pages 9 n.4 and 14, dkt. 637, there was appellate risk on both the Class I and Class II claims, and the state of the County's financial condition loomed in the background. See also Florence v. Bd. of Chosen Freeholders of County of Burlington, 621 F.3d 296 (3rd Cir. 2010) (dismissing blanket strip search claim); Bull v. City and County of San Francisco, 595 F.3d 964 (9th Cir. 2010) (en banc) (same) Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008) (en banc) (same).

## 2. Continued Litigation Would Be Lengthy, Complex And Costly

If the parties were to continue to litigate this action through individual damage trials, each side would expend considerable time and money in prosecuting and defending their positions. As explained above, it would take almost 80 years of trial time were all the claims to be tried. The costs in attorney and court time would be enormous. Moreover, even with creative solutions to try to ensure that the class members got their day in court, many class members would certainly have to wait several years for compensation, if not longer. By contrast, the proposed Settlement Agreement provides compensation now to all of the Class Members who have submitted timely, valid claims.

## 3. There Is Virtually No Genuine Opposition To The Settlement Agreement

Given the large size of the class and the number of individual notices that were mailed, it is telling that only seven objections were received. Cf. Isby v. Bayh, 75 F.3d

15

1191, 1200 (7th Cir. 1996) (13% of jail conditions class members filed objections to settlement). Of these seven, only five were properly filed with the Court and timely.[5] Despite these deficiencies, Counsel has addressed the substance of all of the objections below.

Of these seven, one is filed by a person who requests that 2.5% of the settlement fund be allocated to him personally without any explanation or basis for doing so. See Exhibit E (Niemiec Aff. at Exhibit 9 at pp. 2-4) (Objection filed by Sienky Lallemand). His objection seeks a disproportionate and unfair allocation of the settlement fund.

The remaining objections are no more problematic. For instance, Richard Kearney objects to the fact that Class I men will receive a payment that is less than Class II men, given that all men go through the same strip search procedure regardless of their charges. Id. at Exhibit 9 at p. 5. The difference in payment levels is fair. Unlike Class I men, Class II men had a claim that they should not have been strip searched at all and therefore should not have suffered any intrusion of privacy. It is appropriate to assess their injuries as greater than persons who were allowed to be strip searched.

William T. Sherrod objects that the settlement fund should be allocated in such a manner that persons who were strip searched multiple times during the class period would receive up to five payments. See Exhibit E (Niemiec Aff. at Exhibit 9 at p. 1). While this is one way of allocating the available settlement monies, it is not the only fair method, and the Parties did not believe that it was consistent with how juries would

---

[5] Two objections were not filed with the Court as required by the Settlement Agreement and set forth in the Notice. Exhibit C (Settlement Agreement at ¶ 14(r)); Exhibit H (Notice) at Question 15 ("How do I tell the Court I don't like the Settlement?"). See also Exhibit E (Niemiec Aff. at Exhibit 9 at 10-14) (Objections filed by Ronald Witt and David Kraybill). Of these two objections, David Kraybill's objection was also untimely. Rust Consulting received his objection on February 4, 2011, and emailed it to Class Counsel only yesterday.

assess damages. Persons who were admitted into the jail on multiple occasions are likely to be less sympathetic than a person who was arrested only once, and thus likely to get lower damages. In merely disclosing to the jury that he was strip searched during multiple admissions, a plaintiff would risk lowering his overall award. A claim for a single strip search may result in greater compensation than the total for multiple strip searches. Moreover, the experience at the bellwether trials demonstrated that jurors perceive additional strip searches to be far less injurious than a single strip search. For all of these reasons a single payment sufficiently accommodates persons who were booked multiple times, and is fair.

William Dujka and Ronald Witt object that the amount of the settlement is too little given the abuses that occurred during their strip searches. Id. at Exhibit 9 at p. 6, 10-12. These are the only two individuals out of the entire quarter-million member Class making such an objection. For the reasons explained throughout this Memorandum, the amount of the settlement is fair both in terms of the gross payment to the Class and in terms of the per-class member distribution, and comports with other settlements approved as fair. Moreover, the fact that a class settlement amount is below what a class member might achieve by opting out and proceeding individually is to be expected, and does not demonstrate that the consideration to the class is unfair. Cf. E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir. 1985) ("The essence of settlement is compromise. Each side gains the benefit of immediate resolution of the litigation and some measure of vindication for its position while foregoing the opportunity to achieve an unmitigated victory.") (citations omitted). In addition, the substance of Mr. Witt's objection (which was not filed with the Court) relates to sexual injuries suffered as a

result of being subjected to a penal swab at the Jail, a particularly invasive procedure formerly part of the Jail's intake process that was not encompassed by this strip search class action. See Exhibit E (Niemiec Aff. at Exhibit 9 at 12).

