**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| KIM YOUNG, RONALD JOHNSON, | ) | |
| WILLIAM JONES, ALLEN GORMAN, | ) | |
| GERRAD LAMOUR, LEE MERCADO, | ) | |
| BRADLEY HYTREK, CARL GRAY, and | ) | No: 06-CV-552 |
| MATTHEW LIPTAK, on behalf of themselves | ) | |
| and a class of others similarly situated, | ) | JUDGE KENNELLY |
| | ) | |
| Plaintiffs, | ) | JURY TRIAL |
| DEMANDED | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF COOK and TOM DART, | ) | |
| Sheriff of Cook County, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF MICHAEL KANOVITZ IN SUPPORT OF THE PARTIES'**
**JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

I, Michael Kanovitz, under penalty of perjury, declare and state that:

1.      I am an attorney with the law firm of Loevy & Loevy, the firm the Court

appointed as class counsel in this case.  I have served as the lead attorney for the

Plaintiffs in this case since its inception.

**Class II Membership Estimate**

2.      During the discovery phase of this litigation, I worked with a statistician at

Columbia University, Thomas DiPrete, to estimate the rate of Class II membership in the

population of persons admitted into Cook County Jail.

3.      We pulled a random sample of 2,000 admissions for the database.  Loevy

& Loevy attorneys and paralegals then looked up the charging information available for

Exhibit D

each detainee for that detention in the Circuit Court of Cook County's electronic database. This was a labor intensive process.

4.     After collecting and analyzing this data, we determined that slightly less than 26% of admissions met the definition for Class II.

## Claims Rate Estimate

5.     Throughout the negotiations, both sides used per-class member payment amounts to justify their opposing positions on the size of the common fund. As the parties grew close to agreement on the amount of the cash portion of the common fund, Defendants raised the issue of a reversion to the County in the event that fewer than the expected percent of class members submitted claims. This demand required that Plaintiffs make our best assumptions about the number of class members likely to submit claims and the payment amounts per-claimant.

6.     Because claims rates fluctuate based on numerous factors, we focused on claims historic claims rates in other large civil rights class actions. We used a cut-off of 40,000 class members or more as the measure for what constitutes a "large" class. The data available to us (mainly from conversations with class counsel, claims administrators and motions for final approval available on Pacer) showed claims rates averaging approximately 13%, with 20% being the high range. Attached hereto as Exhibit 1 is a chart reflecting the data with attached support for the numbers.

7.     After collecting this information, and speaking with several claims administrators about how to maximize the claims rates, I assumed that our firm would be able to do better than the average and produce a claims rate close to 20%. Based on that rate, and our estimates of class size and Class II membership, we estimated approximate

per-class member payment amounts of $1,000 for Class II men, $700 for Class I men, and $500 for Class II women.

## Status of the County's Reversion

8.      Paragraph 37 of the Settlement Agreement provides for a reversion not to exceed $5 million to the County if there is money remaining in the cash portion of the fund after payment of all items to be paid out of the cash portion using the foregoing estimated per-class member payment amounts.

9.      Robin Niemiec of Rust Consulting has reported that the claims rate is at least 25% in this case.

10.     Assuming a claims rate of at least 25%, which now seems likely, and assuming the Court awards the attorneys fees, costs, and incentive bonuses allowed under the Settlement Agreement, the entire cash portion will be distributed and there will be no reversion of funds to the County.

I declare under penalty of perjury that the foregoing is true and correct.


_____
Michael Kanovitz

Signed:   February 22, 2011

3

Exhibit 1

| Plaintiff | Defendant | Docket # | Court | Apprx Class Size | Timely Claims | Claims Rate | Attached as: |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Jackson | Sheriff of Cook County | 06-cv-493 | N.D.Ill. | 100,000 | 11,000 | 11 | Exhibit 2 |
| Cazenave | Foti | 00-CV-1246 | E.D.La. | 85000 | 6500 | 8 | Exhibit 3 |
| Craft | County of San Bernadino | 05-CV-0359 | C.D.Cal. | 150084 | 20350 | 19.6 | Exhibit 4 |
| Eddleman | Jefferson County | 91-CV-0144 | W.D.Ky. | 50000 | 8000 | 16 | Exhibit 5 |
| McBean | City of New York | 02-CV-5426 | S.D.N.Y. | 40352 | 3402 | 11 | Exhibit 6 |
| Schaffer | County of Alameda | 06-CV-0310 | N.D.Cal. | 40845 | 6598 | 17 | Exhibit 7 |
| Tyson | City of New York | 97-CV-3762 | S.D.N.Y. | 67000 | 6000 | less than 10 | Exhibit 8 |
| Williams | Block | 97-CV-03826 | C.D.Cal. | 276717 | 36730 | 13.3 | Exhibit 4 |

Avg = 13.2

Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT JACKSON, JOSEPH McGRATH, and DERRELL SMITH, | ) ) ) | |
| *Plaintiffs,* | ) ) | No. 06 CV 493 |
| -vs- | ) ) | *(Judge Coar)* |
| SHERIFF OF COOK COUNTY, and COOK COUNTY, ILLINOIS, | ) ) ) | |
| *Defendants.* | ) | |

# PLAINTIFF'S MEMORANDUM IN SUPPORT OF APPROVAL OF PROPOSED SETTLEMENT

## I. Introduction

About 100,000 potential classmembers have received notice of the proposed settlement of this case: Plaintiffs sent class notice and an opt-out form by first class mail to the 157,352 males who had been processed into the jail between January 27, 2004 and January 9, 2007, when testing ended; slightly more than 58,000 letters were returned by the postal service; each return was investigated in an attempt to obtain the correct address and a second notice was sent to about 500 new addresses.

Claims have been filed by about 11,000 class members. Four class members have filed documents in connection with the settlement: class member Craig Streeter wants the Court to know that the testing was non-consensual and very unsanitary. (Record Item No. 237, attached as Exhibit 1.) Class member Michael Ellis states that he was subjected to the challenged procedure five times and wants to submit a claim. (Record Item No. 238, attached as Exhibit 2.)

Class member Daniel T. Roberts objects to the settlement and has exercised his right to opt-out. (Record Item No. 239, attached as Exhibit 3.) Mr. Roberts does not provide any details about his objection to the settlement. Class member Ron Haddad Jr. objects to the provision of the settlement which limits to two hundred dollars the amount that can be paid to any unnamed member of the class. (Record Item No. 240, attached as Exhibit 4.) For the reasons set out below, the Court should overrule Mr. Haddad's objection and find that the proposed settlement is "fair, reasonable, and adequate."

## II. History of the Litigation

Plaintiffs filed this action in January of 2006. On April 25, 2006, the Court entered a scheduling order, which required the filing of dispositive motions by December 1, 2006. The parties vigorously prepared this case for trial and, after securing a two week extension of time, filed cross-motions for summary judgment on December 15, 2006.

On December 14, 2006, the Court ordered that the case would proceed as a class action. On March 23, 2007, the Court denied the cross motions for summary judgment and set the case for trial on June 18, 2007. The parties completed their preparation for trial, and submitted a joint pre-trial order on April 27, 2007. On May 18, 2007, the Court held a pre-trial conference and ruled on motions in limine.

Following the Court's ruling on the motions in limine, counsel for the parties met to discuss the possibility of settlement and agreed to a resolution of the claims asserted on behalf of the class and the individual claims asserted for the named plaintiffs After reaching the proposed settlement of the class and individual claims, counsel discussed issues of attorneys fees and costs and reached an agreement as to these matters. The Court gave its preliminary approval to the

Case: 1:06-cv-00552 Document #: 62-4 Filed: 10/26/07 Page 9 of 92 PageID #:1583
Case: 1:06-cv-00493 Document #: 246 Filed: 10/26/07 Page 9 of 92 PageID #:1581

- 3 -

proposed settlement on June 15, 2007 and the proposed settlement was approved by the Cook County Board on July 10, 2007

## III.  The Proposed Settlement

The proposed settlement brings this litigation to an end. Defendants, who abandoned the challenged policies during the pendency of this case, will establish a fund in the total amount of $4,575,000.  This Fund will cover administration of the settlement, i.e., notice to the class, attempting to locate class members who are not reached by first class mail to their last known address, processing of claim forms, issuance of settlement checks, and mailing of settlement shares to class members.  The Fund will also cover attorneys' fees and expenses, and incentive awards to the three named plaintiffs. The remainder of the fund, or $3,200,000, will be available for distribution to unnamed class members.

Each class member will receive at least one hundred dollars from the settlement fund.  If less than 16,000 claims are filed, the recovery will be capped at two hundred dollars per claim; any surplus will revert to Cook County.  The settlement provides that claims will be paid on an aliquot basis if more than 16,000 but less than 32,000 claims were filed.

The settlement agreement also provides that, subject to the approval of the court, each of the three named plaintiff will receive an incentive award in the amount of $25,000.  (The incentive award is to paid to each named plaintiff without any deduction for attorneys' fees or costs.)  This amount reflects the service that each named plaintiff provided to the class and is of comparable magnitude to incentive awards in jail strip search cases:  In this district, each of the three class representatives in *Calvin v. Will County,* N.D.Ill. No. 03-CV-3086, received a $25,000 incentive award.  Awards in other district are

comparable. The class representative in *Maneely v. City of Newburg,* S.D.N.Y., No. 01-CV-2600 also received a $25,000 incentive award. Each of the two class representatives in *Blihove v. St. Croix County,* W.D.Wis. No. 02-CV-450 received a $35,000 incentive award, and $300,000 was distributed to three class representatives in *Haney v. Miami Dade County,* S.D. Fl., No. 04-cv-20516.

The settlement agreement also sets aside a separate fund for attorneys' fees and costs, including the costs of administering the settlement ($1,000,000 for fees and $300,000 for costs).

## IV. Standards for Approving the Settlement of a Class Action

The standards for approving the settlement of a class action were recently restated by the Seventh Circuit in *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.* 463 F.3d 646, 653 (7th Cir. 2006):

> In order to evaluate the fairness of a settlement, a district court must consider the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement. [citation omitted] The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiff's case on the merits balanced against the amount offered in the settlement. [citation omitted]

This case was settled shortly before trial; all parties were represented by skilled and experienced counsel. Counsel for all parties aware of the risk in civil rights litigation: while a jury could have made a significant award for each class members, our court of appeals could also have concluded that the swab test was not unconstitutional. The Seventh Circuit has not been reluctant to plow new ground in civil rights cases. For example, in *Newsome v. McCabe,*

Case: 1:06-cv-00552 Document #: 64-16 Filed: 02/28/07 Page 11 of 92 PageID #:1583
Case: 1:06-cv-00499 Document #: 246 Filed: 10/26/07 Page 5 of 12 PageID #:6318

- 5 -

256 F.3d 747, 751 (7th Cir. 2001), *opinion on denial of rehearing,* 260 F.3d 824 (7th Cir. 2001), the Seventh Circuit overruled its long standing precedent and departed from decisions in eight circuits to hold that 42 U.S.C. §1983 does not include a cause of action analogous to a common law action of malicious prosecution. Similarly, in *Wallace v. Kato,* 440 F.3d 421 (7th Cir. 2006), *aff'd,* 1276 S.Ct. 1091 (2007), the Seventh Circuit overruled two of its recent decisions to establish a categorical rule of accrual (subsequently endorsed by the Supreme Court), for false arrest cases brought under Section 1983.

In light of the uncertainty in any civil rights case, the settlement provides a reasonable monetary recovery to the unnamed members of the plaintiff class.

In addition to considering the strength of plaintiff's case on the merits and the monetary payment to each class member, "district judges presiding over proposed class settlements are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole because class actions are rife with potential conflicts of interest between class counsel and class members." (citations omitted) *Mirfasihi v. Fleet Mortg. Corp.* 450 F.3d 745, 748 (7th Cir. 2006). The settlement in this case is a reasonable resolution of this class action and should be approved by the Court.

## V.  Attorneys Fees

Class counsel seek fees in the amount of one million dollars. This amount is reasonable in relation to the benefit achieved for the class, and reflects counsels' hard work in preparing this case for trial and negotiating the settlement.

- 6 -

The rule in this circuit is that "when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Marketing Litigation,* 264 F.3d 712, 718 (7th Cir. 2001), *opinion following remand,* 325 F.3d 974 (7th Cir. 2003). "The object in awarding a reasonable attorney's fee . . . is to simulate the market . . . The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client. *In re Continental Securities Litigation,* 962 F.2d 566, 572 (7th Cir. 1992).

Civil rights cases are typically litigated on a contingent basis, where the lawyer agrees to accept a percentage of the recovery as his (or her) fee, subject to a credit for any statutory fees are awarded. This percentage ranges from the customary one-third, *Freeman v. Mayer,* 95 F.3d 569, 570 (7th Cir. 1996) to 40%. *Kirchoff v. Flynn,* 786 F.2d 320, 322 (7th Cir. 1986). Attorneys use the higher percentage when the claim is small and the case is likely to be resolved by settlement, without any award of statutory fees.

The requested award of one million dollars is about 20% of the total size ($4,575,000) of the settlement fund. If only 12,000 claims are filed, $800,000 will revert to the County, The requested fee award would then be about 26% of the total to be paid out the settlement. Either percentage is reasonable.

## VI. Costs

Cook County has advanced $200,000 to cover the costs of administering the settlement. A total of $171.194.58 has to date been expended on the mailing service and the call center. Counsel seek reimbursement for the following additional expenses:

Case: 1:06-cv-00552 Document #: 244 Filed: 02/28/07 Page 13 of 92 PageID #:15935
Case: 1:06-cv-00499 Document #: 246 Filed: 10/26/07 Page 7 of 12 PageID #:6316

- 7 -

Filing Fee  ................................................................................................ $250.00
Transcripts from *Thompson* Trial  ............................................................ $743.60
Depositions and Transcripts  .................................................................. $20,209.97
Plaintiffs' Expert Fee  ......................................................................... $2,000.00
Witness and Process Server .................................................................. $2,644.00
Transportation (to dep of def expert)  ....................................................... $813.41
Messenger Service  ................................................................................ $329.87
Photocopying  ...................................................................................... $727.16
Class notice (pre settlement)  ............................................................. $17,038.06
Postage  .............................................................................................. $256.25
Total  ...............................................................................................$45,012.32

## VII. Conclusion

For the reasons above stated, plaintiffs request that the Court approve the proposed settlement, authorize incentive payments of $25,000 to each of the named plaintiffs, and approve counsel's request for an award of fees of one million dollars and reimbursement for costs in the amount of $45,012.32.

Respectfully submitted,

/s/ Kenneth N. Flaxman

_____

KENNETH N. FLAXMAN, #00339
ARDC No. 830399
200 South Michigan Avenue
Suite 1240
Chicago, Illinois 60604-2430

(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com

*an attorney for the plaintiff class*

# CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of October, 2007, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Francis J. Catania, Ass't State's Atty, 50 W Washington St, Room 500, Chicago, IL 60602, and Daniel F. Gallagher, Esq., Larry S. Kowalczyk, Esq., Query & Harrow, Ltd., 175 W Jackson Blvd, Ste 1600, Chicago, IL 60604-2827, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: none.

/s/ Kenneth N. Flaxman

_____

Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)

Exhibit 3

|  |  |
|---|---|
| GRETA CAZENAVE, ET AL. | CIVIL ACTION |
| Plaintiffs | NUMBER 00-1246, SECTION A |
| VERSUS | MAGISTRATE SECTION 5 |
| SHERIFF CHARLES C. FOTI, JR. ET AL. | |
| Defendants | JUDGE JAY C. ZAINEY |

## AFFIDAVIT OF HOWARD FRIEDMAN

I, Howard Friedman state as follows:

## I. EXPERIENCE

1. I am an attorney in good standing in the Commonwealth of Massachusetts. I am counsel for the plaintiff class in this case.

2. I am a member of the Bar of the Supreme Court of the United States of America, the Supreme Judicial Court of Massachusetts, the United States Court of Appeals for the First Circuit, and the United States District Court for the District of Massachusetts. I graduated from Northeastern University School of Law in 1977.

3. I became a member of the Massachusetts bar in 1977. My first legal job was at the Prisoner's Rights Project in Boston where I represented prisoners on civil rights cases under 42 U.S.C. §1983. Among other cases, I represented a class of inmates who were members of the Nation of Islam in a suit alleging violation of their civil rights under the First Amendment. I have continued to handle civil rights cases and class actions since then while working in legal services programs for the elderly and then in private practice. I have been engaged in the private practice of law since October 1981. My private practice has emphasized civil rights litigation, particularly cases alleging misconduct by law enforcement officers and agencies.

