IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KIM YOUNG, RONALD JOHNSON, WILLIAM JONES, ALLEN GORMAN, GERRAD LAMOUR, LEE MERCADO, BRADLEY HYTREK, CARL GRAY, and MATTHEW LIPTAK, on behalf of themselves and a class of others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>COUNTY OF COOK and SHERIFF TOM DART in his capacity as Head of the Cook County Sheriff's Department,<br><br>    Defendants. | Case No. 06 C 552 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 2010, plaintiff Kim Young and eight others, on behalf of a class of similarly situated pretrial detainees, entered into a $55 million settlement with Cook County regarding alleged civil rights violations in the Cook County Jail. The Court approved the settlement in 2011. Under the terms of the settlement, counsel for the plaintiff class sued a number of Cook County's insurers in state court for failing to contribute insurance coverage to assist the County in settling the class action. The County later joined the lawsuit. In 2017, after hard-fought litigation, class counsel negotiated a settlement involving a $52 million payment by the insurers. Of this, $32.5 million has been allocated to the class; the rest will go to the County and the State of Illinois.

Plaintiffs' counsel have petitioned for an award of attorney's fees plus costs associated with the notice mailing for this recent settlement and for $10,000 incentive awards to the named plaintiffs. The Court has approved the supplemental settlement and has taken the petition for fees, costs, and incentive awards under advisement. For the reasons stated below, the Court grants plaintiffs' petition.

**Background**

In 2006, named plaintiffs Kim Young and Ronald Johnson sued Cook County, the Sheriff, and certain Sheriff's Department and Cook County employees (collectively, the County) on behalf of themselves and a class[1] of similarly situated pretrial detainees at the Cook County Jail. Young and Johnson alleged that the County engaged in strip-search practices that violated detainees' Fourth and Fourteenth Amendment rights. The background facts of that case (*Young I*) are described in this Court's prior opinions. *See, e.g.*, *Young v. County of Cook*, 616 F. Supp. 2d 834 (N.D. Ill. 2009).

The Court approved a class-wide settlement in *Young I* in March 2011. As previously noted, the class received a total of $55 million from the County pursuant to the *Young I* settlement. The parties further agreed that Cook County would assign to the class its claims and rights to payment under a number of insurance policies held by the County. The *Young I* settlement agreement also provided that class counsel Loevy

---

[1] The Court ultimately certified two classes of plaintiffs: one class of "males who were subjected to a strip search and/or a visual body cavity search" on or after January 30, 2004 as new detainees at the Cook County Jail and another class consisting of "all persons charged only with misdemeanor or lesser offenses not involving drugs or weapons" who were subjected to such a search within the same time frame. *Young v. County of Cook*, No. 06 C 552, 2007 WL 1238920, at *9 (N.D. Ill. Apr. 25, 2007).

& Loevy would be "eligible to receive as Attorneys' Fees up to one-third of the amount recovered from the Defendants' insurers if Plaintiffs recover any funds in the action on the Assigned Claims." Pls.' Mot. for Prelim. Approval of Class Action Settlement, Ex. 1 ¶ 46.

Based on their belief that the County's insurers had defrauded the County to avoid paying $20 million in coverage they owed in connection with the *Young I* settlement, plaintiffs brought suit against the insurers in state court in 2012. The Court will refer to this litigation as the Young insurance case. Plaintiffs alleged violations of the Illinois False Claims Act (IFCA), 740 ILCS 175/3, and common law claims for breach of contract, fraud, and tortious interference, among others. The Illinois Attorney General declined to intervene in the case. Cook County intervened in 2013. After four years of litigation, the Young insurance case went to trial in March 2016. The jury awarded the plaintiffs treble damages of $60 million on their IFCA claim, $20 million in compensatory damages for fraud, $20 million in compensatory damages for fraudulent concealment, and $20 million in punitive damages. After the parties filed cross motions for judgment notwithstanding the verdict (JNOV), the court vacated the award of damages, holding that the award was cumulative and that there was insufficient evidence to support the punitive damages award as well as the verdict on the fraud and fraudulent concealment claims. On the other hand, the court also granted plaintiffs' motion for JNOV regarding two other defendants' liability for violations of the IFCA, breach of contract, and tortious interference. The court ordered a new trial to determine damages.

