IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KIM YOUNG, RONALD JOHNSON, WILLIAM JONES, ALLEN GORMAN, GERRAD LAMOUR, LEE MERCADO, BRADLEY HYTREK, CARL GRAY, and MATTHEW LIPTAK, on behalf of themselves and a class of others similarly situated,<br>　　　　　Plaintiffs,<br><br>　　v.<br><br>　COUNTY OF COOK and SHERIFF TOM DART in his capacity as Head of the Cook County Sheriff's Department,<br><br>　　　　　Defendants. | No. 06-CV-552<br><br><br>JUDGE KENNELLY |

**RUST DECLARATION OF SETTLEMENT COSTS**

I, Jason M. Stinehart, declare:

1.　　The purpose of this declaration is to provide an overview of the costs incurred in carrying out the Young Insurance and USI notice plans.  As of September 30, 2017, Rust Consulting, Inc. ("Rust") has administered the requirements of the notice plan as outlined in the subsequent paragraphs.  The purpose of the declaration is to provide an overview of the work done, and the cost associated, and in particular to explain why the costs ended up being approximately 3% above the cap that Rust had agreed to.

WORK COMPLETED

2.　　Rust was contracted to carry out the Court-approved notice plan to inform class members about the Young insurance settlement.  As part of that process, on or about May 17, 2017, Rust Consulting

extracted a list of those who submitted a valid claim form from Young I to provide notice to Class Members of the settlement in the Young Insurance case, as only those Class Members who submitted a timely, valid claim to the Young I settlement were eligible to participate in the subsequent Young Insurance settlement. As part of the up-front process, Rust also sent CAFA notices to 57 Attorney Generals as well as 56 Insurance Regulators.

3. A one-time notice was sent via First Class to that last known address of each eligible class member. After sending out the Class Notice, Rust used a tiered approach to identify address updates for undelivered notices. Rust sent all undeliverable notices without a forwarding address to Transunion for skip tracing. Following the Transunion skip trace, the remaining undeliverable mail was sent to Experian for further skip tracing. Rust also attempted to obtain address updates from the Illinois Department of Corrections, and used a CLEAR manual trace to exhaust efforts to find current addresses of class members. If an alternate address was located then a new notice was mailed to the alternate address via First Class mail.

4. Rust established and maintained a case-specific informational website for class members to access the notice as well as other key documents filed with the court. This included the ability to correspond electronically with class members, and Rust also received correspondence from class members via USPS regarding address updates, as well as requests for information on the timing of settlement payments, and reissue requests. This included correspondence from non-class members seeking research on whether they were eligible for any payment.

5. In addition, Rust established and supported a toll-free number as well as a non-toll-free number for class members. These numbers allowed class members and non-class members to utilize interactive voice response and live operators to provide callers with pertinent information of the Young Insurance settlement.

6. Finally, Rust was responsible to issue class member payments, and receive, record and perform further skip-trace on undeliverable payments. Rust managed the reconcilement and tax reporting responsibility on behalf of the fund as well.

7. Rust had agreed to a cap on fees for the project, which were made based on assumptions from similar cases Rust had administered in the past, but which were ultimately estimates. This includes how much undeliverable mail from the initial notice we may expect to receive, and subsequently how many records need further skip tracing. We also estimate the number of calls we expect to receive and along with that the associated staffing to provide an adequate service level. We also estimate the number of class member communications we expect to receive. Further, we expect to receive undeliverable checks which also require skip tracing and other supporting work to achieve the highest possible check cashing rate. These are items that have a per piece cost, and require staff hours to coordinate and process.

8. Regarding undeliverable mail on the initial notice, Rust estimated $37,292 in cost, related to receiving undeliverable notices, performing the trace activities outlined above, and remailing notice. This assumed roughly 10% of notices would be undeliverable. Overall, the undeliverable rate was close to 40%. This not only increased the transactional costs to process the mail, it created downstream impacts in the number of traces that were required, notices that needed to be printed, and postage for those re-mails, which doubled the costs in this area. Most of the overage was print and postage, of which postage is a fixed cost.

9. Regarding class member correspondence, Rust anticipated a low need for class members to contact Rust, as there was no action needed for them to receive a payment. However, we received almost 12,000 pieces of correspondence for the project in total, all of which requires review, research and response. Rust had approximately $65,000 in time billed to the review, research and response to these class member inquiries.

DECLARATION OF JASON M. STINEHART RELATED TO SETTLEMENT COSTS

10. Regarding call center activities, Rust anticipated we would need to staff for roughly 1,000 hours for call center support, and use an automated system which should handle roughly 60% of the general class member inquiries. Rust ultimately received over 80,000 calls into the toll-free number, which was roughly 7 times more than what was anticipated. This also impacted the number of minutes that callers were active in the automated system, which were roughly 7 times more than anticipated as well. Total call center charges were approximately $665,000 in total to support class member inquiries.

11. Regarding class member payments, and specifically reissue processing, Rust anticipated many fewer undeliverable payments, considering the amount of work that went into delivering the initial notices to class members. We anticipated approximately $6,854 in total for reissue processing, and costs were closer to $36,300. We received over 11,000 undeliverable checks or approximately 10 times more than anticipated. This resulted in increased processing costs, including trace, print and ultimately more postage to re-mail payments.

12. These specific increases also added to the project management and technical management budgets as well. However, Rust was able to absorb much of the overage in these areas, either through efficiencies gained in other areas, or negotiating volume discounts with our vendors, where they could be obtained. Rust worked diligently throughout the project to maintain budget, and was either at or below the expected budget in the non-transactional areas that it could impact.

13. In summary, Rust was able to maintain costs close to budget in the areas it was able to impact, and was also able to absorb many of the large transactional overruns mentioned above, and still come in within less than 3% variance to the project cap.

## FUNDS REMAINING IN THE SETTLEMENT ACCOUNT

14. The current distribution account balance is approximately $783,129.61. Rust has $35,167.67 in billed work, which is beyond the project cap that was originally anticipated, but is less than 3% total

variance. Rust has continued to support class member inquiries and reissue requests costs to date, as part of the ongoing Young settlement which is expected to conclude in early 2022.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of March, 2022, in Minneapolis, MN.

*[signature]*
_____
JASON M. STINEHART