Antonio Claiborne objects that money damages are not a sufficient remedy as to him and that the relief provided to him should be expungement of his criminal record or clemency. Id. Exhibit 9 at pp. 7-9. Expungement or clemency is not a remedy that was available to the class and it is not a remedy for which the Defendants had the power to settle. That being said, nothing in this settlement precludes Class Members like Mr. Claiborne from seeking expungement of their records if they qualify to do so.[6]

Finally, David Kraybill mailed an untimely objection to Rust, which he also failed to file with the Court, in which he (and he alone, out of the quarter-million Class members) objects to the attorney's fees portion of the Settlement Agreement. Id. at Exhibit 9 at pp. 13-14. Assuming the Court is inclined to overlook the procedural shortcomings, the substance of his objection has been thoroughly addressed in Class Counsel's Petition for Attorney's Fees and Costs, which Counsel refers to and incorporates here. Dkt. 637.[7]  In short, while he believes that Counsel should be "adequately compensated for taking a case like this to trial and for the expense and risk" involved, he believes Counsel's fees should be lower than the fees we receive when we represented Plaintiffs on an individual basis. See Exhibit E (Niemiec Aff. at Exhibit 9) at

---

[6]  Class Counsel has frequently referred individuals, including Class Members in this action, to the Expungement Desk at the Daley Center, which is staffed by volunteers from the Cabrini Green Legal Aid Clinic, to assist individuals in processing the necessary forms to expunge their records. See Exhibit F (Bala Keen Aff. at ¶ 5).

[7]  Because this objection was not received until after Class Counsel had already filed their Petition for fees and costs, it was not specifically referenced or addressed therein, although, as stated in the text, Counsel stand on their arguments contained in the Petition.

13. For the reasons discussed extensively in Counsel's fee petition and the accompanying affidavits, the one-third fee provided for in the Settlement Agreement accurately reflects the market for and the high risk nature of this case. Dkt. 637 at pp. 6-20. In any event, the fee is in fact less than the 40% contingency that Counsel typically requires to take a case of this nature on an individual basis.

### 4. Class Counsel Supports This Settlement Agreement

Class Counsel's firm is in an excellent position to evaluate the fairness of the settlement based on more than a decade of hard-won experience representing civil rights plaintiffs. As the Court saw from its supervision of the settlement process, Class Counsel took a hard-line position in negotiations and kept fighting (all the way through trials and an appeal) until we were able to get a fund size which we felt was fair. We rejected offers of $20 million (with a 40% contingency fee) and, later, of $40 million. We also insisted on obtaining an assignment of claims that, after much evaluation (including by hiring expensive coverage counsel), we believed the County was undervaluing. Because the County's final settlement offer provides significant payments to class members (in line with many other class action settlement) without further delay or risk, while allowing the Class to seek more, Counsel determined that settlement would provide the best benefit for class members, and Counsel supports the settlement.

### 5. This Settlement Was Negotiated Only After Significant Discovery And Litigation

As recounted in greater detail in Class Counsel's Petition for Attorney's Fees, Costs, and Class Member Incentive Bonuses (dkt. 637) the Settlement was obtained only after completing discovery, conducting multiple trials and litigating an appeal. There are more than 600 entries on the docket. Thus, this case is completely on the opposite end of

the spectrum from those which raise a red flag because they settled early in the game. There can be no serious contention that the Class should have litigated further before settling.

**B.     The Notice Provided To Class Members Meets Due Process**

The purpose of a class notice is to provide interested parties notice of the settlement, their right to object and exclude themselves, and enough information about the terms of the settlement so that they can evaluate their options. See Phillips Petroleum Co. v. Shutts, 472 U.S.797, 812 (1985). In this case, the Notice that was provided Class Members met and surpassed the requirements of due process.