4. I am a member of the Massachusetts Bar Association (MBA), the American Association for Justice Association (formerly known as the Association of Trial Lawyers of America (ATLA)), the Federal Bar Association, and the Massachusetts Academy of Trial Attorneys (MATA). I served as a member of the MBA, Individual Rights and Responsibilities Section Council (IRR) from 1991 to 1995. I chaired the Police Misconduct Committee of the IRR from 1988 to 1999. I served as the chair of the Civil Rights Section of ATLA from 1996 to 1997. I served as a member of the Massachusetts Attorney General's Civil Rights Task Force and its police committee from 1992 to 1998. I was a founder of the Police Practices Coalition in Boston and I am the current President of the National Police Accountability Project of the National Lawyers Guild.

5. I have lectured on the subject of police civil liability for Massachusetts Continuing Legal Education, Inc. (MCLE), Suffolk Law School Advanced Legal Education, Georgetown Law

Exh. A

Center, MATA, MBA, FBI National Academy, New England Associates, National Lawyers Guild (NLG), ATLA, and several law schools and colleges. I have presented at continuing legal education seminars across the country.

6.  I have particular expertise in handling cases alleging unconstitutional strip searches. The first case I handled alleging an unconstitutional strip search was in 1984. I have represented the plaintiffs in seventeen cases alleging illegal strip-searches. In addition to these cases, I have represented individuals whose illegal strip search claims were settled without litigation.

7.  In addition to this case, I have been lead counsel in four class actions alleging unconstitutional strip searches which have been resolved: *Mack v. Suffolk County,* 191 F.R.D. 16 (D.Mass. 2000)*, Connor v. Plymouth County,* No. 00-10835-RBC (D. Mass.), and *Nilsen v. York County,* 219 F.R.D. 19 (D.Me. 2003) and *Ryan v. Garvey* (D. Mass.). I am class counsel in one pending strip search class action, *Garvey v. MacDonald,* No, 07-30049-KPN (D. Mass.) I have also been lead counsel in two other class actions alleging violations of civil rights which sought primarily injunctive or declaratory relief and co-lead counsel in a consumer class action in Massachusetts state court. Currently, I am lead counsel in a class action lawsuit against the Sheriff of Suffolk County regarding inhumane conditions at the jail.

8.  I have been a guest speaker on the subject of class actions in Professor Karen Blum's civil procedure class at Suffolk University Law School.

9.  In May 2005, I served as the chair and as a speaker at two seminars sponsored by the Suffolk University Law School Center for Advanced Legal Studies: "Introduction to Section 1983" and "Advanced Police Misconduct Litigation." In April 2004, I was on the faculty for a one-day seminar at Georgetown University Law Center on Prison Litigation. I spoke on the subject of "Fourth Amendment Rights of Prisoners" along with Massachusetts Judge and former Sheriff Robert Rufo. My presentation and written materials focused on the constitutionality of strip searches. I was also on a panel at Georgetown discussing "Litigating Prison Conditions and Excessive Force Claims." In October 1999, I was a panelist on the topic of "Strip-searches: Yes or No?" at the International Criminal Justice Expo & Conference sponsored by Northeastern University College of Criminal Justice, in Boston, MA.

10.  I have authored several articles on civil rights litigation including "Damages Actions Under Section 1983" in Federal Civil Litigation in the First Circuit, (co-author) MCLE, April 1995; "Evaluating Police Misconduct Cases," Trial Magazine, December 1997; "Plaintiff's Strategies for Avoiding Summary Judgment on Municipal Liability Claims for Failure to Act," 2 Massachusetts Governmental Liability Reporter 1 June 1988 and "Attorney's Fee Awards: Calculation in the Wake of *Hensley* and *Blum*," Police Misconduct and Civil Rights Law Report, Vol. 1 No. 7, Summer 1984. I served as the editor for the "Civil Rights Forms Book," ATLA Civil Rights Section, June 1998.

11.  Lawyers from across the country consult with me on civil rights issues. Lawyers in Rhode Island, New York, New Jersey, Minnesota, Michigan, Illinois, Washington D.C., Florida,

2

Louisiana, California, Washington, and other states have consulted with me on the subject of strip searches.

12.     Civil rights litigation in general, and in particular, litigation against jails is high specialized, complex, and it requires a keen knowledge of constitutional issues and knowledge of 42. U.S.C. 1983. These cases are factually complex, especially class actions, requiring proof of a policy or custom by jail officials.

13.     Success in these cases requires skilled and tenacious plaintiffs' counsel. The cases are complex, time-consuming, expensive to litigated, requiring plaintiff's counsel to advance costs. The cases are typically litigated against highly experienced, well-financed defense counsel who have no incentive to compromise in light of the defenses permitted to their clients such as qualified immunity, which allow the defendant to take an immediate appeal should the trial court rule against the defense client. Often these defendants are uninsured but they willing to spend money to defend litigation.

14.     Based on my experience and knowledge of this case, the settlement achieved in this case is fair and reasonable in light of the circumstances.

## II.     KNOWLEDGE OF THIS CASE

### A.     INFORMATION REVIEWED TO SUPPORT MY OPINION

15.     Class Counsel has with me on issues in this case including class certification, strategies regarding settlement and settlement values, not to mention the complicated issues of trying to develop a non-opt-out class as was the Defendants' non-negotiable position from the outset. They also consulted me on a number of ethical concerns during the litigation.

16.     In addition to discussion with Class Counsel, I have reviewed various aspects of this record on PACER and performed my own independent research with regard to the various aspects of this case.

17.     I have been provided with and reviewed Class Counsels' time and expense records and have reviewed the bank records concerning the escrowed settlement fund.

18.     I have also read the various affidavits submitted to the Court in support of the various aspects of this case, including those of Class counsels' and the Class Representatives.

19.     I have been provided with various reports from the Claims Administrator, Analytics, Inc., and am familiar with the rate of return from the notice campaign in this case, as well as the objections and opt outs.

## B.    THE RECORD

20.    Based upon my knowledge of this record and my experience in strip search class actions, I can attest that this case is an example of how difficult it truly is to undertake civil rights class action litigation.

21.    The discovery and motion practice appear to have been aggressive and instrumental in moving this case to its ultimate conclusion for the benefit of the class.

22.    The Plaintiffs initiated important discovery in the early stages of the the to obtain the booking and other OPCSO records. This information is critical in order to identify, investigate and protect the class interests. The Record reflects that as with my experience, all discovery efforts were resisted by Defendants and required adversarial hearings in order to obtain critical information. As it turns out, had Plaintiffs not sought and obtained the electronic booking records of the jail early on, those records, more likely than not, would have been lost in Hurricane Katrina and the ability to contact class members would have been impaired.

23.    Class counsel also obtained important financial information to ascertain the individual defendants ability to pay any compensatory or punitive damage awards. This same inquiry was made with regard to OPCSO's finances, through a municipal finance expert, in order to determine the Sheriff's Office's ability to pay any award that may be levied against it as the result of its unconstitutional policy of strip and body cavity searching minor offenders that came through the jail.

## C.    THE INJUNCTIVE RELIEF ACHIEVED

24.    Class Counsel brought about significant institutional reform. They achieved not one, but three Consent Decrees in this case. After Plaintiffs succeeded in stopping the unconstitutional blanket policy and practice of strip and visual body cavity searches, the Defendants revise the practice in an effort to circumvent the Consent Decree. After Plaintiffs put an end to that, one of the Sheriff's Wardens persisted in the unconstitutional "change out" practice in the Templeman complex.

## D.    THE DAMAGES CLASS SETTLEMENT

25.    With the Consent Decrees in place, Class Counsel then embarked upon the very difficult task of obtaining certification of a damages class. After another year of litigation, and two difficult days of mediation in May of 2004, Class Counsel achieved a favorable settlement for the Class. Defendants agreed to establish a fund of $9.375 million, plus interest to pay the damages associated with their unconstitutional practices, and then counsel worked tirelessly to protect that

4

settlement over the course of in excess of three years, inclusive of holding onto the settlement during one of the most difficult periods in New Orleans history, Hurricane Katrina.

26.     From my personal knowledge and experience, had mediation not been successful, Defendants would have aggressively defended this case, taken advantage of all constitutional defenses to for their clients. This could have caused tremendous delay through interlocutory appeals on class certification and qualified immunity. Winning a verdict could have been the beginning of another round of litigation to attempt to collect the money.

27.     The establishment of this settlement fund is particularly impressive because of the obstacles presented by the municipal defendant. This result is even more impressive considering the Defendants finances. I understand that the OPCSO is a self-insured entity and the Sheriff's Office must pay all of its litigation costs, judgments and settlement outs of the same pool of money.  I understand the Sheriff's office was suffering from serious financial concerns. In addition, punitive damages are not available against the public entity and the wardens and deputies are typically not in a position to pay those damages.

28.     I in my experience handling these cases, I can advise the Court that there are two basic settlement models in strip search class actions: the "fixed award" method and the "pro rata" method.  With a "fixed award," the parties agree on a set amount per claim and a maximum payout for the settlement. Class members can get no more than the set amount per claim but if a larger number of class members submit claims than anticipated, then the amounts are reduced by equal shares.  If fewer claims are filed than were estimated, the remaining money goes back to the defendant.  Cases settled using the "fixed award" method have resulted in announcements to the press of larger nominal settlement amounts than the ultimate settlement amount actually received by the class members. For example, in *Doan v. Watson*, the settlement agreement was for up to $2,591,000.00 on behalf of 2,591 class members, however, the County actually only paid $1,330,000.00 because only 630 claims were made and each claimant was capped at $1,000.00. Also, in *Kahler v. Rensselaer County Jail/Bruce v. Rensselaer County Jail*, the settlement amount announced was for $2.7 million for a class of 2,700.  However the defendant only paid $1.2 million because only 733 members came forward at a capped award of $1,000.00.

29.     In contrast, under the "pro rata" method, such as in this case, participating class members receive a pro rata share of the entire settlement fund after attorney's fees, expenses and costs of administration are deducted.  Instead of returning money to the defendant, if fewer people file claims, the class members who filed claims receive the benefit of all of the money in the fund (absent expenses).

30.     In my opinion, the "pro rata" method is a better means by which to fairly and reasonably compensate the class members and is the method I have used in settling the strip search class actions that I have handled. District courts in my cases and in other jurisdictions have approved these common fund, lump-sum settlements. For example, in April 2005, the Southern District of New York in *McBean v. City of New York*, 2005 WL 991906, *6 (S.D.N.Y. 2005), approved a

settlement that provides an award of $750.00 for a single strip-search and $1,000.00 for multiple strip-searches finding that it is "consistent with awards for similar class action claims in other cases in this Circuit." In *Williams v. Block*, a class action case in California alleging several civil rights violation, the unlawful strip-search portion was settled for $13,399,000. That fund, like the fund here, was distributed based on a point system where a strip-search received 3 points. Each point was worth $142.07 or $426.21 for each strip-search. In *Eddleman v. Jefferson County*, class members received approximately $750.00 per point for having been strip and visual body cavity searched. Recently, a court granted preliminary approval of "fixed award" settlements that provided fixed amounts of $1,000 per class member in *Maneely v. City of Newburgh*, and *Kahler v. Rensselaer County Jail/Bruce v. Rensselaer County Jail.*

31.     While each of these cases is factually different and had its own individual complexity, based upon my knowledge of these cases nationwide, the settlement fund in this case stacks up to these other settlements and provides fair, adequate and reasonable compensation for class members similarly situated. Taking into consideration the size of the settlement fund after it has accumulated interest , minus a reasonable attorneys fees and costs, it is estimated that the Sub-class A members will receive approximately $1,000, Sub-Class C members will receive approximately $350.00, and Sub-class B members will receive about $525.00.

32.     Class members in this case will not have to disclose confidential psychiatric or medical records, nor will they have to disclose the details of their arrests and strip-searches publicly. This allows people to obtain vindication for a violation of their right to privacy without being forced to give up their privacy. Anonymity is very important to class members in strip search cases. As in *Tyson v. City of New York*, where Step 1 class members only had to fill out a claim form received $250, the claimants here will receive between $300 and $1,000 using the same simple process.

E.     NOTICE, DUE PROCESS AND CLAIMS RESPONSE

33.     In addition, I have consulted with Class Counsel regarding Claims Administration and the Notice plan. We discussed the issues of notice in general and now it may be complicated as a result of the displacement of the population due to Hurricanes Katrina and Rita.

34.     With regard to notice and due process, I have been provided with various statistics concerning the reach of the notice as produced by the Claims Administrator, Analytics, Inc. As an aside, I have personally employed Analytics as a Claims Administrator in 3 jail strip search class actions. I have been favorably impressed with their work.

35.     Research in my office shows that participation rates in strip search class actions vary depending on unique factors in each case. They have ranged from just above nine (9%) percent and 28 percent. For example, in *Williams v. Block (Los Angeles, CA)*, C.D.Cal. Docket No. CV-97-03826-CW, there were approximately 400,000 class members and just above nine (9%) percent, participated. In *Tyson v. City of New York*, S.D.N.Y. Docket No. 1997CV03762, which had approximately 50,000 class members and 6,000 participated. The participation rate of 28% in *Mack*

6

*v. Suffolk County*, D.Mass. Docket No. 98-12511-NG, is the highest participation rate in a strip-search class action to counsel's knowledge. Of the 5,400 class members, 1,492 participated. This was due to the enormous amount of publicity over a period of years. The case was covered by both major newspapers, all five local television stations and the radio news programs. Also, unlike *Williams* and *Tyson*, the potential class of 5,600 women in *Mack* was smaller and was generally limited to residing in the geographically smaller area of Boston. The participation rate tends to decrease as the size of the class increases.

36. Here, the return of approximately eight (8) percent is quite extraordinary considering the intervention of Hurricane Katrina and the diaspora caused by that catastrophic events.

### F. ATTORNEYS' FEES AND COST

37. Plaintiffs were represented by experienced, capable counsel who have long and diverse backgrounds in civil rights. As set forth by Plaintiffs' Supplemental Memorandum for fees and costs (which I have reviewed at length), the "'least' experienced of Class Counsel have been practicing law for almost a quarter of a century and the senior member of the team has the distinction of having been engaged in the practice of law for 50 years." I have known Mary Howell many years and her reputation in the civil rights community nationwide precedes her. She is know as a tireless advocate for the disenfranchised. I believe the Court has extensive experience with Mr. Samuel S. Dalton, who I understand has spent more than 50 years fighting for Louisiana's poor and outcast. Majeeda Snead learned under the expertise of Mary Howell and Sam Dalton. Christina R. L. Norris was one of the lead Counsel in the *Eddleman v. Jefferson County, Kentucky*, strip search class action that resulted in the highest ever settlement paid by that County, and she brought that experience to this case. Obviously the Court is in the best position to observe the efforts, legal skills and results of Plaintiffs' Class Counsel, but having observed this case primarily from the outside looking in, those efforts and results are excellent.

## III. CONCLUSION

38. Based upon the foregoing, I believe I am in a position to comment favorably on all aspects of this class action settlement, including the reasonableness, fairness, and adequacy of the settlement. In my opinion, this settlement falls with in the reasonable range of relief for damages in strip search class actions and fully addresses the class members' claims. Further the fees and expenses sought by Plaintiffs' counsel are reasonable given the time, effort and litigation skills that this case demanded, the results achieved and the enormous risk this case placed upon each respective lawyer during the pendency of the case; not to mention the risk superimposed by Hurricane Katrina. Plaintiffs' counsel not only fought tirelessly to achieve injunctive relief in the form of stopping the unconstitutional practices at OPCSO. After those results were achieved and repeatedly enforced, Counsel then fought to achieve a reasonable and fair monetary settlement for the class members, after which they had a seemingly endless battle to preserve the Fund. how difficult it was to achieve

7

this settlement and to reduce this settlement to a document commensurate the Plaintiffs' best interests, the Defendants demands and the Court's requirement that the settlement pass muster in this Circuit.

I declare under penalty of perjury that the foregoing is true and correct, this 15th day of June, 2007.

Howard Friedman
Law Offices of Howard Friedman, P.C.
90 Canal Street, 5th Floor
Boston, MA 02114-2022
(617) 742-4100

Sworn to and subscribed before me,
the undersigned Notary Public, Parish
of Jefferson, State of Louisiana,
this 12 day of _____, 2007
_____
Notary Public

My Commission Expires At _____

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GRETA CAZENAVE, ET AL. | CIVIL ACTION |
| Plaintiffs | |
| | NUMBER 00-1246, SECTION A |
| VERSUS | |
| | MAGISTRATE SECTION 5 |
| SHERIFF CHARLES C. FOTI, JR. ET AL. | |
| | JUDGE JAY C. ZAINEY |
| Defendants | |
| | MAGISTRATE ALMA L. CHASEZ |

## MEMORANDUM IN SUPPORT OF MOTION FOR
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT AND
## APPLICATION FOR ATTORNEYS FEES

Come the Class Representatives[1], Jeff Brite, William Brice White III, Lionel Nelson, George Wruz, Anthony Pogorzelski, Tony Buchen, Sylvia Brown, appearing herein individually, and as Class Representatives on behalf of all members of the previously certified classes, and Class Counsel, Samuel S. Dalton, Mary Howell, D. Majeeda Snead, and Christina R. L. Norris, who submit this Memorandum in support of final approval of the Class Action Settlement Agreement previously filed herein.