In May 2017, before the state court held a new trial, the parties agreed on a settlement. In exchange for the dismissal of all claims, the insurer-defendants agreed to

pay a total of $52 million, $26 million of which is allocated to relief allowed under the IFCA. Of that $52 million in settlement funds, the *Young I* class is entitled to a common fund of $32.5 million. The settlement agreement stipulates that "[a]ll Parties will bear their own costs and attorneys' fees" in connection with the suit. State of Illinois's Amicus Br., Ex. H ¶ 5.

The Court granted plaintiffs' motion for final approval of the Young insurance settlement on September 14, 2017. Class counsel have asked the Court to award attorney's fees in the amount of one-third of the $32.5 million common fund, after the costs of administration are subtracted, plus costs for the notice mailing. Class counsel further ask the Court to approve payment of $10,000 incentive awards to the nine named plaintiffs in this case. The Illinois Attorney General has filed an amicus brief opposing the request for attorney's fees. The Court also received four objections from class members to the size of the requested fee award.

## Discussion

**A.     Attorney's fees and costs**

The Illinois Attorney General (IAG) argues that plaintiffs' counsel are not entitled to an award of attorney's fees equal to one-third of the recovery for the class in the Young insurance case. First, the IAG asserts that Loevy waived their entitlement to attorney's fees under the IFCA's fee-shifting provision by failing to petition the state court for a statutory fee award after reaching a settlement in that case. According to the IAG, this renders Loevy ineligible to receive any amount of attorney's fees out of the Young insurance common fund. The IAG further argues that, if the Court does decide to award attorney's fees, the award should be limited to Loevy's lodestar amount, rather

4

than a percentage of the common fund.

Federal Rule of Civil Procedure 23 provides that "[i]n a certified class action, the court may award reasonable attorney's fees and . . . costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). When the settlement of a case results in the creation of a common fund for the plaintiff class, class counsel may petition the court for an award of attorney's fees from the fund under the common fund doctrine, as long as no statutory fee-shifting provision controls the award of fees in the case. See *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 563-64 (7th Cir. 1994). An appropriate fee award in a common fund case reflects a balance between two competing goals: fairly compensating counsel for the services they provided to the class and protecting class members' interests in the common fund. See *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988). Ultimately, the goal is to award a fee that most closely approximates "the market price for legal services," which is the price to which plaintiffs and their attorneys would have agreed had they negotiated *ex ante*. *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718-19 (7th Cir. 2001) (*Synthroid 1*). Factors include the risk of nonpayment, normal compensation rates, the quality of counsel's performance, the stakes of the case, and the amount of work needed to resolve it. *Id.* at 718, 721.

Courts may approach the calculation of a reasonable "market price" fee award in different ways. Under the lodestar method, the court multiplies the number of hours reasonably expended on the case by a reasonable hourly rate. *E.g.*, *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010). Alternatively, a court may choose to award a percentage of the common fund. *See, e.g.*, *In re Dairy Farmers of Am., Inc.*, 80 F.

5

Supp. 3d 838, 862 (N.D. Ill. 2015) (awarding class counsel attorney's fees of one-third of a $46 million common fund).  In common fund cases, the Seventh Circuit leaves the decision whether to use a percentage calculation or the lodestar method to the discretion of the district court.  *E.g.*, *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014) (citing *Florin*, 34 F.3d at 566).  In recent years, instead of awarding class counsel a straight percentage of a large class-action settlement fund, courts in the Seventh Circuit have sometimes calculated fees using a declining marginal percentage scale.  *See, e.g., In re Synthroid Marketing Litig.*, 325 F.3d 974, 980 (7th Cir. 2003) (*Synthroid 2*); *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741, at *6 (N.D. Ill. Apr. 10, 2017); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11 C 4462, 2015 WL 1399367, at *5 (N.D. Ill. Mar. 23, 2015); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 804 (N.D. Ill. 2015).  Under this approach, the court divides the settlement fund into several different tiers of recovery and awards class counsel a decreasing percentage of each tier.  *Synthroid 2*, 325 F.3d at 980.  In *Synthroid 2*, for example, class counsel received 30% of the first $10 million of the settlement fund, 25% of the next $10 million, 22% of the tier of recovery between $20 million to $46 million, and 15% of the recovery in excess of $46 million.  *Id.*  The reason for this, as explained by the Seventh Circuit in *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 959 (7th Cir. 2013), is that negotiated fee agreements regularly reflect the proposition that a marginal increase in recovery may be disproportionate to the increase in the costs of litigation associated with the increased recovery.  For example, "it is almost as expensive to conduct discovery in a $100 million case as in a $200 million case."  *Id.*