At the outset, the initial mailing sent to the last known address of 249,599 confirmed and potential class members amply complied with constitutional minimums, but Plaintiffs went to numerous additional efforts to find current addresses for as many individuals as possible. Plaintiffs also directed the claims administrator to research the last known address for all individuals, utilizing LexisNexis and the United States Postal Service's NCOA address updating service, and then supplemented this information by obtaining parolee addresses from the Illinois Department of Corrections ("IDOC"). See Exhibit E (Niemiec Aff. at ¶ 7-11); Exhibit F (Bala Keen Aff. at ¶ 7-9). In addition, Plaintiffs obtained a list of all persons currently held in the IDOC and directed the Claims Administrator to send notice to incarcerated class members at their IDOC addresses, including explicit instruction on the nuances of correctly marking the envelopes according to the mail rules of each institution. Id. at ¶ 11. The direct notice provided to Class Members was certainly the "best practicable, reasonably calculated under the

circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Phillips Petroleum Co., 472 U.S. at 812 .

The Notice Plan also included published notice in the *Sun Times*, *Chicago Defender*, *La Raza* (selected to reach Spanish speaking class members) and *Prison Legal News* (selected to reach incarcerated class members). The Published Notice ran in each of the publications as a quarter-page ad located in the main body of the paper (not the classified sections) in two print cycles. Moreover, the Notice in the *Prison Legal News* included a printed Claim Form, enabling incarcerated individuals to submit a claim form without needing to rely on the prisons' mail systems, which tend to suffer from unexpected and potentially lengthy delays. See Exhibit E (Niemiec Aff. at ¶ 18). The Notice was also made available in Spanish and on a designated website. Finally, the Defendant posted the Notice in the Cook County Jail's RCDC, every division of the Jail, the law library and in several common areas of the Jail. See Exhibit F (Bala Keen Aff. at ¶¶ 12-15). The Parties endorsed the Notice Plan because it is the best practicable means to reach potential class members and would encourage a high rate of claim submissions.

Finally, the high claims rate is good evidence of the effectiveness of the Notice. The Notice Plan achieved the goal of effectively reaching class members and encouraging them to submit claims. The Notice provided individuals with all the information needed to reach an informed decision regarding their rights and the Proposed Settlement Agreement. Both Parties agreed that the provided was the best practicable in consideration of all the factors at issue for this class of individuals.

**C.** **The Court Should Grant Final Certification of the Three Settlement Classes**

Each of the two Proposed Settlement Classes meets the requirements for certification upon settlement and the even more stringent requirements for certification as a litigation class. See April 25, 2007 Order; Dkt. 92. First, the Settlement Classes meet the four prerequisites of Rule 23(a) of numerosity, commonality, typicality and adequacy of representation. The members of the Settlement Classes, 250,000 strong, are so numerous that joinder is impracticable. Likewise, the Settlement Classes satisfy Rule 23(a)(2) because there are common factual and legal questions for the Class Member's claims. Id. at 8 (courts have repeatedly held that "class actions challenging blanket strip search policies satisfy Rule 23(a)(2)'s commonality requirement") (citations omitted); see also Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992) ("A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)"). The requirements of Rule 23(a)(3) are met because the claims or defenses of the representative parties are typical of the claims or defenses of the class. Finally, the representative Class Members and Class Counsel adequately represent the interests of Settlement Class Members. The Settlement Classes also meet the requirements for certification under Rule 23(b)(3) because common questions predominate over questions affecting only individual members and class resolution is superior to individual lawsuits as this Court has already found in the litigation context. Dkt. 92, April 25, 2007 Order at 13-14; see also In re AT & T Mobility Wireless Data Services Sales Litigation, No. 10 cv 2278, 2010 WL 3190108, at *9 (N.D. Ill. Aug. 11, 2010) (applying Rule 23(b)(3) standards for certification of a settlement class).

**Conclusion**

For all the reasons described above, Plaintiffs respectfully request that the Court finally approve this class action settlement and certify the two Settlement Classes. A proposed Order is attached to the Parties' Joint Motion for Final Approval of Class Action Settlement as Exhibit 1.

Respectfully submitted,

/s/  Michael Kanovitz

Arthur Loevy
Michael Kanovitz
Jon Loevy
Roshna Bala Keen
Samantha Liskow
Heather Lewis Donnell
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

CERTIFICATE OF SERVICE

I, Michael Kanovitz, an attorney, certify that on February 22, 2011, I filed a copy of this Plaintiffs' Memorandum in Support of the Parties' Joint Motion for Final Approval of Class Action Settlement via the court's CM/ECF electronic filing system, and thereby caused a copy to be served to all counsel of record.

/s/  Michael Kanovitz