I.    PRELIMINARY STATEMENT:

On January 16, 2007, all parties herein, through counsel, filed a comprehensive Joint Motion and Memorandum for Preliminary Approval of Class Action Settlement Agreement. (Doc. Nos. 155

---

[1]Kendra Spencer has not actively participated as a Class Representative, only having attended one meeting. She could not be located to participate in the case pre-Katrina and has not been in contact with Class Counsel since Katrina and did not file a Proof of Claim. Class Counsel have moved to have her removed as a Class Representative.

1

a comprehensive history of this case which need not be restated herein. Suffice it to say that the settlement represents the culmination of more than seven years of hard-fought and well defended litigation. The Court has first-hand knowledge of the settlement and the important relief already obtained in this case and knows that it did not come easily. Since 2000, counsel have conducted comprehensive discovery, filed and defended against countless motions and researched and written numerous briefs and memoranda. Importantly, Plaintiffs obtained three (3) consent decrees, designed and inspected "privacy" booths for men and women arrestees (including an inspection post-Katrina in late August 2007), and monitored Defendants' practices for two years to confirm that the constitutional privacy rights of Class Members were being honored.

The settlement negotiations were similarly contentious, going back and forth for many months, punctuated with renewed trial preparation whenever negotiations broke down. Eventually, th Court ordered the parties to participate in mediation in an effort to resolve this matter. After two full days of Court ordered mediation and many months of post-mediation negotiations, the parties presented the Court with what they considered to be a good faith, arms-length settlement that presented a fair and meaningful solution to difficult and complex legal problems. This settlement was preliminarily approved by the Court on January 11, 2007. (Doc. No. 154).

The Court's order of preliminary approval finds that the settlement was sufficiently within the range of reasonableness that notice of the proposed settlement should be issued. (Doc. No. 154, at pp. 2 & 7 , ¶¶ 1 & 13). The Court also made other pertinent findings in that order, including that this class action meets the criteria for certification under Fed. R. Civ. P. 23(b)(3), and the case has been vigorously litigated by the parties (p. 4, ¶ 7). Further, the Court made findings that the aforenamed Class Representatives were adequate (p. 6, ¶ 9), the form of notice submitted for

2

approval was accurate, informative and provided the Class Members with the necessary information to make an informed decision regarding participation in the settlement. The order also approved Analytics, Inc., as the Claims Administrator (p. 7, ¶ 13 & p. 8, ¶ 16), and reaffirmed and appointed Plaintiffs' counsel, who had represented the Class for over six years at that time as Class Counsel. (p. 7, ¶ 10).

The Settlement Agreement provided for the creation of a $9,375,000.00 Settlement Fund (plus interest accumulated since June 2004) to compensate Class Members for the violation of their constitutional rights, to pay incentive awards to Class Representatives, and to pay attorneys fees, expenses and costs, including the cost of administration and expert and consultant fees. The Agreement also contemplates that injunctive relief and other important mandates outstanding in these proceedings, will be confirmed in the final judgment. The Court found as a matter of law that "punitive damages are not available against a public entity such as the OPCSO and are potentially available in this lawsuit only against the individual defendants sued in their individual capacity pursuant to 42 U.S.C. § 1983, [and as a preliminary finding of fact that] the ability of the individual defendants to pay damages in this litigation as awarded in a judgment is highly unlikely to be within their means in comparison to the number of potential claims by class members." (Doc. No. 154, at p. 3, ¶ 4.)

In considering final approval of this settlement, the Court must now decide whether the settlement is within the range of what may be found to be fair, adequate and reasonable based upon all of the facts and circumstances of this case, that the settlement falls within the reasonable range of relief for claims such as this involved in this case and fully addresses the class members claims, and that the notice provided to the Class Members meets the standards required by due process.

3

## II.    **THE SETTLEMENT IS FAIR**

### A.    The Settlement is Entitled to a Presumption of Fairness

Class action settlements are favored particularly because they provide a court with a procedure to dispose of large numbers of claims through a predictable formula and distribution process. The long-standing rule is that "[c]ompromise of disputed claims are favored by the courts." *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910). Courts have recognized that "a [class action settlement like this one] following sufficient discovery and genuine arms-length negotiation is presumed fair." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *In Re Compact Disc Minimum Advertised Price Antitrust Litigation*, 216 F.R.D. 197, 207 (D. Me. 2003); *see also City Partnership Co. v. Atlantic Acquisition Ltd. Partnership*, 100 F.3d 1041, 1043 (1st Cir. 1996). A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." *Manual for Complex Litigation (Third)* § 30.42 (1995). "The settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor the [appellate] Court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 625 (9th cir. 1982).

The Fifth Circuit has consistently followed the factors announced in *Reed v. Gen. Motors Corp.*, 703 F.2d 170 (5th Cir. 1983) in evaluating a proposed class action settlement. These are:

(1) The existence of fraud or collusion behind the settlement; (2) the

complexity, expense, and likely duration of the litigation; (3) the state of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and the absent class members.

*Id. at* 172.

1.  **This Settlement Embodies the Essence of an Arms-Length Agreement: Both Injunctive and Monetary Relief Were Achieved Only After Significant Discovery, Pre-Trial Litigation, and Court-Ordered Mediation.**

This Court is in the best position to recognize how aggressively this case was pursued and defended for the many years that it was pending before it. The Court is intimately familiar with how difficult it was to achieve this settlement, and how hard Class Counsel worked to reduce this settlement to a document commensurate with the Plaintiffs' best interests, the Defendants' requirements, and the Court's insistence that the settlement pass muster in this Circuit. "A strong presumption exists in favor of settlement if the district court determines that the settlement resulted from arms-length negotiations between experienced counsel and was not tainted by fraud or collusion." *Turner v. Murphy Oil USA, Inc.*, CA-No. 05-4206, (consolidated case), Order & Reasons Approving Class Action Settlement and Award of Common-Benefit Fees and Expenses, Jan. 30, 2007 (Doc. No. 1072), citing *Wal-Mart Stores*, 396 F.3d 116-17, and *Newberg on Class Actions* §11:41 (4th ed. 2002).

In this case, Class Counsel initiated important discovery early to obtain the booking and other OPCSO records to identify, investigate and protect the class interests. That discovery was resisted by Defendants and required a motion to compel to achieve production. From these original documents, Class Counsel identified and then interviewed and communicated with as many putative

5

class members as could be located pursuant to the jail records produced.[2]  Discovery in 2001 confirmed the magnitude of this class, showing potential members in excess of 90,000 individuals[3] having been strip searched between April 1999 and May 30, 2003.

As the case proceeded toward trial, financial discovery was propounded to each Defendant to ascertain the Defendants' ability to pay any compensatory or punitive damage award should the case proceed to judgment.  This case had a substantial likelihood of significant punitive damages against at least some individual Defendants as a result of the continued polices and practices of the OPCSO to conduct strip and visual body cavity searches for years following the Fifth Circuit decision in *Kelly v. Foti*, 77 F3d 819 (5th Cir. 1996).  From the beginning of this case, one of the most pressing issues was a very practical one of great concert to all parties: did the Defendants have the financial resources to be able to pay what could have been a massive judgment including sufficient punitive damages awards against the individual Defendants, in particular then-Sheriff Foti.  Depositions were also noticed for the Defendants on that issue.  The financial discovery was vigorously resisted by Defendants with the Court ultimately ordering production of this information under a protective order.  Counsel also participated in the review of OPCSO's finances, employing a municipal finance expert to meet with the Sheriff's Office's CPA to analyze the Office's ability to pay any award that may be levied against it.

The litigation record in this case is significant both before and after the parties reached a

_____

[2]This information was produced in an electronic format pre-Katrina.  Without Plaintiffs having procured this electronic class identification information pre-Katrina, suffice it to say that it probably would have been impossible to provide notice in any direct form comporting with due process.

[3]This number was later refined by the Claims Administrator to be in a range in excess of 85,000.

6

mediated settlement in May of 2004. In fact, settlement negotiations were on-again-off-again until the Court ordered the mediation. As the Mediators' Affidavit shows,(See attached Affidavit of Roger LaRue, Mediator, Exhibit C) the mediation itself was hotly contested. After months of meetings and discussions regarding the possible settlement and review of similar cases nationwide, and after Class Counsel had invested a significant sum in a municipal "ability -to-pay" expert who examined OPCSO's financial records before the Court-ordered mediation commenced, and after two days of mediation attended also by the Class Representatives, the parties remained far apart and the settlement appeared unreachable until the eleventh hour. In fact, after the definitive settlement fund amount had been agreed upon, the parties were then left to finalize the terms of the settlement, which took anther four (4) months after the mediation.

One of the most profound results obtained in this case has been the total elimination of the OPCSO's long-standing strip search and visual body cavity search policies and practices. One of the primary goals of this litigation was always the objective of eliminating the unconstitutional polices and practices at issue. Class Counsel also achieved in the second consent decree the installation of "privacy" or change-out booths, which are essentially dressing rooms. A recent tour of the jail in August 2007 has confirmed that the constitutional rights of each arrestee are still being honored by allowing change out into jail clothing to take place in privacy. It is conservatively estimated that this injunctive relief still benefits in excess of 36,000 minor offender per year, as they pass through the OPCSO facility.

The risks to the class if settlement had not been reached, in terms of establishing liability, damages, and maintaining the class through trial were enormous. While the *Kelly*, or Sub-class A class, was the most likely to prevail on summary judgment, Plaintiffs were also challenging the

7

change-out" (Sub-class B) practice of exposing the naked bodies of detainees while they changed into jail clothing. Defendant denied that this practice was a "search" and claimed it was constitutionally valid. Defendants also raised qualified immunity on the "change-out" issue which could have resulted in no recovery for class members affected thereby. Liability on this issue was not assured, and the dispute regarding this issue threatened to result in protracted litigation with uncertain results.

In any trial where key facts are disputed by witnesses on both sides, a party has a serious risk of losing. Here, the witnesses for the Plaintiffs would have been primarily individuals who were brought to the jail under arrest. Many of the Plaintiffs' witnesses to the jail's standard practice would be individuals who had been at the jail many times. Plaintiffs faced a significant risk that jurors would not believe the testimony of Class Members because of their criminal records, and would instead believe Defendants' witnesses, who would be mostly jail officials.

The majority of Class Members had damages claims so insubstantial they would not been viable if they could not be pursued as part of a class action. "The vast majority of [strip search] claims would never be brought unless aggregated because provable actual damages are too small." *See, e.g., Tardiff v. Knox County*, 365 F.3d 1, 7 (1st Cir. 2004). Many plaintiffs would not be willing to risk the embarrassment of testifying about their strip search. Some plaintiffs, after testifying at a damages trial, would receive nominal damages verdicts. *See Williams v. Kaufman County,* 352 F.3d 994 (5th Cir. 2003). Class Members faced this substantial risk if they had pursued damages trials. The First Circuit noted in *Tardiff* that after the strip search liability trial, the case could have splintered into thousands of individual damages cases. If this Court were to decertify the case, Class Counsel would no longer represent the plaintiffs, and there could have been many different cases

8

with multiple attorneys, possible conflicting theories of recovery and inconsistent verdicts. At that point Defendants could not settle this case on a class-wide basis. Instead the Court and counsel would be faced with thousands-upon-thousands of small damages cases that go on forever, burdening the Court and counsel, as well as the litigants.

Winning a verdict would not necessarily mean the Plaintiffs would obtain compensation. For the reasons suggested above, the compensatory damages awards may well have been small without supporting documentation of medical treatment which most individuals did not have. Punitive damages are unavailable against the institution, and punitive damages against the individual defendants most likely are uncollectible. The OPCSO is self-insured and substantial resources would have been required to defend the case, raising the possibility that there would not be enough money left to pay all of the Class Members. The potential bankruptcy of the OPCSO was a serious consideration throughout the litigation and settlement of this case. The public interest favors settlement especially where the claims are difficult and complex and involve a large number – in this case in excess of 85,000 – participants, which otherwise could lead to years of protracted litigation. *Cotton v Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). *See also In re: Train Derailment near Amite La,*, MDL 1531, 2006 WL 1561470, at *11 (E.D. La. may 24, 2006)("But for amicable resolution of this class action by compromise. . . its disposition would almost certainly have been a complicated, lengthy, and exceedingly expensive enterprise."

### 2.    The Amount of the Settlement is Fair, Reasonable and Adequate and Within the Range of Possible Recovery for Similar Strip Search Class Action Law Suits.

In its review of this request for final approval, the Court should take into consideration of this settlement the compromises that took place during this litigation. Both sides made substantial

concessions in order to reach a fair, reasonable and adequate settlement that provides the maximum benefits for both sides, in light of the risk of continued litigation. The Court must not "substitute its own judgment for that of experienced counsel who. . . have arrived at a settlement after extensive litigation and a careful assessment of the risks and potential rewards involved in a full trial and appeal." *Walsh v. Great Atl. & Pac. Tea co.*, 96 F.R.D. 632, 642-43 (D.N.J.), aff'd 726 F.2d 956 (3d Cir. 1983). As Judge Fallon observed in *Murphy Oil*:

> [c]ompromise is the essence of settlement and the court should not make the proponents of a proposed settlement justify each term of the settlement against a hypothetical or speculative measure of which concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.

*Turner v. Murphy Oil USA, Inc.*, Order & Reasons Approving Class Action Settlement And Award of Common-benefit Fees and Expenses, entered January 30, 2007, (hereinafter *Murphy Oil*)(Doc. No. 1072), at 28., quoting *Nelson v. Waring*, 602 F.Supp. 410, 413 (N.D. Miss. 1983)(also quoting *Cotton*, 559 F.2d at 1330).

This settlement will provide class members with a reasonable sum certain, without the substantial delay and exorbitant expense of continued litigation. *Oppenlander v. Standard Oil Co.*, 64 F.R.D 597, 614 (D. Co. 1974)("The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, afer protracted and expensive litigation." *See In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 216 F.R.D. 197, 206-207 (D. Me. 2003) ("the case law tells me that a settlement following sufficient discovery and genuine arms-length negotiation is presumed fair") (citations omitted). It is well settled that there is "a range of reasonableness" allowed by courts in approving class action settlements. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 2005 WL

10

15056 (2d Cir. 2005) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.1972)). *See generally* Newberg On Class Actions, §11:45 (4ᵗʰ Ed.) ( "Recognizing that there may always be a difference of opinion as to the appropriate value of settlement, the courts have refused to substitute their judgment for that of the proponents. Instead, the courts have reviewed settlements with the intent of determining whether they are within a range of reasonableness.").

An important factor to consider in evaluating this settlement is the monetary relief it provides to the class.[4] The Court knows based upon its many years of dealing with Sherif Foti and OPCSO that a gross settlement fund in the amount of $9.375 million[5] is a significant achievement. Depending upon into which Sub-class a member falls, the awards are expected to range between slightly in excess of $1,000 for those members of Sub-class A (a/k/a the Kelly class) to about $350.00 for Sub-class B (a/k/a the "change out" class) and approximately$525 for Sub-Class C. These payments will place the recovery for these Class Members within the range approved in other cases.[6]

Moreover, the settlement provides for all funds to be distributed by providing one payment for each Class Member. Under this settlement, Class Members are presumed to be a member of one (or more) of the Sub-classes if their names appear on the OPCSO records. If a Member falls into more than one Sub-class, that Class Member will receive compensation provided

---

[4] The change in the Jail's policy and practices regarding intake strip searches of pre-arraignment detainees is another significant factor here.

[5]That fund has grown to a value of approximately $10,086.00 million, even after taking into consideration that over $274,000 in costs of administration have been paid from the fund to date.

[6]See Affidavit of Howard Friedman, Exhibit A attached hereto

for by the highest compensable Sub-class into which he or she falls. These Class Members will receive a payment without the need for any individual proof of damages, or even that he or she actually underwent any kind of strip search. This approach conforms to other strip search settlement class cases across the United States.[7]

Further, as a 23(b)(3) settlement, any class members who believe they have suffered injuries beyond those provided for in this settlement had the option to exclude themselves from the settlement to pursue an individual claim. In comparison to the size of the putative class – in excess of 85,000 individuals -- only a de minimus number of requests for exclusion were received, twenty-seven to be exact. Of that number, at least half of those requested never to be contacted again, stating they wanted nothing to do with the this settlement, expected no payment from the settlement, and/or denied that they were strip searched or even arrested.