The IAG argues that plaintiffs' counsel are ineligible to receive any award of attorney's fees out of the common fund because they waived the fees to which they were entitled under the IFCA. The ICFA provides for an award of attorney's fees when a claim under the statute is settled:

> If the State does not proceed with an action under this Section, the person bringing the action or settling the claim shall . . . receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

740 Ill. Comp. Stat. 175/4(d)(2). The IAG contends that, because plaintiffs were entitled to seek attorney's fees under this fee-shifting provision, *Pierce v. Visteon Corp.,* 791 F.3d 782 (7th Cir. 2015), prevents Loevy from receiving any fee award from the common fund. According to the IAG, *Pierce* stands for the broad proposition that "once a party or class has gained a statutory entitlement to fees, it is no longer eligible for common fund attorney's fees." State of Illinois's Amicus Reply Br. at 3. In *Pierce*, the trial court found for the plaintiffs on their statutory claim and awarded reasonable attorney's fees pursuant to the applicable ERISA fee-shifting provision. *Id.* at 784. The court in *Pierce* rejected class counsel's request for a supplemental award out of the common fund in addition to the statutory fees he was already awarded. *Id.* at 786-87. The court held that "clients should not be ordered to pay counsel who are compensated under a fee-shifting statute." *Id.* at 787. *Pierce* explained, "this case was litigated under a fee-shifting statute, and we do not see a good reason why, in the absence of a contract, counsel should be entitled to money from the class on top of or in lieu of payment by the losing litigant." *Id.*

*Pierce* cannot be read as broadly as the IAG suggests. Even though the court

observed that class counsel should not be "entitled to money from the class *on top of or in lieu of* payment by the losing litigant," the "in lieu of" part is dicta, given that class counsel in *Pierce* sought an award out of the common fund "on top of" what he had already been awarded pursuant to statute. *Id.* (emphasis added); *see also McCue v. MB Fin., Inc.*, No. 15 C 988, 2015 WL 4522564, at *3 (N.D. Ill. July 23, 2015) ("*Pierce's* holding is limited to cases where an attorney obtains a judgment for the class, the attorney is awarded a fee based on the lodestar method that the court deems reasonable, and the attorney seeks an additional, second recovery."). In this case, however, there is no prior statutory attorney's fees award. This case is also distinguishable from *Pierce* because *Pierce* did not involve a settlement of any kind. Additionally, the only claim brought by the plaintiffs in *Pierce* was a statutory claim that included a fee-shifting provision. By contrast, the Young insurance case did not involve a claim under a single statute; plaintiffs made several common law claims in addition to their IFCA claim, and the settlement agreement specifically allocates just $26 million of $52 million to relief under the IFCA. Thus, the IFCA's fee-shifting provision cited by the IAG does not control the award of attorney's fees here. An award of attorney's fees out of the common fund is entirely appropriate in this case, in which plaintiffs agreed to dismiss both statutory and common law claims in exchange for the creation of a large settlement fund.

The IAG next argues that equity requires the Court to use the lodestar method of determining an appropriate fee to prevent class counsel from receiving a much larger amount than they would have been entitled to recover under the IFCA's fee-shifting provision. As previously noted, however, the Young insurance litigation and subsequent

settlement were not based solely on the IFCA claim.  Ultimately, what matters most, and what the law requires, is that the fee award approximate what would have been the market rate for the Young insurance litigation had fees been negotiated *ex ante* by the parties.

Plaintiffs' counsel argue that a flat one-third of the common fund obtained for the class in the Young insurance case most accurately reflects the contingency fee that plaintiffs and counsel would have agreed upon had they engaged in *ex ante* negotiations.  As previously explained, the factors the Court considers in determining a reasonable fee amount include the normal rate of compensation, the risk of nonpayment, the stakes of the case, the amount of work needed to resolve it, and the quality of counsel's performance.  Plaintiffs' counsel have submitted a declaration from Richard Hess, a partner at Susman Godfrey, in support of their request for fees.  Hess attests that "the market rate for plaintiffs' contingency litigation in large commercial cases and False Claims Act cases ranges from a low of 33% to a high of 49%."  Pls.' Mot. for Att'ys' Fees and Incentive Awards, Ex. D (Hess Decl.) ¶ 33.  Loevy's own standard contingency fee is 40% of the gross recovery for civil rights cases and 50% for False Claims Act whistleblower cases when the government declines to intervene.  *Id.*, Ex. E (Kanovitz Decl.) ¶ 5.  According to Hess, in this case, *ex ante* negotiations "between a leading plaintiffs' firm and a sophisticated commercial client or False Claims Act whistleblower . . . would have resulted in a fee agreement of at least one-third, and likely more," because plaintiffs' counsel were advancing all litigation costs and the case was risky.  Hess Decl. ¶ 38.  Neither the IAG nor anyone else has submitted any evidence contrary to Hess's declaration.