Meanwhile, under the terms of this settlement, those who choose to participate in the settlement will receive a prompt, uniform benefit. This allows a greater percentage of the settlement money to be put into the hands of Class Members instead of paying greater amounts for a special

---

[7]Individual review of emotional distress damages is not required for a fair class action settlement. In *McBean v. City of New York*, 2005 WL 991906 *8 (S.D.N.Y. 2005), standardized class member payments were challenged. The Southern District of New York found that individualized assessment was not required. "It is not unreasonable to negotiate a settlement on the assumption that the class and its individual members would be equally well served by moderate but automatic payments requiring nothing more of the class member than submitting a claim." The Court reasoned further that in contrast with a simple formula (such as used in the instant case) the settlement in *Tyson v. City of New York*, S.D.N.Y. Docket No. 1997CV03762, class members who sought larger awards did so "at a substantial price, including, for the highest awards, releasing all medical, psychiatric, school and employment records, and submitting to a deposition and/or psychological examination by a court-appointed psychologist or psychiatrist." The costs of administration in *Tyson* were prohibitive, and that model has not been embraced by subsequent cases.

12

master to determine the precise amount to distribute to each claimant, such as in the *Tyson* case. In that case, due to the complex system devised to compensate the claimants, requiring extensive medical proof, depositions of the claimants and the like the cost of administration was well in excess of $1,000,000.00. Structuring a settlement to individually evaluate the emotional distress felt by each individual class member would require a more extensive claim form, review of documents, face-to-face hearings, and possibly evaluation by a psychiatric expert. It is worth noting, too, that a requirement of detailed documentation from claimants for their damages also discourages a substantial percent of class members from filing a claim because the anonymity and simplicity of the claim process is then lost to the class member. Individual review could require that claimants provide medical release forms or counseling records, which many people would prefer not to do.

Also, the *Tyson*-type system, would require much more money to administer the settlement, and claimants would have to wait much longer to receive their funds. Certainly, such a high cost to administer a class action settlement does not inure to the benefit of the claimants, only to the benefit of the claims administrator. Such is not the case here. The Proof of Claim and Release Form were designed to be simple so that claimants were encouraged to fill it out. The claimant was only required to sign the form, provide a photo-copied identification, and stick the claim form and ID in the mail with a first class stamp to the Claims Administrator so it was received by Analytics by the deadline of August 2, 2007. From the time the direct mail notice was issued in February 2007 until the August 2, 2007 deadline, the claimants had almost six (6) months to complete this simple process.

The result obtained in this case is even more impressive considering the Defendants' finances. OPCSO is a self-insured entity. As such, the Sheriff's Office must pay all of its litigation

costs, judgments and settlement out of the same pool of money. The Sheriff's Office was suffering from some significant financial stress when the settlement was confected. There were lay-offs, and the Sheriff was undergoing other belt-tightening measures. The aftermath of Hurricane Katrina, which devastated many OPCSO facilities, only heightened those concerns. In addition, the confidential financial records of the individual Defendants showed they would not have been able to withstand personal judgment of any substance, especially given the large number of class members. Had the case not settled during the mediation, certainly more extensive litigation would have ensued, at the end of which it would have been unlikely that the punitive damage awards could have been satisfied. Even if there were a substantial judgment, it is unlikely that the OPCSO would have been in a position to incur debt to fund a higher settlement or a judgment. The Sheriff's Office could not be called upon to pay punitive damages of the individual Defendants and any punitive damages that the individuals would have been called upon to pay would remain unpaid in light of their personal lack of personal resources.

The amount of recovery for the Class members herein is well withing the "a range of reasonableness" allowed by courts in approving class action settlements. *See generally, Newberg On Class Actions*, §11:45 (4th ed. 2002) ( "Recognizing that there may always be a difference of opinion as to the appropriate value of settlement, the courts have refused to substitute their judgment for that of the proponents. Instead, the courts have reviewed settlements with the intent of determining whether they are within a range of reasonableness.") The role of the court is "to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and exercise business judgment in determining whether the proposed settlement is reasonable." *In Re Gulf Oil/Cities Serv. Tender Offer Litigation*, 142 F.R.D. 588, 595 (S.D.N.Y.1992).

14

District courts in other jurisdictions have approved lump-sum settlements in similar strip-search class actions, and per class member payout amounts similar to those proposed in this case. In April 2005, the Southern District of New York in *McBean v. City of New York*, found a settlement that provided an award of $750.00 for a single strip-search and $1,000.00 for multiple strip-searches "consistent with awards for similar class action claims in other cases in this Circuit."[8] In *Tyson v. City of New York, supra*, Step 1 class members who filled out a claim form – much like what is required in this case – received $250. An award of $426.21 for a strip-search was approved as reasonable in *Williams v. Block*.[9] Of note too, the Fifth Circuit held in *Williams v. Kaufman County*, 352 F.3d 994 (5th Cir. 2003) that strip searches are cases subject to nominal damage awards in the amount of $100.00 for the constitutional violation. In *Eddleman v. Jefferson County*, 9. F. 3d 1448 (table), 1996 WL 495013 (6th Cir. Aug. 29, 1996)(unpublished opinion), class members received approximately $750.00 per point for having been strip searched. Recently, courts have granted preliminary approval of settlements that provided fixed amounts of $1,000 per class member. *See Maneely v. City of Newburgh*, 208 F.R.D. 69 (S.D.N.Y. 2002) and *Kahler v. Rensselaer County Jail/Bruce v. Rensselaer County Jail*. The estimated awards of between $350.00 and $1,000.00 in this case fall within the range of reasonableness established by prior settlements approved by courts.

**III.** **NOTICE AND ADMINISTRATION OF THE SETTLEMENT MEET DUE**

---

[8] *McBean v. City of New York*, 2005 WL 991906, *6 (S.D.N.Y. 2005) (noting that there is a risk of much lower recoveries if each strip-search case was fully litigated, citing *Shain v. Ellison*, 273 F.3d 56, 67 (2d Cir. 2001) where a jury verdict of $1 was upheld).

[9] *Williams* was a class action for unlawful strip-searches, wrongful warrant detention and overdetention that settled for $27 million. Of that amount, $13,399,000 was distributed based on a point system where a strip-search received 3 points. Each point was worth $142.07 or $426.21 for each strip-search. *Id.*

## PROCESS.

### A.    Direct Mail and Publication Notice Meet Due Process.

Under Rule 23(e) and due process, adequate notice must he given to all absent class members and potential class members to enable them to make an intelligent choice as to the fairness, and reasonableness and adequacy of the settlement. The Supreme Court has held that Rule 23 and due process does not require delivery of actual notice to every class member, but rather "notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). "It is well-settled that in the usual situation first class mail and publication fully satisfy the notice requirements of Fed. R. Civ. P. 23 and the due process clause." *Zimmer Paper Products Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3rd Cir. 1985); See also *Cayuga Indian Nation v. Carey*, 89 F.R.D. 627, 633 (N.D.N.Y. 1981) ("individual notice by first class mail, coupled with notice by publication satisfies the requirements of due process and Rule 23."). "There are no rigid rules to determine whether a settlement notice to class members satisfies constitutional and Rule 23(e) requirements. . . ." *Wal-Mart Stores, Inc. v VISA U.S.A.*, 396 F.3d 96,114 (2nd Cir. 2005), *cert. denied*, 544 U.S. 1044. Notice must be the "best notice practicable under the circumstances." Fed. R. Civ. P. 23( c)(2)(B). Actual notice to each party that would be bound by the settlement is not required. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 313-14 (1950). The Supreme Court in *Mullane* continued: "A construction of the Due Process Clause which would place impossible or impractical obstacles in the way could not be justified." *Id.* "The question is . . . not whether some individual . . . got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement. *Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d

16

1370, 1365 (9th Cir. 1993).

Since entry of the Court's Order of Preliminary Approval of Class Action Settlement Agreement on January 11, 2007, the parties have worked extensively amongst themselves and with the Claims Administrator to fine tune the Short and Long Form Notices, and the Proof of Claim and Release, and to implement the notice and claims administration process as required by due process and authorized by the Court. Of note, the parties adhered to the time-line provided by the Court's order. (See Doc. No. 154 and Affidavits of Attorney Howard Friedman and Richard Simmons/Analytics, Inc. attached as Exhibit A and B respectively).[10] This included providing claimants information through a toll-free number as well as in the "Frequently Asked Questions" section of the website.

After thorough work by the Claims Administrator, Analytics, Inc., including analysis and cross-referencing of the original OPCSO database containing 143,735 "search incidents," Analytics determined that it could identify at least 80,481 individuals who were searched. As set forth in detail in the Affidavit of Mr. Simmons, the OPCSO electronic records were standardized and addresses were updated through all commercially available means. A possible 81,126 names and addresses were identified by Analytics to have "mailable" address and direct mail Notice and Proof of Claim packages were mailed to these "mailable" addresses.[11] Thus, Notice of settlement

---

[10] The Affidavit of Richard Simmons of Analytic, Inc is attached hereto. This affidavit makes reference to voluminous supporting documents which are provided to the Court in a separate binder.

[11] If an individual appeared at more than one address, each address identified was mailed the Notice/Proof of Claim Package. Accounting for multiple addresses of the 85,595, CCN/SSN combinations identified in the source data, 79,348 or 92.7% were mailed notices at one or more addresses.

was mailed to in excess of 81,000 individuals in conformity with the Court's Order. See Affidavit of Richard Simmons/Analytics, Exh B.

In addition, after consultation with Class Counsel, Analytics caused the Short Form Notice to be published a total of 73 times in twenty-six different publications in eight states[12] over the course of 5 months, between February 25, 2007 and June 1, 2007.[13]

The Claims Administrator also established a website for the settlement. Persons with access to computers, including public access terminals, could review all of the relevant pleadings and information concerning the settlement at www.nolastripsearch.com. This website also provided free access to a printable version of the Proof of Claim and Release Form. It had a page of Frequently Asked Questions to inform putative claimants about various aspects of the case. It gave those visiting the site all of the deadlines in the case. The Affidavit from Mr. Simmons shows that by Sept 7, 2007, the www.nolastripserach.com website had 11,045 hits, for an average of 45 visitors per day; 4,207 total unique IPS, standing for individual computer addresses..

The Claims Administrator also provided claimants with a toll-free number to access information concerning the settlement. Analytics' statistics show that the Claims Administrator received over 8,266 telephone calls. Of that number, 700 individuals were transferred to agents to answer specific questions that might not have been addressed in the standard Q&A recorded phone script. See Simmons Affidavit, Exh B attached thereto).

-------------------

[12]The Short Form Notice substantially similar to the one approved by the Court, was published in newspapers in those jurisdictions identified by the Brookings Institute and the Louisiana Secretary of State determined to have significant numbers of displaced persons from Hurricane Katrina.

[13]A complete schedule of publications, circulation, languages, and publication dates is attached to the Affidavit of Richard Simmons/Analytics, Inc., Exhibit B

As of August 2, 2007, the deadline for filing a claim, Analytics had received in excess of 6,500 Proof of Claim and Release Forms representing 8.3 % of the number of putative class members. The reach of this notice falls well within the range of response rates in other strip search class action settlements. Return rates have ranged at between approximately 8% to 12% generally with 28% return on the high side in a case where the class was small and the original source data was much more accurate than what was available here. (Affidavit of Howard Friedman)[14] Exhibit A. (All of the reports and statistics pertaining to the claims administration process are addressed in detail by the Richard Simmons of Analytics and are presented in a separate binder for the Court's review.)

Considering that some of the claimants sought to be notified had been arrested more than seven years previously, and add to that the worst natural disaster ever experienced in the United States which cast many thousand New Orleans residents to the winds, it is submitted that the efforts extended to provide notice consistent with due process here have been successful. Counsel and the Claims Administrator are confident that they have achieved the goal of due process reach to the putative class members in this case based claims received and the statistical return. (Affidavits of R. Simmons and H. Friedman).

## B.    Class Member Responses to the Notice Favors Final Approval of the Settlement.

"If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart Stores, Inc. v. Visa USA Inc.* 396 F.3d 118 (quoting 4 Newberg § 11.41, at 108); *In re Heritage Bond Litigation*, 2005 WL 1594403

---

[14]*Williams v. Block* (10% - 40,000 claims made from 400,000 class members); *Tyson v. City of New York* (12% - 6,000/50,000); *Connor v. Plymouth County* (15% - 105/700); *Moser v. Anderson* (16% - 356/2,200); *Eddleman v. Jefferson County* (16% - 8,000/50,000); *Doan v. Watson* (24% - 691/2,591); *Kahler/Bruce v. Rensselaer County Jail* (27% - 733/2,700); *Mack v. Suffolk County* (28% - 1,495/5,400).

19

(C.D.Cal.)("It is established that the absence of a large number of objectors to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members."). The objection of a few class members does not mean that a settlement should not be approved. For example, the Second Circuit affirmed approval of a class action settlement in a class action for employment discrimination, even though 36 % of the class members objected. *Grant v. Bethlehem Steel*, 823 F.2d 20 (2nd Cir. 1987). The court in *Grant* also cited other cases where a settlement was approved despite the objections of 50 % of the class members. *Id.* at 23.

In this case, any class member who felt dissatisfied with the settlement could object to the settlement and/or exclude himself or herself from the settlement to bring an individual claim. Only two class members timely objected to the settlement and only twenty-seven class members timely excluded themselves.

As to the objections, they do not attack the overall fairness of the settlement. Rather, the objectors seek modification of the settlement based upon their own individual situations. See documents attached to Affidavit B, Richard Simmons/Analytic, Inc.

The Notice provided these objectors the right and opportunity to opt out of the class, and neither did. Furthermore, in a class action it is not the Court's responsibility to look at each individual's situation. The whole purpose of the class action is to find an effective, expeditious way to fairly and reasonably resolve the large number of claims as a whole. Where individual concerns are raised such as above, those individuals had the opportunity but chose not to opt out. Their individual objections cannot vitiate the settlement benefit to the class as a whole.

Regarding the twenty-seven requests for exclusions, at least one-half of those are truly

requests to be "excluded" in all respects from the settlement: meaning no more contact and no desire to participate in any payment from the settlement fund.[15]  The remaining requests for exclusion are more ambiguous.  What is certain though is that many of these requests for exclusion were received early on during the notice phase of the claims administration process, yet none of those seeking exclusion as of the date of this filing have filed any independent claims for relief.

The paucity of class members who have objected or sought to exclude themselves in order to pursue an individual claim supports this Court's approval of the settlement. This fact gives rise to a strong presumption that the settlement terms are fair, adequate and reasonable.

## IV.  CLASS COUNSELS' ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARDS FOR CLASS REPRESENTATIVES.

### A.  Incentive Awards for the Class Representatives are Supported by the Law and the Contributions of These Representatives.

In the Court's Order of Preliminary Approval of Class Action Settlement Agreement entered January 11, 2007, p. 6, ¶9, the Court found that the Plaintiffs who had acted as Class Representatives for the duration of the litigation were "adequate class representatives for the Class/Sub-classes certified herein", and the Court confirmed them as such.  The Court passed the issue of the requested compensation for those representatives of between $5,000 and $20,000 to be heard at the fairness hearing.  Incentive awards to Class Representatives are appropriate based upon

the actions they have taken to protect the interests of the class, the degree to which

the class benefitted from those actions, the amount of time and effort the named

plaintiffs expended in pursuing the litigation, and any negative effects on the named

---

[15]The Exclusion binder is available for the Court's review upon request, but has been maintained separate from the record based upon the individuals' desire to truly be absent from these proceedings.

plaintiffs." *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 292

F. Supp. 2d 184,189 (D. Me. 2003) (citation omitted).

Defendants do not object to the incentive awards suggested for these Class
Representatives. Class Counsel are filing a separate memorandum with the Court presenting
supporting Affidavits urging the Court to award incentive awards to these Class Representatives at
the top of the range agreed to by the parties. *See* Plaintiffs' Supplemental Motion and Memorandum
in Support of Incentive Awards for Class Representatives.[16] Here, Class Counsel is calling for
significant incentive awards because the Class Representatives had to give up their privacy as well
as spend time on the case, and the class representatives suffered negative effects as a result of
participating. Not to mention, the Class Representatives sacrificed their own personal claims for the
benefit of the class as a whole and the good of society. [17]

### A.   Class Counsels' Fees and Costs should be paid in the Amount Sought in the Joint Motion and Proposed Settlement Agreement.