The Young insurance case presented a high risk of non-payment throughout its course. First, even if the IAG's decision not to intervene with respect to the IFCA claim did not in fact represent a judgment that the claim was less than a slam dunk, the danger existed that the court would interpret that decision as reflecting poorly on the merits of the claim. *Cf.* David Freeman Engstrom, *Public Regulation of Private Enforcement: Empirical Analysis of DOJ Oversight of Qui Tam Litigation Under the False Claims Act*, 107 Nw. U. L. Rev. 1689, 1694 n.17 (2013) (collecting cases in which courts made such an assumption with respect to federal False Claims Act cases). Moreover, despite the risk involved in doing so, plaintiffs' counsel represent that they rejected a $20 million settlement offer in the Young insurance case, electing instead to go to trial in March 2016, because they believed they could secure a larger recovery for the class. Although Loevy believed the class would be better served by going to trial, the firm risked walking away with nothing after having invested four years in this litigation. *See, e.g.*, *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 582 (N.D. Ill. 2011) ("Absent settlement, Class Members would face the real risk that they would win little or no recovery."); *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 908 (S.D. Ill. 2012) (noting the "risk that the plaintiff will be unsuccessful and recover nothing for the class" at trial).

An enormous amount of work went into the Young insurance litigation. Plaintiffs' counsel effectively built the case from scratch, on their own or virtually so. Based on their own analysis of the County's insurance programs, Loevy believed that the County's insurers defrauded the County (and its taxpayers) of tens of millions of dollars—money that the County owed the class under the *Young I* settlement. Thus, from the beginning,

10

the stakes in this case were high not only for the class, but also for the County. Loevy negotiated for an assignment of the County's claims and litigated against the insurers for five years in order to obtain an additional recovery for the *Young I* class. After the IAG declined to intervene, plaintiffs faced six separate motions to dismiss. When discovery closed, the insurer-defendants filed four separate motions for summary judgment on all claims. In March 2016, the case went to trial, which lasted four days. Ultimately, after the court vacated the jury's finding for plaintiffs based on a number of post-trial motions, Loevy and the County obtained a $52 million settlement that secures an additional $32.5 million benefit for the class. The settlement agreement also provides for the payment of over $10 million to the County and $8.6 million to the State of Illinois under the Illinois False Claims Act—a windfall that the State receives pursuant to statute even though the IAG decided not to intervene in the case and the State actually suffered no monetary loss at all. As for the quality of Loevy's performance in the Young insurance case, the result speaks for itself.

      The IAG makes no argument regarding why a fee of one-third of the common fund is not reflective of the likely *ex ante* negotiated market price for a case like the Young insurance case. Loevy, on the other hand, has provided evidence that a rate of one-third of the total recovery is on the low end of the market contingency rate for this type of litigation. Moreover, as detailed above, the risk of nonpayment in this case was high, the amount of work needed to resolve it substantial, and the quality of counsel's performance exceptional. The Court therefore finds that one-third of the common fund is a reasonable approximation of the rate that would have been negotiated *ex ante* in this case.

Plaintiffs' counsel further contend that the application of a declining marginal percentage scale of the type this Court ordered in *Aranda* is inappropriate in this case, because the class would not have agreed to a declining marginal percentage rate at the outset. Although the Seventh Circuit has embraced the use of a declining marginal percentage scale in certain situations, it also has cautioned that this approach is not always best. *Synthroid 1*, 264 F.3d at 721; *see also Dairy Farmers*, 80 F. Supp. 3d at 845-46 (declining marginal percentage arrangement is "not a one-size-fits-all recovery scheme"). This is because it "create[s] declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client." *Synthroid 1*, 264 F.3d at 721. This Court had a previous occasion to consider that particular issue in *Aranda*, a case under the Telephone Consumer Protection Act that also involved a large class-action settlement. *Aranda*, 2017 WL 1369741, at *3-4. In *Aranda*, class counsel argued against the use of a declining marginal percentage calculation, citing *Synthroid 1*'s observation regarding the potential declining marginal returns problem. *Id.* at 4. They argued that class members negotiating *ex ante* would prefer a flat one-third rate that encouraged an aggressive push for a high recovery over a declining marginal percentage rate that could lead attorneys to accept a low-value settlement at an early stage in the litigation. *Id.* The Court concluded, however, that *Aranda* was not a case in which the declining marginal percentage approach would be inappropriate because class counsel had admitted that, "[u]p until the very end, [they] were fighting to get anything more than $0 for the class." *Id.* at *5 (quoting Pls.' Reply in Supp. of Att'ys' Fees at 11). It was therefore not a situation in which the prospect of a