---

[16]*See e.g. Eddleman v. Jefferson County, Kentucky*, class representatives received
incentive awards of $5,000, $10,000, or $15,000 each; *Mack v. Suffolk County*, the court
approved a bonus of $15,000 for serving as a class representative; *Godshall v. The Franklin Mint
Co.*, 2004 WL 2745890 (E.D. Pa.) (approving a $10,000 award, from a $1.8 million fund, to
representatives of a 112-persons class where plaintiffs assisted with discovery, depositions,
settlement negotiations over a four-year period); *Williams*, the 66 named plaintiffs shared
$745,750 with awards ranging from $2,000-$31,000; *Connor v. Plymouth County*, the court
approved a bonus of $7,500 for each class representative. In *Blihovde v. St. Croix County, Wis.*
219 F.R.D. 607 (W.D. Wis. 2003), the two named plaintiffs shared $35,000. Finally, the
settlement agreement in *Maneely v. City of Newburgh*, 208 F.R.D. 69 (S.D.N.Y. 2002) calls for a
bonus of $25,000 for the sole class representative.

[17]The attached affidavits of the Class Representatives reflect that all are in support of this
settlement. In addition, a separate supplemental memorandum and Affidavit of Attorney Samuel
S. Dalton has been submitted to the Court on behalf of the incentive awards for the Class
Representatives.

Also in the Court's order of preliminary approval of this settlement, the Court found that "Plaintiffs' Counsel, Samuel S. Dalton (LSBA# 4473), Mary E. Howell (LSBA# 7030), d. Majeeda Snead (LSBA# 150520, and Christina R. L. Norris (LSBA# 14270) are adequate Class Counsel." See Order entered Jan. 11, 2007 (Doc. No. 154, p. 7, ¶ 10. ). Further, in this order the Court found "that this case has been vigorously litigated by the parties for more than six (6) [now (7) seven] years," and the Court further summarized the achievements of counsel. *Id.* at ¶ 12. Pursuant to this same Order, Class Counsel's request an award of attorneys' fees in the amount of thirty-seven (37%) percent of the Settlement Fund, plus costs and expenses, including experts and consultation fees and interest, was ordered to be heard at the fairness hearing.

Defendants do not object to Class Counsels' requests for fee and in fact have advised the Court that based upon their experience and prevailing practices in this community, they believe Plaintiffs' Counsels' request is too low; that in fact 40% is standard practice in this community, not the 37% requested.[18] Class Counsel reiterate their request for a fee in the amount of 37 % of the common fund as fully supported by the Affidavits attached to Plaintiffs' Supplemental Memorandum in Support of Reasonable Attorneys Fees and Costs. The parties also submit that Class Counsels' expenses and the costs of administration as presented to the Court are reasonable and should be paid from the Settlement Fund.

## CONCLUSION

For the foregoing reasons, the parties respectfully move the Court to enter an order giving final approval to this class action settlement, as set forth herein, awarding incentive awards to the

---

[18]Class Counsel agree that a 40% fee is reasonable in this case, but had agreed with the Class Representatives at the mediation to reduce their fee so as to facilitate obtaining this settlement.

Class Representatives in the maximum amount of the range suggested by the Settlement Agreement,

and awarding reasonable attorneys fees and costs, as well as costs of administration, in conformity

with the Plaintiffs' Supplemental Motions and Memoranda in support of same.

Respectfully submitted,

SAMUEL S. DALTON, #4473
2001 Jefferson Highway
Jefferson, LA 70121
(504) 835 4289


MARY E. HOWELL, #7030
316 S. Dorgenois Street
New Orleans, LA 70119
(504) 822-4455


D. MAJEEDA SNEAD, #15052
316 S. Dorgenois Street
New Orleans, LA 70119
(504) 822-4455


CHRISTINA NORRIS, #14270
6008 Brownsboro Park Blvd., Ste. H
Louisville, KY 40207
(502) 899-4755
CLASS COUNSEL
REPRESENTING PLAINTIFF CLASS

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon counsel for all

parties by placing same in the U.S. Mails, properly addressed and postage prepaid on this

12th day of Sept, 2007.

SAMUEL S. DALTON

CazeFairness:MemoMtFinalApproval.12Sept07Final

24

Exhibit 4

## DECLARATION OF BARRETT S. LITT

BARRET S. LITT, an attorney, declares under penalty of perjury, and to the best of his knowledge, information, and belief, as follows:

1.  I am a founding member of Litt Estuar & Kitson, LLP in California.

2.  I was class counsel in Craft v. County of San Bernardino, Case No. 05 cv 539 (C.D. Cal.). In Craft, plaintiffs challenged, *inter alia*, a mandatory policy that all pre-trial inmates at the San Bernardino County Jail who went to court and became entitled to immediate release from custody be strip searched before being released, as well as the policy of conducting all jail strip searches in groups without privacy. The class encompassed detainees held on all types of charges, ranging from petty offenses to felonies.

3.  We preliminarily settled the Craft case with the County of San Bernardino in 2007; the final approval hearing was in 2008. The case settled for $25.5 million. In Craft, we mailed notice to 150,084 class members and received 20,938 claim forms that were eligible for payment. This resulted in a 13.6% claims rate. After the claims period ended, the court extended the claims period because many inmates at certain facilities contended that, although mailed notices may have been sent to them, they had not been received. Additional notices were sent to those who requested them. As a result, we received an additional 8,562 eligible claim forms.

4.  I was also class counsel in Williams v. County of Los Angeles, Case No. 2:97-cv-03826-CW (C.D. Cal.) (a/k/a Williams v. Block), in which we challenged, *inter alia*, the Los Angeles County Jail's policy of over-detaining and strip-searching detainees after a court had ordered them to be released.

5.  We settled the Williams case for $27 million. There were 276,717 class members, to whom we mailed notice. We received 36,730 claim forms that were entitled to

payment. This resulted in a 13.3% claims rate.

      6.     I was also class counsel in <u>Bynum v. District of Columbia</u>, Case No. 02 cv 956 (D.D.C. 2006). In <u>Bynum</u>, we challenged, *inter alia*, over-detentions and strip searches of detainees whom the court had ordered to be released. The case settled for $12 million. We mailed notice to 25,833 class members. We received 3,734 claim forms that were eligible for payment. This resulted in a 14.4% claims rate.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: February 21, 2011

BARRETT S. LITT

Exhibit 5

# Case Profile

new search
page permalink

| | | |
|---|---|---|
| Case Name | **Price v. Jefferson County** | Jail Conditions |
| Docket / Court | 91-cv-0144 ( W.D. Ky. ) | JC-KY-0005 |
| State/Territory | Kentucky | Save Case |

Case Summary

Inmates at the Jefferson County Corrections Department, represented by private attorneys, filed suit under 42 U.S.C. § 1983 on March 7, 1991, in the U.S. District Court for the Western District of Kentucky, alleging that they were strip-searched by county corrections officials in violation of the Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments. Plaintiffs alleged that the Department of Corrections maintained an unconstitutional blanket policy to strip-search all arrestees regardless of individual suspicion. Plaintiffs further alleged that they were required to remove their socks, shoes and belts, lift their shirts, drop their pants and open the waistbands of their underpants for inspection of their genital areas. In the first half of 1991, about two dozen individuals sued Jefferson County alleging their right to be free of strip-searches after arrest. By the middle of 1992, several other plaintiffs filed similar claims. These cases were subsequently consolidated. Until the end of 1992, the parties were engaged in settlement discussions. In June 1993, Plaintiffs filed a motion to amend their complaints and to certify the case as a class action. The motion was granted in September 1993. The District Court (Judge Edward H. Johnstone) granted class certification on August 11, 1994. The Defendants filed an interlocutory appeal, which was granted in Eddleman v. Jefferson County, 96 F.3d 1448 (6th Cir. 1996) (Judge Gilbert S. Merritt). The 6th Circuit held that the District Court did not err by allowing Plaintiffs to amend their complaint. It also did not err in allowing the class certification.

The parties subsequently entered into settlement negotiations, and the District Court (Judge Johnstone) approved the settlement on May 24, 1999. All remaining class members who had not made a timely request to be excluded from the class had their claims dismissed with prejudice.

The settlement fund totaled $11.5 million settlement for a class of about 50,000 people. Approximately 6,000 claims were allowed -- a participation rate of 12%. Settlement distribution was based on a point system where women received twice the amount of award that men received and where class members with multiple strip searches were paid for up to three searches. Settlement funds were distributed based on a point system where the "partial" strip search of a male warranted 4 points and a "full" strip search of a male was 8 points. For females, the points were 8 for "partial" and 16 for "full" strip searches. A second strip search was worth one-half the points of a first search and the third search was one-quarter of a first search. The average award was between $1,000 and $2,000 per class member. The court awarded one-third of the settlement fund for attorney's fees, litigation costs and claims administration expenses. The court also awarded incentive bonuses of $5,000, $10,000 and $15,000 to the three class representatives.

*David Terry - 03/08/2006*

compress summary

- click to show/hide ALL -

## Documents
click to show/hide detail

## Issues & Causes of Action
click to show/hide detail

## Related Cases
click to show/hide detail

## Case Details
click to show/hide detail

## People
click to show/hide detail

## Additional Resources
click to show/hide detail

- click to show/hide ALL -

new search

page permalink

- top of page -



Contact

Report an Error

Privacy Policy

*The Clearinghouse has been generously supported by the National Science Foundation.*

Exhibit 6

## EMERY CELLI BRINCKERHOFF & ABADY LLP

RICHARD D. EMERY
ANDREW G. CELLI, JR.
MATTHEW D. BRINCKERHOFF
JONATHAN S. ABADY
ILANN M. MAAZEL
ERIC HECKER
MARIANN MEIER WANG
O. ANDREW F. WILSON
KATHERINE ROSENFELD
DIANE L. HOUK
ELIZABETH S. SAYLOR
DEBRA L. GREENBERGER
MISHA JAIN
ADAM PULVER
ZOE SALZMAN
SAM SHAPIRO

ATTORNEYS AT LAW
75 ROCKEFELLER PLAZA
NEW YORK, NEW YORK 10019

TELEPHONE
(212) 763-5000
TELECOPIER
(212) 763-5001
WEB ADDRESS
www.ccbalaw.com

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/1/11

January 31, 2011

**By Fax**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

APPLICATION GRANTED
SO ORDERED

John G. Koeltl, U.S.D.J.

2/1/11

Re: *McBean v. The City of New York*, 02 Civ. 5426

Dear Judge Koeltl:

We are class counsel for plaintiff-intervenors in the above-captioned matter, and we write to request authorization to distribute the $29 million settlement fund to the 26,131 claimants who filed timely and eligible claims. The $29 million has been equally divided between the 26,131 claimants, except that those who received payment under the 2005 Settlement have had the amount they received previously ($750 for one strip search; $1,000 for two or more) deducted from their payment amount.

The standard award amount is $1,130.69. To calculate the standard award amount, the amount paid to timely and eligible claimants under the 2005 Settlement (a total of $546,000)[1] was added to the $29 million fund for calculation purposes only. This amount was then divided by 26,131, resulting in the standard payment amount of $1,130.69 ($29,546,000 / 26,131 = $1,130.69). In addition to deductions due to payments in the prior settlement, claimants' checks were reduced (sometimes to $0) due to New York child support liens. A total of $3,036,379.56 was deducted due to child support liens. This approximately $3 million will be paid by the City to the custodial parent of the claimant's child. Finally, if the amount paid and/or withheld for child support exceeded $600 and the claimant did not provide a valid social security number, taxes will also be withheld and paid to the IRS. A total of $268,787.63 will be withheld for this reason. Attached as

---

[1] Two hundred sixty four (264) persons received $1000 under the 2005 Settlement and 376 received $750.

EMERY CELLI BRINCKERHOFF & ABADY LLP
Page 2

Exhibit A is a chart explaining the above calculations. If the Court requests, we will provide (preferably under seal) a chart listing the amount received by each timely and eligible claimant and the amount of each deduction.

As explained in the December 20, 2011 letter to the Court, the parties undertook significant efforts to ensure that all persons' claims were carefully reviewed to determine if they were eligible. A total of 31,952 claims were filed on or before December 15, 2010, which is the date the Court set as the deadline for late claims. Of these, 5,821 claims were deemed not eligible and/or late as follows: (a) 1,208 were deemed ineligible because they were duplicates; (b) 833 claims were late but filed on or before December 15, 2010;[2] (c) 88 claims were found ineligible because they were not signed, and the claimants failed to respond to follow-up letters requesting that they sign their claim form; (d) 3,661 claims were deemed ineligible because they were not on the list of eligible claimants provided by defendants ("City's List"); (e) 2 claims were deemed ineligible because the persons also filed a request for exclusion and did not respond to a letter requesting clarification; and (f) 33 previously-marked claims were processed mistakenly and were not in fact claims but notes on claim forms.[3]

Claimants who were deemed ineligible because they were not on the City's List were sent letters (see Exhibit B) informing them of the decision and providing them with thirty (30) days to provide their New York State Identification ("NYSID") number, if known, and any additional information in support of their claim. Approximately 800 people sent in responses to these letters. This firm carefully reviewed all the responses and forwarded to the City for investigation the information from those persons who appeared potentially eligible based on the arraignment charges and the dates of convictions or dismissals. This firm was not able to determine for sure if persons not on the City's List were eligible because the information provided by claimants generally only showed the charges they were arraigned on and the date they were convicted. If they were not detained at a City jail during this time or had other felony arrests, warrants, or parole violations, they would not be eligible. (We could often tell that claimants were not eligible because the papers they submitted showed that they were arraigned on a felony, pleaded guilty at arraignment, or stated they were strip searched at a police precinct.) The City carefully reviewed these challenges.

The Administrator, an outside vendor this firm hired (Navigant Consulting)[4], and the

---

[2] The late claims have not yet been audited and a determination of whether the claimant had "good cause" to file late has not yet been made. An initial review, however, shows that over 500 of the late claims were filed by otherwise-eligible persons. Two hundred thousand dollars ($200,000) is being held in escrow by the Administrator to pay late claims. The claims filed after December 15, 2011 will not be processed and are not included in the total claim count of 31,952.

[3] The numbers in this sentence add up to more than 5,821 because a few claims were deemed ineligible for more than one reason.

[4] Navigant used sophisticated name matching technology. Navigant conducted "fuzzy" searches to determine which claimants had information similar to that of someone on the City's List. Navigant's technology is used by banks to match people to federal watch lists and is programmed to recognize common

EMERY CELLI BRINCKERHOFF & ABADY LLP
Page 3

City also conducted extensive and sophisticated audits to ensure that persons initially deemed ineligible were not on the City's List under an alias, different spelling, or slightly different social security number or date of birth.[5] Most of these audits were conducted on all claimants deemed ineligible, not just those who responded to the letters requesting more information.

Due to the audits, of the 805 persons who submitted additional information contesting the initial ineligibility determination, approximately 101 were ultimately deemed eligible and 704 remain ineligible. These 704 persons will be sent letters (*see* Exhibit C) informing them of the final determination of ineligibility. Through these audits, an additional 521 persons who did not challenge the initial ineligibility determination were also deemed eligible.

Now that the audits are completed, the Administrator is prepared to distribute the $29 million settlement fund. Attached as Exhibit D are the letters that will be sent to eligible and timely claimants who will receive a check.[6] Everyone who was not paid in the 2005 Settlement will receive a Form 1099 because the IRS requires the issuance of 1099s when settlement amounts of this type are over $600. Those people who will not receive any payment due to child support liens will be sent one of the letters attached as Exhibit E.

We respectfully request that the Court authorize the distribution of the $29 million settlement fund. The Administrator will mail the checks and letters within approximately three business days of receiving this Court's authorization. Please let us know if you have any additional questions. Thank you.

Respectfully Submitted,

/ec/

Elizabeth Saylor

cc:    Muriel Goode-Trufant & Genevieve Nelson, Attorneys for Defendants (by e-mail)
       Richard Davis, Special Master (by email)

---

nicknames and misspellings, and will match people that have similar names, aliases, dates of birth, social security numbers, or addresses. The Administrator reviewed by hand all the potential matches to determine who actually matched to the City's List, and this firm reviewed any close cases.

[5] The information on the City's List differs from that of claimants either because the person gave incorrect information when they were arrested or because of typographical errors in the City's database. Every person who has been detained, however, should receive a unique NYSID number that is based on their fingerprints. Matching was much easier if we had a person's NYSID number. Unfortunately, however, the City did not have NYSID numbers for approximately 5,000 people on the City's List.

[6] The payment amount shown on these letters is 4 cents off due to a last minute calculation adjustment. The correct payment amount will be shown on the checks and letters sent to claimants.