declining marginal percentage fee would have encouraged class counsel to accept a lower settlement offer instead of continuing to push for a larger recovery for the class. *Id.* Here, by contrast, plaintiffs' counsel were not "fighting to get anything more than $0" up until the end. Before the case went to trial, plaintiffs turned down a $20 million settlement offer because Loevy believed that they could do better for the class. They were correct, and the extra work they performed as a result yielded a substantially greater benefit for the class, as well as for the County and the State. That is the kind of lawyering that the Court believes the class members would have expected—and been willing to pay for—had it been possible for them to negotiate rates *ex ante*. Imposing a declining marginal percentage fee structure in this case would disincentivize this by creating the "declining marginal returns to legal work" of which *Synthroid 1* warned. *Synthroid 1*, 264 F.3d at 721. For this reason, the Court concludes that this case, unlike *Aranda*, falls squarely within the category of cases for which the use of a declining marginal percentage scale is not appropriate.

Plaintiffs' counsel have provided sufficient support for their contention that a 33% contingent fee of the total recovery is on the low end of what is typically negotiated *ex ante* by plaintiffs' firms taking on large, complex cases analogous to the Young insurance case. The Court finds that one-third of the common fund is a reasonable reflection of the hypothetical market price of Loevy's services in this case and thus an appropriate fee award. For this reason, there is no need to cross-check this percentage against the lodestar. *E.g., Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (noting that "consideration of a lodestar check is not an issue of required methodology" where the district court has considered the relevant factors in determining

a hypothetical *ex ante* market rate for attorney's fees).

For these reasons, the Court approves plaintiffs' counsel's request for attorney's fees in the amount of one-third of the common fund, net of administrative expenses, and overrules all related objections. The Court also approves the request for reimbursement of the expenses related to the notice mailing for the settlement. The approval of expenses is subject to presentation of documentation establishing the amount and reasonableness of the expenses involved.

**B.     Incentive awards**

Plaintiffs' counsel have also requested approval of incentive awards in the amount of $10,000 for each of the nine named plaintiffs, and no party has objected to the request. Because named plaintiffs play such a crucial role in class action litigation, "an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). Factors for courts to consider in deciding whether to approve such an award include "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Id.*

The named plaintiffs have been involved in the Young litigation for over eleven years. Six of them testified at trial, and all gave depositions and assisted with discovery during the course of the *Young I* litigation. As plaintiffs' counsel point out, without the named plaintiffs' active participation in *Young I*, "the Young Insurance case might never have existed." Pls.' Mot. for Att'ys' Fees and Incentive Awards at 20. After helping to obtain a $55 million settlement payment for the class in *Young I*, the named plaintiffs

14

could have decided that they had done enough. But to further protect the interests of the class, they agreed to continue to represent the class in the Young insurance case, even though it meant an additional five years of litigation. As a result of the named plaintiffs' dedication to seeing the Young insurance case through, the class will receive an additional benefit of $32.5 million.

For those reasons, the Court concludes that the requested $10,000 incentive awards are reasonable and warranted in this case. See, e.g., *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 15 C 10447, 2016 WL 7018566, at *3 (N.D. Ill. Nov. 29, 2016) (awarding $12,500 incentive awards where named plaintiffs actively participated in discovery); *Will v. Gen. Dynamics Corp.*, No. CIV. 06-698-GPM, 2010 WL 4818174, at *4 (S.D. Ill. Nov. 22, 2010) (approving $25,000 named plaintiff incentive awards).

## Conclusion

For the foregoing reasons, the Court grants plaintiffs' motion for attorney's fees and incentive awards [dkt. no. 880].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 20, 2017