# EXHIBIT A

**NYC Strip Search**
*Calculations - $29,000,000 Fund*

| | | | |
|---|---|---:|---|
| Settlement Amount | $ | 29,000,000.00 | |
| Prev Settlements | $ | 546,000.00 | paid in 2005 Settlement to current claimants |
| | $ | 29,546,000.00 | total for calculations purposes |
| | | | |
| Total Claims | | 26,131 | |
| Base per claim | $ | 1,130.68769 | |
| (rounded) | | 1130.69 $ 0.002311 | (fraction difference) |
| | | | |
| Award | $ | 25,694,895.92 | excludes child support & taxes shown below |
| Taxes Withheld | $ | 268,787.63 | paid to IRS |
| Payout | $ | 25,963,683.55 | amount paid by Rust to claimants |
| | | | |
| Child support Calculated | $ | 3,036,379.56 | child support City will pay to custodians |
| Previous Estimate | $ | 3,044,114.65 | child support previously withheld |
| **Difference** | $ | (7,735.09) | City owes this amount to Rust |

# EXHIBIT B

NYC Strip Search Settlement
c/o Rust Consulting, Inc.
P.O. Box 24636
West Palm Beach, FL 33416
Toll-Free 1-800-760-5508 or Non Toll-Free 1-612-605-2964

Date

## RESPONSE DUE DATE: 30 days from mail date

«compute_0007»
«compute_0008»
«compute_0009»«compute_0010»
«compute_0011»
«compute_0012», «compute_0013» «compute_0014»

## NOTICE OF INELIGIBILTY *** Claim No. «clm_no»

Dear Claimant,

We have received the Claim Form and Release you filed in the McBean v. The City of New York, No. 02 Civ. 05426 (NYC Strip Search Settlement). However, according to the records provided to us by the City of New York, you do not meet the qualifications to be deemed an eligible member of the Settlement Class.

As stated in the Court-approved Notice an eligible Class Member is defined as:

(a) All pretrial detainees strip searched at admission to a DOC jail after being arraigned solely on non-felony charges from July 23, 2002 until and including October 4, 2007 ("2002-2007 Sub-Class"). For this sub-class, it does not matter if the offense is related to drugs or weapons or if you were paid under the 2005 Settlement; or

(b) All persons who did not receive payment as part of the 2005 Settlement who were strip searched at admission to a DOC jail between July 15, 1999 until and including July 22, 2002 after being arraigned solely on non-felony charges, one or more of which was a Drug or Weapon Non-Felony Charge, as described under Question 10 ("1999-2002 Sub-Class").

For you to be eligible for payment, you cannot have been, at the same time as your non-felony admission, also admitted for (i) a felony charge; (ii) a parole violation; (iii) an outstanding warrant for a felony offense; (iv) a violation of felony probation; or (v) a City or State conviction and sentence. Searches after admission (ex. housing searches) are not covered.

If you accept this determination, you do not need to do anything in response to this letter.

IF YOU DISAGREE with this determination, you must complete the Request for Additional Information Form on the backside of this letter and return it to the address above by the Response Due Date. Please note if you do not submit the Request for Additional Information Form on the reverse side of this letter to challenge the City's determination of your ineligibly you will receive no money under the Settlement.

For more information or answers to Frequently Asked Questions please visit the website at www.nycstripsearch.com, call one of the hotline numbers listed above or email us at info@nycstripsearch.com.

Sincerely,


Administrator



NCLM

## NYC STRIP SEARCH SETTLEMENT REQUEST FOR
## ADDITIONAL INFORMATION FORM

Name: [                              ]          Alias (if any): [                              ]

DOB: [   ]      [   ]      [        ]
     Month      Day        Year

New York State ID (NYSID), if known:  [                    ]

Approximate Date of Arrest, if known:  [    ]   [    ]   [        ]
                                       Month   Day     Year

For the case at the time of relevant admission (if known):

Charge: [                                                          ]

Book and Case Number:  [                                           ]

Facility you were admitted to:  [                                  ]

The more information you are able to provide, the more likely we will be able to verify your claim. If available, please submit the below supporting documentation.

Supporting documentation includes:

    A.    Rap Sheet;

    B.    Court record showing:

        1.    the charges you were arraigned on;

        2.    the date you pled, the date the charge was dismissed, or the date you were found guilty after trial.

NCLM

# EXHIBIT C

NYC Strip Search Settlement
c/o Rust Consulting, Inc.
P.O. Box 24636
West Palm Beach, FL 33416
Toll-Free 1-800-760-5508 or Non Toll-Free 1-612-605-2964

Date

«compute_0007»
«compute_0008»
«compute_0009»«compute_0010»
«compute_0011»
«compute_0012», «compute_0013»  «compute_0014»

**FINAL DETERMINATION *** Claim No. «clm_no»**

Dear Claimant,

We have received and processed your response to the Notice of Ineligibility letter that was mailed to you. Upon reviewing the documentation that you provided with your response, it has been determined that your claim is not eligible. According to the records provided to us by the City of New York, you do not meet the qualifications to be deemed an eligible member of the Settlement Class.

As stated in the Court-approved Notice an eligible Class Member is defined as:

(a) All pretrial detainees strip searched at admission to a DOC jail after being arraigned solely on non-felony charges from July 23, 2002 until and including October 4, 2007 ("2002-2007 Sub-Class"). For this sub-class, it does not matter if the offense is related to drugs or weapons or if you were paid under the 2005 Settlement; <u>or</u>

(b) All persons who did not receive payment as part of the 2005 Settlement who were strip searched at admission to a DOC jail between July 15, 1999 until and including July 22, 2002 after being arraigned solely on non-felony charges, one or more of which was a Drug or Weapon Non-Felony Charge, ("1999-2002 Sub-Class").

For you to be eligible for payment, you cannot have been, at the same time as your non-felony admission, also admitted for (i) a felony charge; (ii) a parole violation; (iii) an outstanding warrant for a felony offense; (iv) a violation of felony probation; or (v) a City or State conviction and sentence. If you pled guilty at arraignment, you are not eligible. Searches at the police precinct, before arraignment, or after admission (e.g., housing, transfer, or court transport searches) are not covered.

For more information or answers to frequently asked questions, please visit the website at www.nycstripsearch.com, call one of the hotline numbers listed above or email us at info@nycstripsearch.com.

Sincerely,


Administrator


DNOT

# EXHIBIT D

NFC Study Search Settlement
c/o Rust Consulting, Inc.
P.O. Box 24636
West Palm Beach FL 33416

IMPORTANT TAX RETURN DOCUMENT ENCLOSED

Toll-Free 1-800-760-6605
Non Toll-Free 1-812-805-9454

January 27, 2011

Claim Number: 7172717

SAMPLE B SAMPLE
100
STREET ADDRESS
PO BOX 123
CITY STATE 33123-3210

PLEASE EXECUTE ONE PAYMENT STUB FOR YOUR RECORDS

Settlement payment: $830.73

Total Settlement payment, if any ... $830.00
Total Tax Deduction, if any ... $0.00
Total Interest payment deduction, if any ... $0.00
Total payment amount ... $830.73

Bank of America

900002

| DATE | CONTROL NUMBER | AMOUNT |
|---|---|---|
| 01/27/11 | 9409999558 | $830.73 |

CASH PROMPTLY. VOID AND WILL NOT BE RE-ISSUED
180 DAYS AFTER DATE OF ISSUANCE
NOT VALID FOR AMOUNT OTHER THAN SHOWN

Pay: Eight Hundred Thirty And 73/100 Dollars
Payable to: SAMPLE B SAMPLE

VOID

NFC Birth Search Settlement
c/o Rust Consulting, Inc.
PO Box 24636
West Palm Beach FL 33416

⑈000090000⑈ ⑆063000047⑈ 898048218844⑈

NYC Strip Search Settlement
c/o Rust Consulting Inc.
PO Box 24636
West Palm Beach FL 33416

Toll-Free 1-800-760-8309 or
Non Toll-Free 1-612-605-2964

January 27, 2011

Claim Number: 88888888

SAMPLE A SAMPLE - 123589748
ICO
STREET ADDRESS
PH BOX 1234
CITY STATE 25535-1681

Dear Class Member,

Over 26,000 timely and eligible claims were filed in McBean v. City of New York, No. 02 Civ. 05426 (SDNY), the NYC strip search case. The $20 million settlement fund has been equally divided between these approximately 26,000 persons, except those who received payment under the 2005 Settlement have had the amount they received previously ($750 for one strip search, $1,000 for two or more) deducted from their payment amount.

In addition, any amounts owed due to child support liens were deducted. Please note any deduction for child support went toward the balance you may have and does not mean your child support liability was paid in full. You are responsible for paying down the amount you received under the existing lien for child support. We cannot offer individual tax advice regarding this distribution. You must consult your own advisor to determine what the consequences, if any, there might be.

The standard award amount is $1,130.73, subject to the deductions noted. This check represents your award in the settlement. This check may be cashed at any Bank of America location for a nominal fee not to exceed $6.00.

| Award amount: | $1,130.73 |
|---|---|
| (A) 2005 Settlement payment, if any: | $1,000.00 |
| (B) Child support lien deduction, if any: | $0.00 |
| Your payment amount: | $130.73 |

---

Detach and sign the back of this instrument.

NYC Strip Search Settlement
c/o Rust Consulting Inc.
PO Box 24636
West Palm Beach FL 33416

Bank of America
63-4
530

000001

| DATE | CONTROL NUMBER | AMOUNT |
|---|---|---|
| 01/27/11 | 9999999999 | $130.73 |

CASH PROMPTLY, VOID AND WILL NOT BE REISSUED
180 DAYS AFTER DATE OF ISSUANCE
NOT VALID FOR AMOUNT OTHER THAN $130.73
Payee's signature required on back in order for this instrument to be valid

Pay: One Hundred Thirty And 73/100 Dollars
Payable to: SAMPLE A SAMPLE - 123589748



⑈000050000⑈ ⑆063400004⑆ 8780127386519⑈

# EXHIBIT E

NYC Strip Search Settlement
c/o Rust Consulting, Inc.
P.O. Box 24636
West Palm Beach, FL 33416
Toll-Free 1-800-760-5508 or Non Toll-Free 1-612-605-2964

Date

«compute_0007»
«compute_0008»
«compute_0009»«compute_0010»
«compute_0011»
«compute_0012», «compute_0013» «compute_0014»

**FINAL DISPOSITION *** Claim No. «clm_no»**

Dear Claimant,

Over 26,000 timely and eligible claims were filed in McBean v. City of New York, No. 02 Civ. 05426 (SDNY), the NYC strip search settlement. The $29 million settlement fund has been equally divided between these approximately 26,000 persons, except those who received payment under the 2005 Settlement have had the amount they received previously ($750 for one strip search; $1,000 for two or more) deducted from their payment amount. Due to the deductions explained below, however, you are not entitled to any payment.

In addition to deductions due to the 2005 Settlement, any amounts owed due to child support liens were deducted. Please note any deduction for child support went toward the balance you may have and does not mean your child support balance was paid in full. If you did not provide a valid social security number, taxes were also withheld. You are responsible for paying taxes on the amount paid for child support, and these amounts will be reported to the IRS. We cannot offer individual tax advice regarding this distribution. You must consult your tax advisor to determine what tax consequences, if any, there might be.

The standard award amount is $1,130.73 subject to the deductions noted. As shown below, after these deductions, the dollar amount of your payment is reduced to zero.

| Award amount | $1,130.73 |
|---|---|
| (A) 2005 Settlement payment, if any | $<< ent.previousettlementamt >> |
| (B) Tax deduction, if any: | $<<ent.balance_1099>> |
| (C) Child support lien deduction, if any: | $<<ent.childsupportpayable>> |
| Your payment amount: | $0 |

Enclosed with this letters is your IRS Form 1099-MISC which you will need when you file your tax return for the period January 1, 2011 through December 31, 2011. This information is being furnished to the Internal Revenue Service.

For more information or answers to frequently asked questions, please visit the website at www.nycstripsearch.com, call one of the hotline numbers listed above or email us at info@nycstripsearch.com.

Sincerely,


Administrator


NOL

NYC Strip Search Settlement
c/o Rust Consulting, Inc.
P.O. Box 24636
West Palm Beach, FL 33416
Toll-Free 1-800-760-5508 or Non Toll-Free 1-612-605-2964

**IMPORTANT TAX DOCUMENT ENCLOSED**

☐ CORRECTED (if checked)

| PAYER'S name, street address, city, state, ZIP code, and telephone no.<br><br>NYC Strip Search Settlement<br>c/o Rust Consulting, Inc.<br>P.O. Box 24636<br>West Palm Beach, FL 33416<br>1-800-760-5508 | 3 Other income<br><br>$<<ent.balance_1099>> | | OMB No. 1545-0115<br>**2011**<br>Form 1099-MISC |
|---|---|---|---|
| | 4 Federal income tax withheld<br><br>$<<withholding>> | | |
| PAYER'S federal identification number<br>27-3500607 | 7 Non-employee Compensation | 14 Gross proceeds paid to an attorney | **Miscellaneous Income** |
| RECIPIENT'S identification number<br>XXX-XX-1234 | | | Copy B<br>**For Recipient** |
| RECIPIENT'S name, street address (including apt. no.), city, state, and ZIP code<br><br>Name<br>Address1<br>Address2<br>City State Zip | | | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| Account number (see instructions) | | | |
| Form 1099-MISC | (keep for your records) | | Department of the Treasury Internal Revenue Service |

**Instructions for Recipient**

**Account number.** May show an account or other unique number the payer assigned to distinguish your account.

**Amounts shown** may be subject to self-employment (SE) tax. If your net income from self-employment is $400 or more, you must file a return and compute your SE tax on Schedule SE (Form 1040). See Pub. 334, Tax Guide for Small Business, for more information. If no income or social security and Medicare taxes were withheld and you are still receiving these payments, see Form 1040-ES, Estimated Tax for Individuals. Individuals must report as explained for box 7 below. Corporations, fiduciaries, or partnerships report the amounts on the proper line of your tax return.

**Box 3.** Generally, report this amount on the "Other income" line of Form 1040 and identify the payment. The amount shown may be payments received as the beneficiary of a deceased employee, prizes, awards, taxable damages, Indian gaming profits, payments made by employers to former employees who are serving in the Armed Forces or the National Guard, or other taxable income. See Pub. 525, Taxable and Nontaxable Income. If it is trade or business income, report this amount on Schedule C, C-EZ, or F (Form 1040).

**Box 4.** Shows backup withholding or withholding on Indian gaming profits. Generally, a payer must backup withhold at a 28% rate if you did not furnish your taxpayer identification number. See Form W-9, Request for Taxpayer Identification Number and Certification, for more information. Report this amount on your income tax return as tax withheld.

**Box 14.** Shows gross proceeds paid to an attorney in connection with legal services. Report only the taxable part a

NOL

NYC Strip Search Settlement
c/o Rust Consulting, Inc.
P.O. Box 24636
West Palm Beach, FL 33416
Toll-Free 1-800-760-5508 or Non Toll-Free 1-612-605-2964

                                                                Date

«compute_0007»
«compute_0008»
«compute_0009»«compute_0010»
«compute_0011»
«compute_0012», «compute_0013» «compute_0014»

**FINAL DISPOSITION *** Claim No. «clm_no»**

Dear Claimant,

Over 26,000 timely and eligible claims were filed in McBean v. City of New York, No. 02 Civ. 05426 (SDNY), the NYC strip search settlement. The $29 million settlement fund has been equally divided between these approximately 26,000 persons, except those who received payment under the 2005 Settlement have had the amount they received previously ($750 for one strip search; $1,000 for two or more) deducted from their payment amount. Due to the deductions explained below, however, you are not entitled to any payment.

In addition to deductions due to the 2005 Settlement, any amounts owed due to child support liens were deducted. Please note any deduction for child support went toward the balance you may have and does not mean your child support balance was paid in full. You are responsible for paying taxes on the amount paid for child support. We cannot offer individual tax advice regarding this distribution. You must consult your tax advisor to determine what tax consequences, if any, there might be.

The standard award amount is $1,130.73 subject to the deductions noted. As shown below, after these deductions, the dollar amount of your payment is reduced to zero.

| Award amount | $1,130.73 |
|---|---|
| (A) 2005 Settlement payment, if any | $<< ent.previoussettlementamt >> |
| (B) Child support lien deduction, if any: | $<<ent.childsupportpayable>> |
| Your payment amount: | $0 |

For more information or answers to frequently asked questions, please visit the website at www.nycstripsearch.com, call one of the hotline numbers listed above or email us at info@nycstripsearch.com.

Sincerely,

Administrator

NOL

Exhibit 7

1  Mark E. Merin (State Bar No. 043849)
   Cathleen A. Williams (State Bar No. 068029)
2  **LAW OFFICES OF MARK E. MERIN**
   2001 P Street, Suite 100
3  Sacramento, California  95814
   Telephone:     (916) 443-6911
4  Facsimile:     (916) 447-8336
   E-Mail:        mark@markmerin.com
5
   Attorneys for Plaintiffs
6

7                   UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9

10 | DANIEL SCHAFFER, on behalf of himself and all | Case No. C 06-0310 MMC |
   | those similarly situated; | |
11 | | **CLASS COUNSELS' APPLICATION FOR** |
   | Plaintiffs, | **APPROVAL OF STIPULATED** |
12 | v. | **ATTORNEY'S FEES AND** |
   | | **REIMBURSEMENT OF COSTS** |
13 | COUNTY OF ALAMEDA, ALAMEDA COUNTY | |
   | SHERIFF CHARLES C. PLUMMER, IN HIS | **DATE**:     November 16, 2007 |
14 | INDIVIDUAL AND OFFICIAL CAPACITIES, | **TIME**:     9:00 a.m. |
   | ALAMEDA COUNTY SHERIFF'S DEPUTIES | **CTRM**:   7, 19th Floor |
15 | DOES 1 THROUGH 50, AND ROES 1 THROUGH | **JUDGE**:  Hon. Maxine M. Chesney |
   | 20, INCLUSIVE, | |
16 | | |
   | Defendants. | |

17

18                          **I. INTRODUCTION**

19         On June 20, 2007, the Honorable Maxine M. Chesney entered an order preliminarily approving

20 the settlement of this class action strip search case to compensate two classes of detainees who were

21 unlawfully strip searched at Alameda County's Santa Rita Jail and/or Glenn Dyer Jail before

22 arraignment.

23         The Court set November 16, 2007, at 9:00 p.m., as the date and time for a Fairness Hearing for

24 consideration of final approval of the class action settlement.  The Court also specified that Class

25 Counsel's application of award of attorney's fees and costs would be heard at the time of the Fairness

26 Hearing.  This application supports Class Counsel's request for approval by the Court of the stipulated

27 sum of $1,175,000.00 as attorney's fees and reimbursement of costs and expenses.

28 \\\

This fee is reasonable and appropriate under the principles which govern fee awards in civil rights class actions such as the present case. The stipulated sum represents 19% of the total amount allocated for settlement ($6,150,000.00), a percentage well below the 25% "bench mark" set by the Ninth Circuit for an award of fees from a common fund. It also bears a reasonable relationship to the amount of fees which would be awarded under applicable fee shifting statues, given class counsel's extra-ordinary success in resolving this case through a settlement which guarantees thousands of arrestees in the classes fair compensation. (A copy of the Court's Order for Preliminary Approval of Class Action Settlement is attached hereto as Exhibit 1.) Accordingly, plaintiff requests that this application for attorney's fees be granted.

## II. STATEMENT OF FACTS/HISTORY OF LITIGATION

### A. Statement of Facts

As plaintiff learned through discovery, the defendants' policies and customs, though ambiguous, conflicting, and not invariably reduced to writing, required strip/visual body cavity searches of all arrestees, regardless of the offense for which they had been arrested, who were brought to the jails and held for assignment to housing before arraignment. The strip search procedure at the Alameda County jails included the requirement that arrestees strip naked and cooperate in the visual inspection of the rectum (accomplished by bending and spreading butt cheeks), as part of the body cavity search, and arrestees were searched in groups where they had no privacy and were visible not only to other arrestees but also to staff not participating in the strip search. Plaintiff Daniel Schaffer, after being arrested for a minor offense not involving drugs, weapons, or violence, was subjected to this humiliating strip/visual body cavity search in a group setting at the Santa Rita jail.

Plaintiff filed his government tort claim on August 29, 2005, triggering a change in defendants' policies. On or about August 31, 2006, defendants made modifications to their strip search practices to ensure that only persons for whom there was reasonable suspicion to believe they were concealing contraband or weapons were subjected to strip searches prior to arraignment. Defendants also, beginning June 1, 2006, and continuing through December 31, 2006, instituted various changes to their strip search

practices, including the installation of privacy screens in areas where strip searches are conducted, so that persons strip searched on reasonable suspicion, prior to arraignment, were no longer strip searched in groups.

## B. History of Litigation

Plaintiff Schaffer filed this Class Action Complaint on January 17, 2006, alleging that he himself, and all those similarly situated, were subjected to blanket strip searches at defendants' facilities following booking and prior to arraignment, once it was determined that such arrestees were to be assigned to housing units. Plaintiff also alleged that the strip searches were performed in groups where persons strip searched could see and be seen by others as they were strip searched in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and in violation of the State Constitution and California Penal Code Section 4030.

The parties engaged in extensive discovery which included depositions of parties and witnesses, production of documents and propounding and responding to interrogatories and requests for admissions.

Upon completion of discovery on plaintiff's allegations, the parties opened negotiations for a comprehensive resolution of this litigation to provide compensation to two classes of persons. The "Group Strip Search Class" includes those arrestees who were strip searched in a group prior to arraignment during the class period which extends from January 17, 2004, through and including December 31, 2006 (Class Period One). The "Illegal Search Class" includes those arrestees who were arrested for an offense which did not involve violence, drugs, or weapons and were strip searched prior to arraignment from January 17, 2004, through August 31 2006 (Class Period Two).

On February 14 and 15, 2007, the parties participated in mediation sessions presided over by the Honorable Raul A. Ramirez (Ret.), and arrived at a Stipulation of Settlement, a copy of which is attached hereto as Exhibit 2, which defines the two settlement classes, provides methods to notify settlement class members (SCM's) of the terms of the proposed settlement, procedures for the entitlement of each

claimant to receive compensation under the settlement, and to object to the settlement at a Fairness Hearing before this Court. The notice also advised SCM's of their right to opt-out of the settlement.

### III. CLAIM SUBMISSION AND EVALUATION PROCESS

**A.      Summary of Terms of Settlement**

The Stipulation of Settlement provides that all persons in the two defined classes who submit qualifying verified claim forms will be compensated, subject to pro-rata reduction, for a maximum of two strip searches. Felony arrestees who were otherwise lawfully subject to a strip search are entitled to $35.00 per search to compensate them for the loss of privacy resulting from the group strip search. Misdemeanor arrestees who were otherwise lawfully subject to a strip search are entitled to $200.00 per search to compensate them for the group search. Felony arrestees who were *not* lawfully subject to a strip search are entitled to $1,000.00 per strip search; misdemeanor arrestees who were *not* lawfully subject to a strip search are entitled to $1,500.00 per search.

In addition to the sums provided above, SCM's are eligible to receive certain minor enhancements of $250.00 or major enhancements of $500.00 if they fit into categories described in detail in the Stipulation of Settlement if they were under or over specified ages at the time of their strip searches, suffered from physical or mental disabilities, were required to remove religious garments, and/or were more than two months pregnant or menstruating, provided they respond appropriately on claim forms submitted under penalty of perjury.

Additionally, the stipulated settlement provides for amounts from $5,000.00 to $25,000.00 to persons who demonstrate that they received treatment for physical, emotional, or psychological injury within 90 days after experiencing an illegal strip search which is the subject of their claim.

Awards to Claimants are subject to reduction for any debts owed to the County, up to a maximum of fifty percent (50%) of the claimants' awards, in accordance with stipulated procedures to be followed by the Claims Administrator.

The total settlement amount for distribution to claimants is $4,700,000.00, including $75,000.00 for the representative plaintiff. The total of all payments to persons in the Group Search Class is $625,000.00. The total of all payments to persons in the Illegal Search Class shall not exceed the sum of $4,000,000.00. The settlement is structured to compensate persons strip searched in violation of Penal Code § 4030 at or above the minimum compensation provided in such statute, and to compensate others at a reasonable level in relation to other class action strip search case settlements. A large number of persons will receive compensation under this stipulated settlement scaled to achieve differential payments based on varying levels of harm suffered and severity of charges which led to incarceration

Defendants are to allocate up to $275,000.00 to cover the cost of processing and administering the settlement. If the total cost of claims administration is less than $275,000.00, the balance of any funds allocated for this purpose will revert to defendants. In addition to Claims Administration costs and expenses, certain expenses of the Special Master will be charged to the Claims Administration Fund as expenses relating to Claims Administration.

Class Counsel is to receive a total award of $1,175,000.00 for attorney's fees, costs and expenses incident to prosecuting this action, inclusive of any costs and fees incurred in seeking final approval of this Stipulation of Settlement and the defense thereof in any Court or jurisdiction. Payment is to be made in two equal payments: $587,500.00 will be paid within 30 days of the Effective Date; the remaining $587,500.00 will be paid at the time of distribution of settlement funds to the class claimants. This award is subject to approval of the Court through this Motion.

**B.  Claim Submission and Evaluation Process**

Prior to settlement, starting in March 2007, thousands of potential SCM's contacted the law office of class counsel Mark Merin by telephone to inquire as to the status of the case as a result to publicity resulting from the filing of the complaint. Each potential SCM was evaluated for eligibility; written eligibility forms were completed, and a computerized data system was set up to keep track of every SCM

in preparation for litigation or settlement of the case. (See, Declaration of Mark E. Merin filed herewith, paragraph 15).

Within thirty (30) days after preliminary approval of the stipulated settlement by this Court, the parties retained Gilardi and Associates, a firm which specializes in class action claim administration. Gilardi and Associates mailed the notice and claim form ("Notice Packets") to the last known address of 40,845 SCM's, and mailed out an additional 2,204 Notice Packets to SCM's who had learned of the lawsuit from class counsel (and other sources) and been referred to the toll free number. Over 5,000 claim forms were received by Gilardi from SCM's by the post mark deadline for submission of claims (October 11, 2007). (Declaration of Ryanne Fitzgerald, to be filed in support of final approval of settlement.) Based on the answers provided by the SCM and following comparison with database information, Gilardi will determine the value to be assigned to each claim and/or refer the claims to class counsel and counsel for the defendants for further evaluation, as appropriate. If the total value of all of the claims submitted by the cut off date exceeds the amount provided for settlement of the class claims, each claim will be proportionately reduced so as to exhaust the claim fund.

## IV. THE AMOUNT OF THE AGREED UPON FEES IN THE SETTLEMENT AGREEMENT SHOULD BE APPROVED IN LIGHT OF THE COURT'S UNDERLYING OBLIGATION TO AWARD A FEE THAT IS REASONABLE UNDER ALL THE CIRCUMSTANCES SINCE IT REPRESENTS THE FAIR MARKET VALUE OF THE LEGAL SERVICES PROVIDED

### A.    Introduction

Following negotiations finalizing the amount of up to $4,700,000.00 for the class members and Representative Plaintiff, and up to $275,000.00 for claims administration, the parties, in an arms' length negotiation, agreed that defendants, subject to Court approval, would pay Class Counsel a total of $1,175,000.00 for attorney's fees and costs, inclusive of any amounts which Class Counsel may have to expend to defend the settlement on appeal.

\\\

Class counsel requests the Court to approve the amount agreed upon for payment of attorney's fees and reimbursement of Class Counsel's expenses in the settlement agreement in light of the Court's underlying obligation to award a fee that is reasonable under all of the circumstances, since it represents the fair market value of the legal services provided and is well within the range of reasonable attorney's fees judged by the common fund and/or statutory fee-shifting standards.

**B.    The Stipulated Amount for Attorney's Fees and Costs Is a Reasonable Percentage of the Common Fund, At 19% Well Below the 25% Benchmark Established by the Ninth Circuit**

Even where, as here, fee-shifting statutes exist which permit prevailing parties to recover their attorney's fees from the opposing side, Class Counsel may, nevertheless, recover attorney's fees under the common fund doctrine. *(Staton v. Boeing Company*, 327 F.3d 938, 967 (9th Cir. 2003).)  The total settlement amount, not to exceed $6,150,000.00, may be considered a "common fund".  The stipulated amount of fees ($1,175,000.00) represents 19% of this "common fund", an amount well below the "benchmark" of 25% this Circuit has established.  (See *Hanlon v. Chrysler Corp., supra*, 150 F.3d 1011 at 1029; *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).) Recognizing that 25% of a common fund is not a percentage set in stone, many Circuits, including the Ninth Circuit, have followed *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974) and looked to twelve factors which impact upon the appropriate percentage to be awarded as a fee in any particular case.  In *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 at 70 (9th Cir. 1976), the Court set out guidelines for District Courts to utilize in assessing the percentage to apply to a common fund in awarding attorney's fees.  These guidelines mimic the *Johnson* factors:  "(1) the time and labor requires, (2) the novelty and difficulty of the questions involved, (3) the skill required to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and abilities of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."  We address here each of the *Kerr* (*Johnson*) factors to the extent that they are germane to this litigation:

### 1. The Time and Labor Required

Following initial contacts with Representative Plaintiff Daniel Schaffer, who contacted the Law Office of Mark E. Merin, Class Counsel concluded, based on preliminary research, that the strip search of which Plaintiff complained violated state and federal law, but recognized that the law relating to the strip searches of those assigned to housing was still evolving and unclear. As is reflected in the statements of legal services, copies of which are attached as Exhibit A to the Declaration of Mark E. Merin, attorneys in Class Counsel's office devoted over 1,743 hours to evaluation of class members' eligibility, consultation with client, research, preparation of pleadings, discovery (depositions, requests for production of documents, and interrogatories), preparing for and successfully mediating the dispute; negotiating and preparing a stipulated settlement and moving the Court for preliminary approval of that stipulated settlement of this class action. Total costs to date are approximately $10,000. (See, Declaration of Mark E. Merin, Exhibit B.)

After obtaining the Court's preliminary approval of the settlement, counsel have devoted additional substantial time to the preparation of and supervision of the distribution of notices and claim forms, the organization of an accurate database of claimants, and coordination with counsel and claims administrator of the receipt and remailing of forms returned as undeliverable. (Declaration of Mark E. Merin, paragraph 14.) The claim form informed the claimants that class counsel would provide assistance to those class claimants who require it if they contact the offices of class counsel. Thousands have done so. (See, Declaration of Mark E. Merin filed herewith.)

### 2. The Novelty and Difficulty of the Questions Involved

Initially, class counsel was confronted with a complex and evolving area of law requiring the balancing of security considerations against the privacy rights of arrestees before arraignment. As the case proceeded, however, it became apparent that written policies did not specifically address the practices. Depositions of Defendants' staff corroborated, in the main, the claims of Representative Plaintiff. It was necessary for Plaintiff to establish and prove the extent of the violations and their uniformity in order to establish the appropriateness of class treatment and resolution.

### 3. The Skill Requisite to Perform the Legal Services Properly

As appears from the Declaration of Mark E. Merin, the principal litigating attorney in this action, they have many years of experience litigating in the civil rights and class action areas in state and federal court and have previously participated in class action strip search litigation. The combined skill and experience of counsel in Class Counsel's office enabled them not only to draft comprehensive and focused pleadings, but also to successfully to undertake and conclude the mediation.

### 4. The Preclusion of Other Employment by the Attorney Due to Acceptance of the Case

As is reflected in the Declaration of Mark E. Merin, Class Counsel, the decision to undertake a class action strip search case is one requiring consideration of the time demands and the necessity to turn down other legal employment. It is not only the actual hours which, being devoted to this case, could not be allocated to others, but also the need to schedule time in the future which precludes other intensive obligations which would pose conflicts during times which must be devoted to the litigation.

### 5. The Customary Fee

A strip search case may be likened to a personal injury case, as well as classified as a civil rights/constitutional law litigation. In such cases, a contingency fee is customary and Plaintiff entered into such a fee with Class Counsel specifying payment of 40% of the settlement or award. The stipulated fee, however, including costs, is approximately 19% of the common fund, considerably less than what Plaintiff individually agreed to pay from any awards he received.

Attorney's fee awards in class action strip search cases are generally at or above the "benchmark" of 25% of the common fund. (See, for instance, *Williams, et al. v. County of Los Angeles*, *et al.* (C.V. 95-03826-CW) (D.C. C.D. Cal. 2002) where attorney's fees of over $9 million dollars were awarded from a common fund of $27.3 million dollars, and *Brownyn Ford, et al. v. Suffolk County, et al.* (98-11346-NG) (D.C. MA 2002) where Class Counsel were awarded 30% of the $10 million dollar common fund.)

\\\

\\\

### 6. Whether the Fee Is Fixed or Contingent

The fee negotiated with Plaintiff is a contingency fee with the agreement providing for an attorney's fee of 40% of any sum recovered following the filing of a Complaint. All costs and expenses were to be, and were, advanced by attorney's to be reimbursed only from the Plaintiff's share of any recovery. Counsel have, in fact, advanced all costs necessary to prosecute the action and have received no payment from Plaintiff or anyone else. (See, the original retainer agreement, a copy of which is attached as Exhibit C to the Declaration of Mark E. Merin filed herewith).

### 7. Time Limitations Imposed by the Client or the Circumstances

Other than the need to file within the applicable statute of limitations and to meet Court deadlines, there were no time limitations which should be a consideration.

### 8. The Amount Involved and the Results Obtained

The settlement fund compensates those who could have been lawfully strip searched a modest amount for the loss of privacy due to the strip search, and provides for payments between $1,000.00 to $1,500.00 for those who were unlawfully strip searched. Many plaintiffs will be entitled to receive additional amounts based on their specific circumstances.

Counsel are aware of no prior strip search action against Alameda County but, in many instances where individual strip search claims have been tried to a jury, verdicts have been awarded to Plaintiffs of only nominal damages. In the Sacramento strip search case (*Bull v. Sacramento County,* Sacramento Superior Court, Case No. 01AS 01545), the average claim was just under $1,500.00.

In this case, given that the group strip searches, while humiliating and offensive were nonetheless perfunctory, it is unlikely that any particular individual would merit an award much greater than the amount that person will recover under the formula applicable to this settlement unless aggravating factors could be demonstrated.

As the policies were revised as a result of the filing of this class action lawsuit, thousands of people have already benefited from the litigation and thousands more stand to benefit in the future since the offensive strip search practices have been eliminated, not to mention that many claimants will receive substantial payments once the settlement is finally approved and the individual awards are determined.

### 9. The Experience, Reputation and Ability of the Attorneys

As the Declaration of Mark E. Merin, filed herewith, demonstrates, he and the counsel in his firm who worked on this case have excellent backgrounds and reputations and proven track records of success in varied federal litigation. The attorneys in the Law Office of Mark E. Merin are AV rated by Martindale Hubbel and have expertise in federal civil rights litigation which was brought to bear on the resolution of this case.

### 10. The Undesirability of the Case

In this post 911 world, where security arguments generally trump personal privacy concerns, a class action lawsuit targeting pre-arraignment strip searches would not be too sought after and many local attorneys would have refused to accept the risk of losing this case. The small amount of damages provable for each individual claimant would also have made the time necessary to prosecute the case difficult to justify unless class status could be achieved.

### 11. The Nature and Length of the Professional Relationship with the Client

None of the attorneys in the office of Class Counsel had any prior relationship with the Representative Plaintiff in this case, so this factor could not be a consideration in deciding whether or not to revise the stipulated attorney's fee.

### 12. Awards in Similar Cases

Settlement of class action strip search cases, of which Class Counsel is aware, have generally resulted in amounts ranging between $500.00 to $2,000.00 being awarded to each plaintiff, depending upon individual circumstances. In *Bull v. Sacramento County* (CA 2004) Plaintiffs received an average of $1,500.00 per person, even though depending upon the egregiousness of the specific circumstances, pursuant to a complicated claim form and adjudication process, individuals could receive additional damages; in *Smith v. Montgomery County* (MD 1987) class members received $1,200.00 and, in some circumstances, up to $2,500.00 per person.

**C.    The Stipulated Amount for Attorney's Fees and Costs Is Reasonable in View of the Contingency Fee Negotiated with Representative Plaintiffs**

In analyzing the reasonableness of a stipulated attorney's fee to be taxed to or taken from a common fund, courts frequently use, as a check on reasonableness, the contingency fee negotiated with Representative Plaintiff.  In Regan W. Silber & Frank E. Goodrich, *"Common Fund and Common Fund Problems: Fee Objections and Class Counsel's Response"*, 17 Rev. Litig.  525, 546-48 (Summer 1998), the author's reviewed relevant cases and concluded:

> The percentage awarded [from the common fund] should mimic the market.  The percentage method is consistent with and is intended to mirror practice in the private market place where contingent fee attorneys typically negotiate percentage fee arrangements with their clients.  As Judge Posner emphasized in *In Re Continental Illinois Securities Litigation*, "[t]he object in awarding reasonable attorney's fee. . . is to stimulate the market. . .   The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." In non-class litigation, 1/3 contingency fees are typical.  In their concurring opinion in *Blum*, Justice Brennan and Marshall observe that "[i]n tort suits, an attorney might receive 1/3 of whatever amount the plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery."

If the named plaintiff has agreed to pay a 40% contingent fee, that is powerful evidence of a reasonable fee.  One of the best ways to demonstrate the value of counsel's work to the class is to review the consideration agreed to be paid by the named plaintiffs in their contracts.  If the named plaintiff has employed their counsel by contingent fee arrangements that obligated them to pay 40% of the recovery, it would indeed be inequitable for the members of the class, who will enjoy the benefits of this settlement without incurring the risks of bringing the claim, to pay less than named plaintiff.

In this action, Class Counsel entered into negotiated fee arrangements with Representative Plaintiff, a copy of which is attached as Exhibit C to the Declaration of Mark E.  Merin filed herewith, specifying a contingency attorney's fee of 40% after the filing of a Complaint, significantly greater than the percentage stipulated to be recovered from the common fund.

**D. In Light of the Principles of Federal and California Law Applicable to the Determination of Attorney's Fees to Be Awarded under the Relevant Fee-Shifting Statutes (42 USC Section 1988; CCP § 1021.5; P.C. § 4030(p)), the Stipulated Fee Is Reasonable**

Since the underlying claims in the class action entitle the prevailing Plaintiffs to recover attorney's fees under several fee-shifting statutes (42 U.S.C. § 1988[1], California Penal Code § 4030(p)[2], and California Code of Civil Procedure § 1021.5[3]), it is appropriate for the Court to cross check the reasonableness of the fee by reference to the "lodestar" method which calculates a fee by multiplying the number of hours reasonably expended by a reasonable hourly rate for their services. The "lodestar" in this case is $666,612.50. (See, Declaration of Mark E. Merin, Paragraph 13 and Exhibit A thereto). Under Federal law, the "lodestar" is subject to a multiplier when "such an adjustment is necessary to the determination of a reasonable fee" on the basis of factors "not fully reflected in the basic fee," including, for example, the results obtained. (*Guam Soc. of Obstetricians and Gynecologists* 100 F.3d 691, 697, fn.5 (9th Cir 1996).) Here, a multiplier of approximately 1.76 results in the stipulated fee, an appropriate

---

[1] **42 U.S.C. § 1988 provides, at subparagraph (b):**
(b) Attorney's fees
  In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C. 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

[2] **Cal. Penal Code § 4030 provides, at subparagraph (p):**
(p) Any person who suffers damage or harm as a result of a violation of this section may bring a civil action to recover actual damages, or one thousand dollars ($1,000), whichever is greater. In addition, the court may, in its discretion, award punitive damages, equitable relief as it deems necessary and proper, and costs, including reasonable attorney's fees.

[3] **Cal. Code of Civil Procedure § 1021.5 provides:**
Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefore, unless one or more successful parties and one or more opposing parties are public entities, in which case no claim shall be required to be filed therefore under Part 3 (commencing with Section 900) of Division 3.6 of Title 1 of the Government Code.
  Attorneys' fees awarded to a public entity pursuant to this section shall not be increased or decreased by a multiplier based upon extrinsic circumstances, as discussed in *Serrano v. Priest*, 20 Cal. 3d 25, 49.

---

1    multiplier in view of class counsel's success in securing fair compensation for thousands of SCM's.

2          Under California law, the Court may exercise its discretion to increase the "lodestar" amount

3    through use of a "multiplier" in order to take into account a broad spectrum of factors, "including the

4    quality of representation, the novelty and complexity of the issues, the results obtained, and the

5    contingent risk presented."  (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 26; 97

6    Cal.Rptr. 797.)

7          California Courts have held that the Court *should* consider the results obtained and the public

8    benefit of the lawsuit in enhancing the "lodestar" fee under California fee-shifting statutes.  As in *Lealao*

9    *v. Beneficial California, Inc., supra,* 82 Cal.App.4th 19; 97 Cal.Rptr.2d 797, and in *Beasley v. Wells*

10   *Fargo Bank* (1991) 235 Cal.App.3d 1407, 1419; 1 Cal.Rptr.2d 459, the Court recognized enhancement of

11   the lodestar was appropriate to create an incentive for private enforcement of consumer protection

12   litigation: this type of litigation "would not be pursued by counsel but for the expectation of receiving

13   enhanced fee awards in successful cases."  (See also, *State v. Meyer* (1985) 174 Cal.App.3d 1061, 1073;

14   220 Cal.Rptr. 884; *Coalition for Los Angeles County Planning v. Board of Supervisors* (1977) 76

15   Cal.App.3d 241, 251; 142 Cal.Rptr. 766; and *Vo v. Las Virgenes Municipal Water District* (2000) 79

16   Cal.App.4th 440; 94 Cal.Rptr.2d 143.)

17                                      **V. CONCLUSION**

18

19         In the present case, as noted above, the Plaintiff, through the settlement of this action, has

20   conferred substantial benefit on each of the SCM claimants who were subjected to an unlawful or non-

21   private strip search. Non pecuniary benefits of incalculable value have directly resulted from the

22   Plaintiff's litigation of the legality of the strip search policies at the Alameda jails.  Furthermore, the

23   agreed upon fee reflects the high value placed upon settlement.  If the case was not settled on behalf of

24   the class and the matter proceeded to trial, reasonable fees in the thousands of trials which would have

25   ensued would easily have exceeded the stipulated fee and taken years to conclude.

26         This stipulated fee was negotiated during arms' length negotiations presided over by an

27   experienced mediator, only after the amount allocated for the payment of class claims was first agreed

28   upon.  Counsel, in fact, rejected any offer which included a specified amount of fees in order to avoid

any conflict of interest with the class.  This factor weighs strongly in favor of approving the stipulated fee which resulted from the arms' length negotiation.

The devotion which this case required over 2 years of litigation from a team of attorney's in Class Counsel's office, and the excellent results obtained in securing a common fund up to $6,150,000.00 to settle class member claims, amply justifies a total payment of $1,175,000.00 for attorney's fees inclusive of all costs for the work already accomplished and to be required to bring this matter to a conclusion, even through the appellate stage, if necessary.

All of the factors which the Courts have considered to guide them in setting an appropriate award of attorney fees, confirm the reasonableness and appropriateness of the fees. Accordingly, Plaintiff respectfully requests the Court to approve the stipulated amount of $1,175,000.00 for attorney's fees and costs incurred in the prosecution and settlement of these actions.

DATED: November 1, 2007                    Respectfully Submitted,

                                           LAW OFFICE OF MARK E. MERIN


                                           /s/ - "Mark E. Merin"
                                           _____
                                           By:    Mark E. Merin
                                                  Attorneys for Plaintiffs

1    Mark E. Merin (State Bar No. 043849)
     **LAW OFFICE OF MARK E. MERIN**
2    2001 P Street, Suite 100
     Sacramento, California 95814
3    Telephone:   (916) 443-6911
     Facsimile:    (916) 447-8336
4

     Attorneys for Plaintiffs
5

6    GREGORY J. ROCKWELL, ESQ. (SBN 67305)
     BOORNAZIAN, JENSEN & GARTH
7    A Professional Corporation
     552 12th Street, Suite 1800
     P.O. Box 12925
8    Oakland, CA 94604-2925
     Telephone: (510) 834-4350
9    Facsimile: (510) 839-1897

10   Attorneys for Defendants
     COUNTY OF ALAMEDA, ALAMEDA
11   COUNTY SHERIFF CHARLES C. PLUMMER

12                UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14

15   DANIEL SCHAFFER, and all others similarly | Case No. C 06 0310 MMC
     situated, et al.

16              Plaintiffs,

**DECLARATION OF RYANNE FITZGERALD IN SUPPORT OF THE PARTIES JOINT SUBMISSION IN SUPPORT OF FINAL APPROVAL OF STIPULATED SETTLEMENT**

17          vs.

18   COUNTY OF ALAMEDA, ALAMEDA COUNTY
     SHERIFF CHARLES C. PLUMMER, IN HIS
19   INDIVIDUAL AND OFFICIAL CAPACITIES,
     ALAMEDA COUNTY SHERIFF'S DEPUTIES
20   DOES 1 THROUGH 50, AND ROES 1 THROUGH
     20, INCLUSIVE,
21
             Defendants.
22

**DATE:**
**TIME:**
**CTRM:**
**JUDGE:**

23       I, Ryanne Fitzgerald, declare as follows:

24        1.     I am employed by Gilardi & Co., LLC ("Gilardi"), located at 3301 Kerner Blvd., San

25   Rafael, California. Gilardi was appointed as the Settlement Administrator in this matter. I am over 21

26   years of age and am not a party to this action. I have personal knowledge of the facts set forth herein

27   and, if called as a witness, could and would testify competently thereto.

28

2.     On or before June 20, 2007, Gilardi received from the Defendants a list containing the names and addresses of 40,845 potential class members in this matter ("Class List"). Gilardi removed duplicates based on multiple arrests in order to send just one claim form to the potential class members, processed the names and addresses through the National Change of Address Database to update any addresses on file with the United States Postal Service ("USPS") and formatted the list for mailing purposes ("Mailing List").

3.     On or before June 26, 2007, Gilardi established a toll free telephone number (877-446-2122) for class members to call and request a Notice of Proposed Settlement of Class Action Strip Search Case ("Notice"), and Class Action Claim Form ("Claim Form").

4.     On or before July 9, 2007, Gilardi established a web page (www.schaffervalamedaco.com) with the Amended Stipulation of Settlement, Notice, and Claim Form posted thereon.

5.     On or before July 16, 2007 Gilardi caused the Notice, Claim Form, and Postage Pre-Paid return envelope ("Notice Packet") to be mailed by the United States Postal Service ("USPS") to the 40,024 potential Class Members on the Mailing List. Attached hereto as Exhibit A is a true and correct copy of the Notice Packet.

6.     On July 18, 25, 2007, and August 1, 2007 Gilardi caused a copy of the Summary Notice to be published in the East Bay Express. On July 19, 25, 31, 2007, Gilardi caused a copy of the Summary Notice to be published in the Daily Review. On July 19, 25, 31, 2007, Gilardi caused a copy of the Summary Notice to be published in the Oakland Tribune. On July 19, 25, 31, 2007, Gilardi caused a copy of the Summary Notice to be published in the Tri-Valley Herald.

7.     Since mailing the Notice Packets to the class members, Gilardi has received 112 Notice Packets returned by the USPS with updated addresses. Gilardi promptly remailed these Notice Packets to the updated address supplied by the USPS.

8.     Gilardi has received and fulfilled an additional 2,204 requests for Notice Packets from individuals who had learned of the class action and settlement through the Publication Notices, website, or toll free telephone number.

9. Since mailing the Notice Packets to the class members, Gilardi has received 31,021 Notice Packets returned by the USPS with undeliverable addresses. Gilardi, through a third party locator service, performed address searches for these Notice Packets and was able to find updated addresses for 19,626 class members whose Notice Packets were returned undeliverable and remailed the Notice Packets to those updated addresses.

10. On August 30, 2007, Gilardi caused the mailing of 9,584 follow-up reminder postcards to the class members who had not yet submitted a Claim Form.

11. The opt out deadline was on October 11, 2007. To date, Gilardi has received four (4) timely opt outs from people identified on the Mailing List, one (1) timely opt out from a person not identified on the Mailing List and zero (0) late opt outs. Attached hereto as Exhibit B is a list of the timely received opt outs.

12. The claims filing postmark deadline was on October 11, 2007. To date, Gilardi has received 6,598 timely Claim Forms and 100 late Claim Forms. Of the 6,598 claim form received, 4,517 are in the Group Search class, 1,081 are in the Illegal Search class, and 1,000 are preliminarily identified as not class members but their claims are still under review.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 5th day of November 2007 at San Rafael, California.

RYANNE FITZGERALD

Exhibit 8

## DECLARATION OF RICHARD D. EMERY

RICHARD D. EMERY, an attorney, declares under penalty of perjury, and to the best of his knowledge, information, and belief, as follows:

1. I am a founding member of Emery Celli Brinckerhoff & Abady LLC ("ECBA"). I was class counsel in Tyson et al. v. the City of New York et al., Case No. 97 Civ. 3762 (S.D.N.Y.).

2. In Tyson, plaintiffs challenged a mandatory policy requiring the systematic strip search of all persons being held pre-arraignment in Department of Correction ("DOC") facilities in New York and Queens counties. The class encompassed detainees held on all types of charges, ranging from petty offenses to felonies.

3. We settled the Tyson case with the City of New York in 2001. There were approximately 67,000 members of the settlement class, and the settlement had a claims rate of less than 10%.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York                     February 18, 2011

                                        RICHARD D. EMERY